**Nos. 25-5150, 25-5151**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES, ET AL.,
Defendants-Appellants,

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES, ET AL.,
Defendants-Appellants,

On Appeal from the United States District Court
for the District of Columbia
Nos. 25-cv-907, 25-cv-966
The Hon. Royce C. Lamberth, U.S. District Judge

### RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS'
### EMERGENCY MOTION FOR A STAY PENDING APPEAL; AND
### EMERGENCY MOTION FOR EXPEDITED CONSIDERATION

Kristin Bateman*
Jennifer Fountain Connolly
Robin F. Thurston
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org

Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Plaintiffs-Appellees (additional counsel listed on inside cover)*

April 28, 2025

*Admitted in California only; practicing under the supervision of District of Columbia Bar members

Hailyn J. Chen
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave.,
   Fiftieth Floor
Los Angeles, CA 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn
MUNGER, TOLLES & OLSON LLP
560 Mission St.,
   Twenty-Seventh Floor
San Francisco, CA 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties**

All parties appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

**B.    Rulings under review**

References to the rulings at issue appear in the Brief for Defendants-Appellants.

**C.    Related cases**

This case has not previously been before this Court.  There are two related cases currently before this Court.  *See Widakuswara v. Lake*, 25-5144 (D.C. Cir.); *Abramowitz v. Lake*, 25-5145 (D.C. Cir.).  In addition, there are two related cases currently pending in the United States District Court for the District of Columbia.  *See RFE/RL, Inc. v. Lake*, 25-cv-799 (D.D.C.); *Open Technology Fund v. Lake*, 25-cv-840 (D.D.C.).


Dated:  April 28, 2025                     */s/ Donald B. Verrilli, Jr.*
                                                          Donald B. Verrilli, Jr.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................. iii

TABLE OF CONTENTS ............................................................................. iv

TABLE OF AUTHORITIES ......................................................................... v

GLOSSARY OF ABBREVIATIONS ......................................................... viii

INTRODUCTION ....................................................................................... 1

STATEMENT ............................................................................................. 5

    A.    Factual and Legal Background ....................................................... 5

    B.    Procedural Background ................................................................... 9

ARGUMENT ............................................................................................ 11

I.    The Government Is Not Likely to Succeed on the Merits................... 11

    A.    The District Court Had Jurisdiction to Enjoin the Unlawful Impoundment of the Networks' Funds. ...................................... 12

    B.    The Agency Is Violating Congress's Clear Directives. ............ 18

    C.    The Government's Other *Widakuswara* Arguments Do Not Apply Here. .................................................................................. 21

II.    The Remaining Stay Factors Compel Denying Any Stay................... 21

III.    The Court Should Expedite Its Adjudication of this Stay Motion. ..... 23

CONCLUSION ......................................................................................... 24

CERTIFICATE OF COMPLIANCE .......................................................... 25

CORPORATE DISCLOSURE STATEMENT ........................................... 26

CERTIFICATE OF SERVICE .................................................................. 27

# TABLE OF AUTHORITIES

PAGE(S)

FEDERAL CASES

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013)..............................................................2

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004)..............................................................12

*Alpine Sec. Corp. v. FINRA*,
    121 F.4th 1314 (D.C. Cir. 2024)........................................................21

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011)............................................................................17

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).....................................................12, 14, 15, 17, 18

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    904 F.3d 1014 (D.C. Cir. 2018)..........................................................12

*Crowley Gov't Servs, Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022)....................................................14, 17

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025).........................................................15, 16, 22

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)..............................................................16

*KalshiEX LLC v. CFTC*,
    119 F.4th 58 (D.C. Cir. 2024)............................................................11

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)..........................................................22, 23

*Md. Dep't of Hum. Res. v. HHS*,
    763 F.2d 1441 (D.C. Cir. 1985)..........................................................14

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982)................................................3, 13, 17

*Nat'l Ctr. for Mfg. Sciences v. United States*,
  114 F.3d 196 (Fed. Cir. 1997) ........................................................14

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................11

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017)........................................................13

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985)........................................................16

*Suburban Mortg. Assocs., Inc. v. HUD*,
  480 F.3d 1116 (Fed. Cir. 2007) ......................................................18

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006)....................................................17, 18

*Train v. City of New York*,
  420 U.S. 35 (1975)..........................................................................20

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992)....................................................13, 14

*Widakuswara v. Lake*,
  2025 WL 945869 (S.D.N.Y. Mar. 28, 2025)......................................9

**FEDERAL STATUTES**

22 U.S.C. § 6201 ..........................................................................5, 23

*22 U.S.C. § 6204(a)(5)................................................................6, 19

*22 U.S.C. § 6204(a)(6)................................................................6, 19

22 U.S.C. § 6208(a) ........................................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

22 U.S.C. § 6208(c)(5)..............................................................20

Pub. L. No. 103-236, 108 Stat. 382 (1994)................................5

Pub. L. No. 108-11, 117 Stat. 559 (2003)..............................5, 6

*Pub. L. No. 118-47, 138 Stat. 460 (2024)........................7, 18, 19

Pub. L. No. 119-4, 139 Stat. 9 (2025)........................................7

### OTHER AUTHORITIES

Allocate, Black's Law Dictionary (12th ed. 2024)................19, 20

Fed. R. App. P. 27(a)(2)(B) ......................................................9

Fed. R. App. P. 27(a)(3).............................................................9

Hearing of the Subcommittee on International Operations and
    Terrorism, Committee on Foreign Relations, "The Broadcasting
    Board of Governors: Finding the Right Media for the Message in
    the Middle East" at 1 (April 29, 2004) .................................6

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFC | Court of Federal Claims |
| FY | Fiscal Year |
| MBN | Middle East Broadcasting Networks, Inc. |
| RFA | Radio Free Asia |
| USAGM | United States Agency for Global Media |

# INTRODUCTION

This Court should deny the Government's motion for a stay because granting it would force Plaintiffs-Appellees Radio Free Asia ("RFA") and the Middle East Broadcasting Networks ("MBN," and collectively, the "Networks") out of existence before this Court has a chance to adjudicate the Government's appeal. On May 9—just days from now—RFA will be forced to terminate the vast majority of its staff and will exist in name only. MBN is on the brink of extinction; it cannot survive past May 31. The Networks' destruction would contravene Congress's clear statutory direction that the Executive Branch must provide appropriated funding to the Networks so that they can perform democracy-promoting functions with which Congress has entrusted them. It would also be deeply unjust. This Court should not permit the Executive Branch to destroy the Networks—whose existence and entitlement to funding Congress has reaffirmed again and again—by unlawfully refusing to disburse their funding and then preventing them from obtaining meaningful judicial relief before they are eliminated by the very actions they brought these lawsuits to challenge.

The Networks' case is narrow and straightforward. It concerns only whether the Executive may refuse, without any cause other than policy disagreement with Congress, to disburse appropriated funds to the Networks, notwithstanding Congress's unambiguous direction that specific sums "shall be allocated" by the

1

U.S. Agency for Global Media ("USAGM" or "Agency") directly to the Networks. The district court concluded that the Agency's "decision to cut all grant funding to the Networks directly violates congressional appropriations laws," as well as several constitutional provisions. Stay.Add.31; *see* Stay.Add.31-32.[1] That conclusion followed inexorably from this Court's precedent holding that although a "President sometimes has policy reasons … for wanting to spend less than the full amount appropriated by Congress," "even the President does not have unilateral authority to refuse to spend the funds" Congress has directed to named recipients. Stay.Add.31 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.)). The district court's preliminary injunction in the Networks' cases is tailored to enforce that ruling, requiring that the Agency return to disbursing the Networks' funding in the ordinary course. *See* RFA/MBN Stay.Add.1-2. These cases thus do not present the broader questions about the Executive's authority to reduce the Agency's workforce or supervise its staff that are at issue in the co-pending cases *Widakuswara v. Lake*, 25-5144, and *Abramowitz v. Lake*, 25-5145.

---

[1] Citations to "Stay.Add." are references to the Addendum to the Government's stay motion in *Widakuswara v. Lake*, 25-5144, and *Abramowitz v. Lake*, 25-5145. Citations to "RFA/MBN Stay.Add." are references to the Addendum filed by the Government in its stay application in the instant cases. Citations to "Add." are references to the addendum filed with this opposition.

The Government's motion does not come close to justifying a stay of the preliminary injunction in the Networks' cases. The Government barely disputes the merits of the Networks' statutory and constitutional entitlement to their appropriated funds. Stay.16.[2] It offers no statutory basis for the Agency to refuse Congress's command based on its decision to second-guess the "priorities" that Congress has chosen. Instead, the Government relies entirely on the argument that the Tucker Act deprived the district court of jurisdiction. Stay.11-18. That argument may have some force in cases where the plaintiff is a discretionary grantee whose only entitlement to funds is contractual, but it is borderline frivolous in *these* cases. The Networks are mandatory grantees with an express *statutory* entitlement to funds. This Court's precedents firmly establish that plaintiffs may vindicate statutory rights in federal court, regardless of whether those rights are implemented through a contract with the Government. *E.g.*, *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).

The equities here are equally one-sided. The Government suffers no cognizable harm from being enjoined, during the pendency of this appeal, to

---

[2] Citations to "Stay." are references to the Emergency Motion for an Administrative Stay and Partial Stay Pending Appeal filed by the Government in *Widakuswara* and *Abramowitz*. In the instant cases, the Government requests a stay pending appeal "for the reasons stated" in its *Widakuswara* and *Abramowitz* motions. RFA/MBN Stay.3-4. Accordingly, this opposition responds to the arguments in those motions.

disburse funding that Congress already earmarked for the Networks. Yet the Agency has ignored a temporary restraining order requiring restoration of the Networks' funding since *March 28*, driving the Networks to the brink of extinction. To survive, RFA must receive funding or else take extreme measures by May 9. MBN has already terminated the employment of over 500 people, but will not survive without funding past May 31. A stay of the district court's order would kill the Networks—the very unlawful outcome the Executive seeks to obtain —before they can defend the district court's injunction. This Court should not countenance that untenable and unfair result.

In all events, the Networks respectfully urge this Court to adjudicate the stay motion by Wednesday, April 30. That would leave the Networks approximately one week to seek vacatur of any stay in the Supreme Court before RFA must terminate hundreds of employees on May 9. Counsel for the Networks conferred with counsel for the Government regarding this request. The Government does not object to filing a reply brief tomorrow, April 29, provided that all plaintiffs in the related cases file their oppositions by 10:00 a.m. tomorrow morning. Plaintiffs in all related cases have either filed or agreed to file their oppositions by 10:00 a.m. tomorrow morning.

**STATEMENT**

**A.     Factual and Legal Background**

1.  For decades, RFA and MBN have provided independent, objective journalism to millions of people in countries that otherwise lack access to a free press.  Each was established as a private nonprofit entity following an Act of Congress declaring that "[i]t is the policy of the United States to promote the right of freedom of opinion and expression" and that "[i]t is in the interest of the United States to support broadcasting to other nations."  22 U.S.C. § 6201.

a.  RFA brings uncensored journalism to Asian countries that restrict free speech and freedom of the press.  Add.6.  It was established in 1996, after Congress called for a broadcasting service for "Asian nations whose people do not fully enjoy freedom of expression."  United States International Broadcasting Act. Pub. L. No. 103-236, Title III, § 309(b), 108 Stat. 382, 440 (1994).  RFA provides content in 10 languages and, at the start of this litigation, reached nearly 60 million people each week.  Add.6.  RFA helps hold accountable the Chinese Communist Party and other regimes by countering censorship and misinformation.  Add.6-7.

b.  MBN similarly brings uncensored journalism to Middle Eastern and North African countries.  Add.27.  It was established following the terrorist attacks of September 11, 2001.  *See* Pub. L. No. 108-11, 117 Stat. 559, 562 (2003) (appropriating funds "for activities related to the Middle East Television Network

broadcasting to the Middle East and radio broadcasting to Iraq").  From its

inception, MBN had the "enthusiastic support of President Bush and key leaders of

the Administration and Congress" and was a "key tool in the war on terrorist

attempts to spread hatred and intolerance."[3]

At the start of litigation, MBN reached approximately 34 million adults in 22

Arabic-speaking nations across the Middle East and North Africa.  Add.29.  MBN

has countered the anti-American propaganda of the Islamic State of Iraq and Syria.

Add.29.  In recent days, its channels have effectively gone dark.  Add.24.

2.  Each year since the Networks' inception, Congress has directed the

Executive Branch to disburse appropriated funds to the Networks to fulfill their

critical missions.  The International Broadcasting Act tasks the U.S. Agency for

Global Media with "allocat[ing] funds appropriated for international broadcasting

activities" and "mak[ing] and supervis[ing] grants … for broadcasting and related

activities."  22 U.S.C. § 6204(a)(5), (6).  In accordance with that statutory

responsibility, the Agency has made grants to RFA and MBN each year since their

inception.  Add.7, 30.  No other entity is authorized to disburse appropriated funds

---

[3] Hearing of the Subcommittee on International Operations and Terrorism,
Committee on Foreign Relations, "The Broadcasting Board of Governors: Finding
the Right Media for the Message in the Middle East" at 1, 6 (April 29, 2004).

to the Networks, both of which rely exclusively on appropriated funds. *See* Add.7, 30.

Congress sets the amount that must be allocated to RFA and MBN in annual appropriations legislation. In fiscal year 2024, Congress appropriated about $857 million to the Agency. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 735 (2024) ("2024 Appropriations Act"). The law specified that the Agency's appropriation "*shall* be allocated in accordance with the table" in an accompanying "explanatory statement." *Id*. (emphasis added). The referenced table "allocated" about $60 million to RFA and $100 million to MBN. Add.47. The appropriations act provides only one exception to that directive: "funds may be reprogrammed within and between amounts designated in [the] table," subject to congressional notification procedures, "except that no such reprogramming may reduce a designated amount by more than 5 percent." 2024 Appropriations Act, 138 Stat at 735. In other words, Congress expressly prohibited the Agency from denying either Network any more than 5% of its appropriated funding. Congress has extended the same funding directive for RFA and MBN in fiscal year 2025 through continuing resolutions. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101, 139 Stat. 9, 10-12 (2025).

3. On March 15, 2025, the Agency began impounding the very funds that Congress had commanded the Agency to disburse. The Agency sent each Network a one-page letter, signed by Defendant Kari Lake (the "Senior Advisor" to the Acting CEO of the Agency), terminating each Network's funding outright. Each letter provided the same reason: The grant award "no longer effectuates agency priorities." Add.15, 42. Each letter invoked an Executive Order "mandating that the USAGM eliminate all non-statutorily required activities and functions," but contained no further explanation. Add.15,42.

In the normal course, each Network receives a monthly allotment of its funding from the Agency around the start of each month. Add.4-5, 7-8, 25-26, 30. The Networks have not yet received their April funding. Add.2, 22. The impoundment of the Networks' funds has produced dire financial consequences. If RFA does not receive funding by May 9, it will be forced out of existence unless it terminates approximately 340 employees—leaving behind a shell with "even more minimal broadcasting," facing "bankruptcy in late summer." Add.2. MBN has already terminated the employment of 514 individuals (more than 90% of its workforce); it urgently needs funds, without which it cannot survive past May 31. Add.21-22.[4]

---

[4] The Networks have provided up-to-date financial information in accompanying declarations executed yesterday. *See* Add.1-3 (RFA); Add.21-23 (MBN). The

## B. Procedural Background

On March 27, RFA filed suit and on March 28, it moved for a temporary restraining order to halt the Agency's unlawful impoundment. Compl., *RFA*, 25-cv-907 (D.D.C.), ECF No. 1; Mot. TRO, *RFA*, 25-cv-907 (D.D.C.), ECF No. 12. On April 1, MBN filed suit. Compl., *MBN*, 25-cv-966 (D.D.C.), ECF No. 1.

Shortly thereafter, Government counsel represented that the Agency considered the Networks' grant terminations "suspended" pursuant to a March 28 temporary restraining order entered in *Widakuswara v. Lake*, 2025 WL 945869, at *1 (S.D.N.Y. Mar. 28, 2025). Based on that representation, and related representations that the Agency planned to expeditiously disburse funds, the Networks made multiple unsuccessful attempts to reach an out-of-court resolution with the Government.

On April 8, the Government moved to vacate the *Widakuswara* TRO. Mot. Vacate, *Widakuswara*, 25-cv-1015 (D.D.C.), ECF No. 73. On April 9, MBN moved for a preliminary injunction. Mot. PI, *MBN*, 25-cv-966 (D.D.C.), ECF No. 11. The district court contemporaneously agreed to treat RFA's pending motion as

---

addendum also includes prior declarations submitted in district court. That includes supplemental declarations that the district court did not expressly grant leave to file, but that were filed and provided to the Government. All are properly before this Court. *See* Fed.R.App.P.27(a)(2)(B), (a)(3).

a motion for a preliminary injunction and to permit the Networks to jointly brief their motions. *See* Min. Order, *RFA*, 25-cv-907 (D.D.C. Apr. 10, 2025).

On April 17, the district court held a hearing in *Widakuswara* and related case *Abramowitz v. Lake*, 25-cv-887. Those cases, unlike this one, challenge the Government's efforts to dismantle the Agency more broadly, including both the Agency's reductions in force and its terminations of funding, including to RFA and MBN. *See* Mem. Op. at 1, *Widakuswara*, 25-cv-1015 (D.D.C. Apr. 22, 2025), ECF. No. 98. On April 22, the district court entered a preliminary injunction in *Widakuswara*. The court held that the plaintiffs were likely to show that the Agency's dismantling efforts were unlawful and, as relevant here, that the Agency's termination of the Networks' grants violated the International Broadcasting Act and appropriations statutes, as well as the Take Care Clause and separation-of-powers principles. Stay.Add.30-32. The injunction required the defendants to reverse the dismantling, and also enjoined the defendants from maintaining their termination of the Networks' funding. Stay.Add.1-2.

On April 24, the Networks each moved for a preliminary injunction based on the court's *Widakuswara* decision, which had effectively resolved the Networks' statutory and constitutional claims in their favor. *E.g.*, Mot. to Enter Order, *RFA*, 25-cv-907 (D.D.C.), ECF. No. 24. The court granted the motions and ordered the

Government "to restore the FY2025 grants with" each Network.  RFA/MBN Stay.Add.2.

The Government appealed, and now seeks a stay "for the reasons stated in its emergency motion in *Widakuswara* and *Abramowitz*."  RFA/MBN Stay.4.

## ARGUMENT

"A stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted).  Four factors guide the decision whether to take that exceptional action:  "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Id.* at 433-34.  The Government falls far short of bearing that burden.

## I.     The Government Is Not Likely to Succeed on the Merits.

The Agency is flagrantly violating an unambiguous statutory directive that it "shall" allocate specified sums of appropriated funds to the Networks.  Contrary to the Government's primary contention, federal district courts have jurisdiction to enjoin this blatant violation of Congress's command.  The Government's failure to

show any likelihood of success—let alone a "substantial" likelihood—is a "fatal flaw for [its] stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1018-19 (D.C. Cir. 2018) (citation omitted).

### A.    The District Court Had Jurisdiction to Enjoin the Unlawful Impoundment of the Networks' Funds.

The Government's stay application makes only one argument as to the Networks:  that the Tucker Act deprived the district court of jurisdiction.  Stay.11-18.  Drawing from inapposite cases holding that *discretionary* grantees must bring their *contract* claims in the Court of Federal Claims ("CFC"), the Government argues that the *mandatory* grantees in this case must bring their *statutory and constitutional* claims there as well.  The Government is wrong.

1.  At the outset, the Government continually conflates jurisdiction with the merits.  Jurisdiction turns on whether the Networks bring "essentially a contract action," which the Tucker Act diverts exclusively to the CFC, *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), or whether they are instead seeking to "enforce [a] statutory mandate," which district courts can and do routinely adjudicate, *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988).  Throughout, however, the Government argues that the district court lacks jurisdiction because the Networks do not in fact have a statutory entitlement to funding.  The Government is wrong; the Networks unquestionably

have a statutory entitlement to their funds.  *See* Part I.B, *infra*.  But in all events,

whether the Networks are correct about that goes to the merits, not jurisdiction.

Properly understood, the jurisdictional question is determined by two

considerations:  (1) "the source of the rights upon which the plaintiff *bases* its

*claims*" and (2) "the type of relief *sought* (or appropriate)."  *Megapulse*, 672 F.2d

at 968 (emphases added); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C.

Cir. 2017) (jurisdiction turns on source upon which plaintiff "*bases* its claims"

(emphasis added) (citation omitted)).  Both considerations self-evidently support

the district court's jurisdiction.

First, the Networks' claims are not "founded *only* on a contract," but instead

"stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of

Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added),

*overruled on other grounds by Perry Cap.*, 864 F.3d at 620.  It is a *statute* that

provides that the Networks "shall be allocated" specified sums of appropriated

funds.  It is a *statute* that commands the Agency to effectuate that direction through

grant agreements.  And it is a *statute* that prohibits the Agency from disbursing any

less than Congress specified, subject to tightly circumscribed reprogramming

authority that the Agency has not invoked.  The Networks base their claims on

those *statutory* protections—not any provision of their individual grant

agreements. Indeed, the Networks would have the exact same claims even if no grant agreements existed.

Second, the type of relief sought requires district court adjudication. The inquiry "boils down to whether the plaintiff effectively seeks to attain monetary damages." *Crowley Gov't Servs, Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022); *see Bowen*, 487 U.S. at 895. The Networks plainly do not. They sought (and obtained) an injunction that halts the Agency's unlawful refusal to follow Congress's funding directive and governs the parties' relationship going forward. *See Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses . . . suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) ("[Plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages.'"); *Transohio*, 967 F.2d at 611 (courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract"). That is prospective relief that would be

wholly unavailable in the CFC. *See Bowen*, 487 U.S. at 905.[5]  The Networks' suits

therefore fell within the district court's jurisdiction.

2.  The Government nonetheless insists that the Supreme Court's stay order

in *Department of Education v. California*, 145 S. Ct. 966 (2025), resolves this case

in its favor.  In fact, *California* confirms the existence of jurisdiction here.

The plaintiffs in *California* were discretionary grantees who did not allege

that the termination of their grants violated *any statute*.  Mem. ISO Mot. for TRO

at 16-23, *California v. Dep't of Educ.*, 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF

No. 7.  No statute specified that the plaintiff grantees were entitled to specified

sums of appropriated funds; rather, any entitlement arose solely from grant

agreements with the government following a competitive process.  The plaintiffs

therefore contended that the "terms and conditions of [their] grant awards d[id] not

permit termination on the grounds" the government had invoked, rendering the

termination arbitrary under the APA.  *Id*.  The Court concluded that the plaintiffs

_____

[5] The Government mischaracterizes the relief granted.  It is incorrect that the order
under review "direct[ed] the Agency to release approximately $15 million in
taxpayer funds in short order."  Stay.2.  The order enjoined the Government to
return to the status quo preceding the unlawful March 15 termination, without
"purport[ing] to state what amount of money, if any, was owed."  *Bowen*, 487 U.S.
at 888.  A "district court's jurisdiction 'is not barred by the possibility' that an
order setting aside an agency's action may result in the disbursement of funds."
*Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (quoting *Bowen*, 487 U.S.
at 910).

15

sought to "enforce a contractual obligation to pay money," notwithstanding their invocation of the APA. *California*, 145 S. Ct. at 968 (citation omitted).

That conclusion broke no new ground; it is instead entirely consistent with this Court's decision in *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985). There, the Air Force awarded a procurement contract to the plaintiff, who then challenged the termination of the contract as arbitrary and capricious under the APA. Because the plaintiff did not allege any statutory or constitutional entitlement to sell air compressors to the Air Force, the APA arbitrariness claim was at its core a complaint that "the contract forbids termination under th[e] conditions" presented. *Id.* at 78. The throughline in *California* and *Ingersoll-Rand* is clear: Plaintiffs cannot engage in "artful pleading" under the APA (Stay.18) to avoid Tucker Act jurisdiction when their entitlement to funds is contractual.

Here, in vivid contrast, Congress has designated the Networks as mandatory grantees that *must* receive appropriated funds. The Networks thus base their claims on *Congress's* direction that RFA and MBN *in particular* must receive specified sums. Indeed, the Networks would have the very same statutory and constitutional claims *even if the Agency had refused to enter into grant agreements altogether.* The Networks' claims thus "exist[] prior to and apart from rights created under [their] contract[s]." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

3.  The Government next argues that because Congress required "the execution of a grant agreement" to disburse the Networks' appropriated funds, *any* claim by the Networks is necessarily contractual.  Stay.16.

But this Court has already "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract.'"  *Crowley*, 38 F.4th at 1107 (citation omitted).  That makes sense: Congress often directs the Executive Branch to use contracts to implement a statute, but the Supreme Court has held that such contracts do not transform claims under the statutory scheme into contract claims.  *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011); *Megapulse*, 672 F.2d at 967-68.  The Agency's use of grant agreements to oversee the disbursement of the Networks' funding therefore does not alter the fact that the Networks' claims are based on Congress's statutory funding direction.

The Government's argument would also produce untenable consequences. The CFC "does not have the general equitable powers of a district court to grant prospective relief."  *Bowen*, 487 U.S. at 905.  Under the Government's view, a plaintiff subjected to flagrantly unlawful government conduct could not receive any injunctive protection, merely because of the existence of a contract. Unsurprisingly, this Court has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no

jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).[6]

4. Finally, grasping at straws, the Government asserts that the "mere fact that the grants are made using appropriated funds does not distinguish this circumstance from virtually any other government contract." Stay.17. But that argument attacks an obvious strawman. The Networks' argument is not based on the "mere fact" that they receive appropriated funds. It is based on the critical facts that their claims are based on statute and they do not seek money damages.

**B.      The Agency Is Violating Congress's Clear Directives.**

The Government hardly disputes the district court's conclusion that the Agency is violating Congress's statutory command. For good reason. Congress could not have been clearer that the funds it appropriated for the Networks "shall be allocated" to the Networks. That the Agency has different "priorities" than Congress is no excuse for failing to follow this express directive. To the contrary, it is a blatant violation of the separation of powers.

1. Congress appropriated approximately $60 million to RFA and $100 million to MBN for fiscal year 2025, directing that those funds "shall be allocated"

---

[6] By the same token, the "naked money judgment" that is the sole remedy available in the CFC is not an "adequate substitute for prospective relief" governing the "ongoing relationship between the parties." *Bowen*, 487 U.S. at 905. The Networks seek "injunctive relief to modify the Government's *future* obligations." *Suburban Mortg. Assocs., Inc. v. HUD*, 480 F.3d 1116, 1127 (Fed. Cir. 2007).

to the Networks. 2024 Appropriations Act, 138 Stat. 460, 735. Critically, Congress mandated that the Agency provide each Network substantially all of its appropriated funds, prohibiting the Agency from reprogramming more than 5% of either Network's funding to different programs. *Id.* As the Government concedes, Congress further "instruct[ed] the Agency to exercise its grantmaking authority" to disburse the Networks' funds. Stay.15; *see* 22 U.S.C. § 6204(a)(6) (Agency to "allocate funds appropriated for international broadcasting" to the Networks); *id.* § 6204(a)(5) (Agency to "make and supervise grants" to the Networks). As to RFA, Congress has further specified that such grants "shall be available to make annual grants." 22 U.S.C. § 6208(a). The law is clear: Congress required the Agency to provide the Networks their appropriated funds.

2. Buried within the Government's Tucker Act argument are two statutory points that warrant a response.

First, the Government asserts that the Agency has "complied" with all "statutory requirement[s]" because "it is undisputed that the funds were allocated and obligated to Radio Free Asia and Middle East Broadcasting Networks in accordance with the appropriations table and made available via the grant agreements." Nonsense. The Networks most certainly *do* dispute that the funds specified by Congress have been "allocated" to them as Congress required. In the appropriations context, "allocate" means "distribute," plain and simple. *See*

19

Allocate, Black's Law Dictionary (12th ed. 2024) ("distribute"); *Train v. City of New York*, 420 U.S. 35, 43 n.9 (1975) ("allocate" means the same as "allot," which requires expenditure). The Networks' funds have not been distributed; they are *frozen*. If the Government is relying on some other meaning of "allocate," that doublespeak is belied by both Black's Law Dictionary and Supreme Court precedent. If the Government is suggesting that the Agency complies with the statute as long as it enters into grant agreements, even if it terminates them the next day, the argument is absurd. Congress's direction would not be worth the paper on which it was printed.

Second, the Government raises the specter that the Agency would be "without recourse" to react to "egregious" misconduct by the Networks. Stay.17. Not at all. The Networks argue only that the Agency cannot terminate their grant awards simply because it has different "priorities" than Congress. The Agency has ample authority to ensure that the funds Congress appropriated are used consistent with statutory purposes. *See, e.g.*, 22 U.S.C. § 6208(c)(5) (failure to use funds "for activities consistent with this section," "shall permit the grant to be terminated"). The Agency has not attempted to invoke such authority here—because it has no grounds to do so.

**C.   The Government's Other *Widakuswara* Arguments Do Not Apply Here.**

The Government's remaining arguments have no bearing on the Networks' cases. The Government's complaint that RFA and MBN are not plaintiffs in *Widakuswara*, Stay.11 n.1, has been overtaken by entry of the injunctions in these cases. The Government also argues that the district court erred in *Widakuswara* by ordering the reinstatement of Agency employees and contractors. Stay.18-23. But those arguments do not undercut the Networks' statutory entitlement to their funding. Even if the Court agreed entirely with those arguments, a stay would still not be warranted in the Networks' cases.

**II.   The Remaining Stay Factors Compel Denying Any Stay.**

1. The difference in irreparable harm as between the parties could not be more stark. If this Court grants a stay, the Networks will cease to exist before the appeal can be adjudicated. If the Court rejects the stay, the Government will make payments that Congress has expressly directed, in accordance with decades of practice. The vast disparity in relative harms is reason enough to deny the stay. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1330 (D.C. Cir. 2024) (equity favors allowing a party to "fully litigate[]" its claims "without being throttled by a shutdown of its business").

Defendants argue that they will be irreparably harmed without a stay because "fifteen million dollars of taxpayer money will be irrevocably lost."

Stay.24. That claimed harm pales in comparison to the death sentence the Networks face if a stay is granted. And if the Government fears the Networks cannot "promise" to return funds (Stay.23), that is a problem of its own making. Having been forced to the brink of bankruptcy, the Networks will have no choice but to immediately spend the funds they receive. The Government should not be heard to complain about a situation that the Government itself created. In any event, to address the Government's apparent concern, the Networks would of course consent to a schedule that resolves this appeal expeditiously.

The Government (again) invokes *California*, but (again) it does not assist. In that case, the grantees "represented in th[e] litigation that they have the financial wherewithal to keep their programs running," so the equitable stay factors tipped in the Government's favor. 145 S. Ct. at 969. Here, the opposite is true. Even with the drastic steps both Networks have taken—including mass furloughs and layoffs—neither Network has sufficient funds to last through this litigation. *See* p. 8, *supra*. The Government's assurance that the Networks "will receive funds to the extent required by law" at the end of litigation (Stay.25) is thus meaningless—and indeed lays bare the Government's objective to render its decision to override Congress's policy directives a *fait accompli* without ever being held to account for its unlawful conduct.

2.   The balance of equities and public interest also decidedly weigh against a stay.  "There is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  By contrast, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Id.* (citation omitted).  Moreover, Congress has decided that it is in the public interest to fund the Networks' work because "[i]t is the policy of the United States to promote the right of freedom of opinion and expression" and "[i]t is in the interest of the United States to support broadcasting to other nations."  22 U.S.C. § 6201.  A stay would leave those missions unfulfilled for the first time in decades.

## III.   The Court Should Expedite Its Adjudication of this Stay Motion.

The Networks respectfully urge this Court to adjudicate the stay motion by April 30.  That would leave one week for the Networks to seek vacatur of any stay in the Supreme Court before May 9.

## CONCLUSION

The Court should deny a stay.

Dated April 28, 2025

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*

Kristin Bateman*
Jennifer Fountain Connolly
Robin F. Thurston
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jconnolly@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Hailyn J. Chen
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave.,
  Fiftieth Floor
Los Angeles, CA 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn
MUNGER, TOLLES & OLSON LLP
560 Mission St.,
  Twenty-Seventh Floor
San Francisco, CA 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

*Counsel for Plaintiffs-Appellees*

*Admitted in California only; practicing under the supervision of District of
Columbia Bar members

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,167 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Cir. Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 28, 2025

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, I state that neither Radio Free Asia nor Middle East Broadcasting Networks, Inc., has any parent company and that no publicly held company has a 10% or greater ownership interest in either entity.

Dated:  April 28, 2025 *_/s/ Donald B. Verrilli, Jr._*

Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I certify that on April 28, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.

Dated: April 28, 2025

*/s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.

# ADDENDUM

# TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 27(a)(3)(A)**

*RFA*: Second Supplemental Declaration of Kevin W. Fleming (April 27, 2025) ...............................................................Add. 1

*RFA*: Supplemental Declaration of Kevin W. Fleming (April 16, 2025) ...............................................................Add. 4

*RFA*: Declaration of Kevin W. Fleming (March 28, 2025)...........................Add. 6

*RFA*: Declaration of Tamara Sabljak Bralo (March 28, 2025).....................Add. 17


*MBN*: Second Supplemental Declaration of Deirdre Kline (April 27, 2025) .............................................................Add. 21

*MBN*: Supplemental Declaration of Deirdre Kline (April 16, 2025) .............................................................Add. 24

*MBN*: Declaration of Deirdre Kline (April 9, 2025) ...................................Add. 27


Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024)................................Add. 46

## Second Supplemental Declaration of Kevin W. Fleming

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      This declaration supplements my March 28 and April 16, 2025, declarations with an updated snapshot of RFA's current finances.

3.      In my April 16 declaration, I explained that RFA had furloughed 250 employees (78% of its U.S.-based staff); that RFA had stopped accepting work from stringers around the world; and that RFA had terminated or suspended 95% of independent contractor agreements for domestic and international freelance journalists.

4.      Since then, RFA's situation has grown more dire.

5.      In addition to the actions listed above, we have now suspended 100% of temporary staff and 20% of international staff.  Those measures were necessary in order to conserve funds so that RFA could continue to pay out money associated with employment terminations, like accrued leave.  RFA continues to try to protect its staff during this difficult time.

6.      As a result of the measures described above, RFA has been unable to generate content and programming on air and online as it previously did.  Due to RFA's drastically reduced staffing levels, there has been no new content produced from multiple editorial divisions.  Currently, radio programming has been reduced by approximately 89%.  RFA now broadcasts just seven hours *per week*.  Online, RFA's written content is down by 48% and its video content is down by 60%.  The impact on programming will become only more pronounced in the coming weeks, with four additional language services expected to go dark in May, as RFA continues to preserve as much cash as possible.

7.      In my April 16 declaration, I explained that RFA had $12 million cash on hand.  That figure is now $10 million.

8.      Based on our funds, I initially projected that RFA would have enough money to stay afloat through May 16, 2025.  Since then, RFA made the decision to retain certain key staff members who are visa holders for as long as possible.  RFA also calculated that in order to pay for health insurance for all furloughed staff, and cover some critical operational costs, it would need to move ahead with layoffs one week earlier than planned.  RFA now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures.

9.      On May 9, 2025, RFA will be forced to lay off the approximately 340 people it employs in the United States and abroad.  That is 90% of the entire organization.

10.     After May 9, RFA will exist in name only.  There will be even fewer staff left, even more minimal broadcasting, and RFA likely will be looking at bankruptcy in late summer 2025.  Even before then, however, it will default on its bills and certain employee-related obligations.

11.     On April 18, 2025, RFA wrote to USAGM's Chief Financial Officer to follow up on RFA's April drawdown request.  RFA specifically noted that its "April funding drawdown request remains pending."  RFA reminded USAGM that USAGM's March 15, 2025 "termination" of RFA's grant had been enjoined, and that its current grant agreement (which USAGM signed on January 16, 2025) therefore was operative.

12.     On April 24, 2025, RFA wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from January "is operative" and that "RFA is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

13.     RFA specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

14.     To date, RFA has not received its April funds, which ordinarily it would have received within the first week of April.  It is now nearly May, and RFA is running on fumes.

15.     For the reasons I previously explained, if May 9, passes without RFA's funding restored, it will be extremely difficult—if not impossible—for RFA to ever again resume its work, given the reputational and network impacts previously explained.

16.     As I previously explained, certainty of funding is critical to RFA's operation and financial management.  At the outset of the fiscal year, RFA creates an annual budget and financial plan by month based on the total annual appropriation amount.

17.     RFA can function only if it receives its funding at regular, predictable intervals.  RFA's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

18.     RFA's conservative fiscal management and the steps outlined above have allowed it to survive at reduced operating levels despite not receiving its April funding, but it will not be able to survive for much longer.  Already the organization has suffered irreparable harm.  After May 9, 2025, the organization will effectively cease to exist as it once did.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 27 day of April, 2025.


Kevin W. Fleming (Apr 27, 2025 18:11 EDT)

Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

**Add. 3**

## Supplemental Declaration of Kevin W. Fleming

1.    I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.    This declaration supplements my March 28, 2025, declaration with an updated snapshot of RFA's current finances.

3.    Since March 15, 2025, RFA has taken a number of steps to conserve funds, including belt-tightening measures, like furloughing over 250 employees (78% of its U.S.-based staff).  RFA has also stopped accepting work from stringers around the world and has terminated or suspended 93% of its independent contractor agreements for domestic and international freelance journalists.

4.    At present, RFA has approximately $12 million cash on hand.  That is not enough money to last past May 16, 2025, given RFA's obligations to pay employees their salary and benefits and to make mandatory payments on leases and vendor contracts, in addition to severance owed to union members.

5.    RFA can extend the date of its extinction only by taking steps like furloughing the remaining 22% of its domestic staff and ultimately laying off the approximately 300 people it employs in the United States and abroad.

6.    But, if RFA takes those steps, it will exist only as a shell of its former self.  It will be operated by a skeleton staff, be in default or delinquent on a number of leases, and be forced to stop broadcasting in the majority of its active countries altogether.  At that point, RFA's creditors will no doubt seek to recoup their funds, and RFA likely will be forced into bankruptcy.

7.    In that barebones state, RFA will be able to survive a few months more, until it would have to file for bankruptcy in late summer 2025.

8.    If May 16, 2025, passes without RFA's funding restored, it will be extremely difficult—if not impossible—for RFA to ever again resume its work given the reputational and network impacts discussed in my first declaration, in addition to the very real (and growing) prospect of bankruptcy.

9.    Certainty of funding is critical to RFA's operation and financial management.  At the outset of the fiscal year, RFA creates an annual budget and financial plan by month based on the total annual appropriation amount.

10.    RFA can function only if it receives its funding at regular, predictable intervals.  RFA's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

1

11.    In the past, RFA and USAGM have taken up to five months negotiating RFA's annual grant agreement.  For example, they negotiated the fiscal year 2025 grant agreement, which USAGM terminated on March 15, 2025, from August 2024 until January 2025.  During the pendency of those negotiations, USAGM continued to disburse to RFA its appropriated funds, for the simple reason that without regular disbursements, RFA cannot function.

12.    Since 2024, RFA has spent approximately $5 million per month on expenses like lease payments, vendor payments, payroll, health insurance, utilities, and other basic operating expenses.

13.    The last time that RFA received a drawdown of its annual appropriation was on April 9, 2025, when RFA received approximately $4.63 million.

14.    That payment was too little, too late—those funds belatedly covered RFA's March operating expenses.  But RFA is still waiting on its April funding, which it historically has received within the first week of the month.

15.    RFA's conservative fiscal management and the steps outlined above have allowed it to survive at reduced operating levels despite not receiving its April funding, but it cannot survive past May 16, 2025, without taking drastic steps that will irreparably harm the organization and its future.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _16_ day of April, 2025.


_____
Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

2

**Add. 5**

## Declaration of Kevin W. Fleming

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      RFA is a private, not-for-profit organization incorporated in the District of Columbia with tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. RFA's registered address and corporate headquarters is 2025 M Street NW in Washington, D.C.

## A.      RFA Background

3.      RFA is a self-governing, independent, nonpartisan, not-for-profit news organization.  Over the course of its nearly 30 years of existence, RFA has developed into one of the most comprehensive news operations in the world, broadcasting in ten languages, with staff across 34 countries in Asia and reaching more than 60 million people each week. Since its inception in 1994, RFA has been funded by the U.S. government through federal grants from the United States Agency for Global Media (USAGM) and its predecessor.

4.      After Congress enacted the U.S. International Broadcasting Act to fund independent journalism as a means of providing independent, accurate news to counter the harmful propaganda of America's adversaries, Congress recognized that some of the most repressive regimes in the world were found in Asia.  In response, Congress created RFA. Congress mandated that RFA's mission would be to "provide accurate and timely information, news, and commentary about events in Asia and elsewhere" and serve as a "forum" to "Asian nations whose people do not fully enjoy freedom of expression."  22 U.S.C. § 6208(b).

5.      Consistent with that mission, RFA promotes democratic values by providing accurate, uncensored news and a forum for open debate in Asian countries where citizens do not enjoy full freedom of expression and where local media is controlled by the state or otherwise not independent.  Since its inception, RFA has provided a counterbalance to the Chinese Communist Party (CCP) and other government-controlled media.  It has exposed egregious human rights abuses like the Uyghur genocide in Xinjiang, in addition to providing breakthrough coverage of the CCP's cover-up of COVID-19 fatalities, the unfolding crisis in Myanmar since the 2021 coup, and the journeys of North Korean defectors.  RFA's work is based on the conviction that the first requirement of democracy is a well-informed citizenry,

**Add. 6**

and its reporting has won prestigious awards and been cited by major media outlets and publications.

6. For almost three decades, RFA has, without interruption, fulfilled its statutory purpose by providing individuals in countries across Asia, including China, Burma, Cambodia, Laos, Vietnam, and North Korea, access to accurate and timely information, news, and commentary about events in Asia and elsewhere.

7. It has taken years for RFA to develop the structure, expertise, goodwill, and trust to operate in 10 languages and 34 countries, many of which have governments that are unfriendly to the United States.

8. Today, RFA has over 400 employees, in addition to hundreds of journalists, stringers (freelance journalists), and contractors, and it has offices overseas in Taipei, Bangkok, Seoul, Istanbul, and Dharamsala.

## B.    RFA's Funding Structure

9. Congress formally established funding for RFA in 1994. Since then, Congress has appropriated funding for RFA every year.

10. One hundred percent of RFA's funding comes from its annual congressional appropriation. Without its congressionally appropriated funding, RFA cannot continue to operate and will be forced to shut down permanently.

11. Every year, RFA enters into a grant agreement with USAGM; the agreements award funds on an ongoing basis as they are appropriated, whether by annual appropriations acts or continuing resolutions.

12. In addition,, during years when Congress has made a full-year appropriation, USAGM requests, and RFA provides, an annual program plan that describes RFA's plans for the coming fiscal year along with a corresponding monthly cost breakdown. Typically, during the last week of a month, USAGM requests a monthly plan from RFA for the upcoming month. On rare occasions, USAGM has requested monthly plans for three months at a time.

13. Once the congressionally appropriated funds are obligated via a grant agreement, USAGM is responsible for disbursing funds to RFA. RFA generally receives

**Add. 7**

funds on a month-to-month basis. At the end of a month, RFA makes a letter drawdown request for the upcoming month. In the ordinary course, USAGM acknowledges receipt and causes the funds to be transferred to RFA's bank account by the Department of Treasury. RFA usually receives funding the first week of the new month.

## C.    USAGM's Refusal to Provide RFA's Congressionally Appropriated Funding

14.    For fiscal year 2024, Congress appropriated $60,830,000 to RFA in the Further Consolidated Appropriations Act of 2024

15.    On September 26, 2024, Congress passed a continuing resolution appropriating amounts for fiscal year 2025 from October 1, 2024, to December 20, 2024, at the same funding levels for fiscal year 2024 ($60,830,000). USAGM subsequently executed a grant agreement amendment (FAIN: 1065-25-GO-00001) on October 10, 2024, obligating $11,663,384 for RFA for October and November 2024. RFA received $5,830,182 of those funds on October 14, 2024, and $5,833,202 of those funds on November 13, 2024.

16.    On December 21, 2024, Congress passed another continuing resolution appropriating funding for fiscal year 2025 (from December 21, 2024, to March 14, 2025), at the same funding levels as for fiscal year 2024.

17.    Before then, in August 2024, USAGM and RFA had begun the usual process for executing a new grant agreement for fiscal year 2025. From August 2024 to January 2025, RFA and USAGM exchanged edits and revisions to the grant agreement. On January 16, 2025, the fiscal year 2025 grant agreement (FAIN: 1065-25-GO-00001) was executed. USAGM obligated $13,451,372 of the appropriated amount to RFA through February 28, 2025. On January 21, 2025, RFA received those funds, representing $5,882,510 for December 2024, $5,785,964 for January 2025, and $1,782,898 for February 2025.

18.    At the end of February 2025, RFA tried to ensure that USAGM would grant and disburse the remaining funding that had been appropriated for its use in the Second Continuing Resolution for the period through March 14, 2025. In response, USAGM represented that it would provide funds for the March 1 through 14 period once funds for all of March had been appropriated by Congress, but it still has not done so. USAGM's stated reason for not disbursing those funds was that it typically prefers not to disburse partial-month payments to grantees. On March 13, 2025, USAGM sent RFA an amended grant agreement for the month of March and requested that RFA submit a funding request for March 1 through 31, 2025. The agreement would have awarded RFA an additional

$4,631,068, bringing its total for Fiscal Year 2025 to $29,745,824. RFA's president signed the agreement on March 13, 2025.

19.     USAGM did not, however, countersign or disburse any money to RFA for the period of March 1 through 31, 2025. After RFA's president signed the amended grant agreement for March 2025, the finance team at USAGM assured RFA staff that Victor Morales, the acting CEO of USAGM, would soon counter-sign the agreement, but he never did so.

20.     At the same time on March 13, 2025, RFA requested disbursements for the month of March. RFA submitted the required documentation to USAGM at that time as well. However, USAGM never fulfilled this request, despite confirming receipt of RFA's March 13 request.

21.     On March 14, 2025, Congress passed a continuing resolution appropriating funding for RFA for the remainder of fiscal year 2025, from March 15, 2025 to September 30, 2025, at the same levels as fiscal year 2024. As a proportion of the fiscal year 2024 level specified ($60,608,145), the appropriated amount is $35,493,389 for RFA for the period of March through September 2025. USAGM failed to take any steps to provide RFA its funding even after it was appropriated.

22.     On March 15, 2025, RFA received a letter from Kari Lake, Senior Advisor to the CEO of USAGM, purporting to terminate RFA's grant agreement because the "award no longer effectuates agency priorities." The letter cited a March 14 Executive Order, which provided that the "non-statutory components and functions of" specified agencies, including USAGM, "shall be eliminated to the maximum extent consistent with applicable law." A true and correct copy of that letter is attached as Exhibit 1 to this Declaration.

23.     Lake's March 15 letter advised that RFA could "object to or challenge" the termination decision via an appeal addressed to Lake. RFA submitted such an appeal on March 19, 2025. The letter argued that USAGM's "unilateral termination" of RFA's grant lacked any "basis in law or fact" and violated both federal statutes and the U.S. Constitution. On March 20, a USAGM official informed me that Lake said she would not be responding to that appeal.

24.     The letter RFA received on March 15 purported to terminate RFA's grant agreement with USAGM effective immediately. *See* Ex. 1. The total outstanding amount that Congress has appropriated to RFA, but that USAGM has refused to provide is

$4,631,068 for the month of March.  USAGM's refusal to disburse funds in this manner is without precedent in RFA's history.

25.    The letter also instructed RFA that it needed to commence its closeout "responsibilities as set forth in 2 C.F.R. § 200.344-46" immediately.  The letter threatened RFA with "appropriate enforcement actions" for failure to comply.  RFA estimates that complying with those procedures would cost more than $50 million.  That amount consists of (1) breaking numerous commercial leases in seven countries, including RFA's lease at its Washington, D.C. headquarters ($17,824,479.49); (2) terminating RFA's contracts with vendors around the world ($800,000) (3) terminating and paying severance for hundreds of employees, stringers, and contractors across 34 countries, including (a) RFA's union employees who are covered by a collective bargaining agreement, (b) RFA's staff in foreign countries, (c) RFA's contractors, and (d) RFA's non-union employees ($32,515,933); and (3) emergency relocation services for the 33 employees currently working on H1B visas ($218,300).  Because USAGM is currently withholding RFA's congressionally appropriated funding and will not release RFA from its closeout obligations while the merits of RFA's injunction are resolved, there is no way for RFA to accomplish this.

## D.    Without Appropriated Funds, RFA Will Be Forced out of Existence

26.    Due to the lack of funding for March, RFA has furloughed over 200 employees, or 75% of its U.S.-based staff, has stopped accepting work from stringers around the world because of any inability to compensate them, and has terminated or suspended 93% of independent contractor agreements for domestic and international freelance journalists.  While RFA has some savings to pay its employees' health insurance through April, absent any additional funding, RFA will have no choice but to close the vast majority of its operations at the end of that month.  This process will involve terminating all RFA's contracts with freelance journalists, terminating its leases and contracts, and laying off staff. Without its congressionally appropriated funds, RFA will be forced to stop the vast majority of its journalistic work and may ultimately cease to exist as an organization.

## E.    The Impact of USAGM's Refusal to Provide Appropriated Funds

27.    USAGM's refusal to provide appropriated funds has had and will continue to have several immediate impacts.

28.    First and most fundamentally, failing to provide RFA with its congressionally appropriated funding has interfered with RFA's mission by requiring it to cease essentially all

broadcasting and news operations. RFA reaches 60 million people every week. Stopping news coverage in countries where there are few, if any, alternative news sources apart from state-controlled or state-influenced media means that millions of people will be cut off from access to free and independent media coverage of critical events. This will irrevocably harm RFA's reputation, trust, and credibility with the many people who rely on RFA for news.

29.     Second, RFA's loss of funding will have a devastating impact on its reporters around the world. RFA collaborates with freelance journalists who report from some of the countries most hostile to independent reporting in the world such as China and North Korea. Recruiting freelance journalists in these countries is extremely challenging due to the personal and professional risks involved. RFA has spent decades developing relationships with local freelance journalists, whose language skills and cultural knowledge are essential to RFA's work. Terminating these relationships will undermine RFA's reputation as a reliable partner and in some cases may prevent RFA from being able to reestablish relationships with those journalists and their sources again.

30.     Many of RFA's journalists and staff are unable to safely work from their home countries so they are working on visas outside of them, including in the United States on non-immigrant, employment-based visas. RFA's loss of funding means that these journalists could lose their employment status, putting them at imminent risk of losing their work visas. Because many of our employees' home countries are hostile to the United States and a free and open press, if deported some would face immediate arrest or imprisonment upon arrival.

31.     If RFA is forced to shutter its operations, many of its journalists will be placed in harm's way. Already many RFA journalists have faced threats to their personal security arising from their reporting. RFA journalists and their family members are constantly targeted by the regimes that they cover, and have been subject to arrest, torture, imprisonment and ill treatment in prison, abduction, denial of legal representation, physical surveillance, online harassment, and publication of their personal information online (doxxing). RFA helps protect its journalists from these dangers by advising on physical and digital safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, helping detained journalists secure legal representation, and assisting staff with relocation, including bringing them to safety in the United States. If RFA's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, and the security of those journalists and their families will be endangered. RFA has reporters working in countries like Cambodia and China where, absent RFA's resources, they will likely face prosecution and imprisonment. In addition, RFA has journalists in Vietnam, Cambodia, Myanmar, and the

Philippines who are already incarcerated. RFA has worked to connect these journalists with legal representation when able. Those services will effectively cease if RFA is shut down.

32.    As a result of USAGM's withholding of congressionally appropriated funds, RFA journalists across the world are faced with terrifying uncertainty about their status. They are experiencing high levels of stress and anxiety about what will happen to them and to their families if their employment ends.

33.    Third, RFA's loss of funding will impose unrecoverable financial losses on the organization. RFA is responsible for leases in eight different countries and has other financial obligations around the world. RFA will be forced to default on these obligations without congressionally appropriated funds. RFA has payments due on its lease for its Washington, D.C. headquarters that it will not be able to pay next month without having to furlough the remaining 25% of its U.S.-based staff.

34.    Fourth, terminating RFA's operations and laying off its entire staff, even temporarily, will damage RFA's reputation as an employer and reliable partner in difficult-to-reach countries. RFA has devoted significant resources and decades of work to building up its staff and language capabilities, as well as its reputation and brand. For example, since its inception RFA has worked to build networks and connect with audiences in Tibet and Xinjiang, an autonomous region in northwestern China where 12 million mostly Muslim Uyghurs live. These networks have been difficult to develop due to how closed these regions are and how few people speak the relevant languages. Due to the dangerous environments in which these networks operate, reestablishing them will be challenging—if not impossible.

35.    More broadly, RFA exists to provide independent news coverage that is outside of the control of the governments in which RFA operates. Ceasing news coverage, even temporarily, will allow the state-controlled or state-influenced media in these countries to fill the gap with coverage that is distorted to favor the narratives favored by the local governments. This could have an immeasurable impact on reducing democratic access to information and setting back the work of independent journalism in these countries. For example, just today, a devastating earthquake struck central Myanmar, which is governed by a military junta that has repeatedly taken steps to limit the dissemination of information and forums for dissent, including by cutting off access to the internet and social media services. The unfolding crisis there reaffirms the urgent need for RFA's reliable journalism in countries with limited or no freedom of speech and the press.

**Add. 12**

I declare under penalty of perjury that the foregoing is true and correct.

Dated this **28** day of March, 2025.

Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

8

# Exhibit 1



330 Independence Ave SW, Washington, D.C. 20237

**NOTICE OF GRANT TERMINATION**

March 15, 2025

Dear Radio Free Asia (Bay Fang | FangB@RFA.org),

  This letter provides notice that the U.S. Agency for Global Media (USAGM) is terminating your federal grant, FAIN: 1065-25-GO-00001 and any other grants with USAGM, effective March 15, 2025. *See* 2 C.F.R. § 200.341.

  The award no longer effectuates agency priorities. Therefore, pursuant to 2 C.F.R. § 200.340, Article VIII(a) in your grant award, and the President's March 14, 2025 executive order mandating that the USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby terminates grant FAIN: 1065-25-GO-00001 and any other grants with USAGM in its entirety effective March 15, 2025. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. (March 14, 2025).

  If you wish to object to or challenge this termination decision, you must do so either via email or certified mail within 30 days of the date of this termination notice. Your appeal should contain the following:

1. a copy of the written notice of termination;
2. the date you received the written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of disallowed costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342. Appeals should be addressed to the undersigned.

  You are encouraged to carefully review and discharge your closeout responsibilities as set forth in 2 C.F.R. § 200.344-46, your award instrument, and the USAGM's Terms and Conditions of the Award Agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the USAGM filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking other appropriate enforcement actions, which could impact your eligibility for future grants. *See id.* § 200.344(i). Finally, you are reminded of your duties regarding retention of grant records for at least three years after the submission of your final financial report. *See* 2 C.F.R. § 200.334.

Thank you,

*Kari Lake*

Kari Lake
Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO

1

**Add. 15**

klake@usagm.gov

330 Independence Ave SW, Washington, D.C. 20237

## Declaration of Tamara Sabljak Bralo

1.      I am the Director of Newsroom Safety and Security for Radio Free Asia. (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties.

2.      If RFA's appropriated funds continue to be withheld, RFA and its journalists will face threats to their personal and physical security, as well as threats to their cybersecurity and their personal identifying information contained in RFA's systems. Journalists will also face potential deportation to countries where they and their family members could be prosecuted and imprisoned for their RFA reporting.

## A.     The Impact of USAGM's Refusal to Provide Appropriated Funds to the Personal Security of Our Journalists

3.      RFA relies on freelance journalists in other countries to do some of its most critical reporting.  Many of these journalists, especially those reporting in or about Vietnam, Cambodia, Hong Kong, China, and Myanmar, have faced threats to their personal security arising from their reporting.  RFA journalists and their family members are constantly targeted for their reporting by the regimes they cover, including by having been subject to arrest, torture, imprisonment and ill treatment in prison, abduction, denial of legal representation, physical surveillance, online harassment, and publication of their personal information online (doxxing).

4.      For example, in 2017, when much of the world was unaware of the situation, RFA was the first to report on a broad campaign in China's Xinjiang Uyghur Autonomous Region under which the Chinese government detained thousands of Uyghurs and other ethnic groups in re-education camps.  After the publication of that story, more than 50 family members of RFA journalists were held in prison camps and jails and some were sentenced to prison.

5.      The Chinese government has repeatedly surveilled RFA journalists and subjected them to online harassment.  It has disclosed the government identification pictures of RFA journalists online and labeled them as traitors; RFA has publicly reported many of these incidents to the FBI, and USAGM also has addressed such incidents through other government channels.  Around every significant anniversary, such as the Tiananmen Square anniversary, RFA staff experience higher-than-normal levels of attacks.

**Add. 17**

6.      Since USAGM terminated RFA's grant and suspended its congressionally appropriated funding, RFA staff, particularly those located in Taiwan, have been the subject of increased online harassment. In addition, our journalists in the United States and abroad have had their private information published on the internet (doxxing).

7.      Knowing the risks of providing accurate reporting broadcast into regimes that want to suppress the truth, RFA has supported its journalists in danger by helping them to secure legal representation when possible, in some instances conducting risk assessments for journalists out on assignment, providing safety trainings, assisting journalists with relocation, and bringing staff to safety in the United States. For example, RFA hired legal counsel to represent RFA journalists who were interrogated about their stories and sources by Malaysian police.

8.      There are six RFA journalists who, as a result of their reporting, are currently incarcerated in countries where RFA broadcasts. In Vietnam, four journalists are in prison and one is under house arrest. In Cambodia, two journalists have ongoing legal cases. One RFA journalist is currently incarcerated in Myanmar. If RFA is unable to access congressionally appropriated funds, these individuals will be left without representation or anyone to advocate on their behalf.

9.      Without the ability to draw on congressionally appropriated funds, RFA will no longer be able to protect its journalists who are operating in authoritarian countries from the threats they routinely face. These services are necessary for RFA journalists to do their work in countries where reporting involves great personal and physical risk. If RFA cannot provide these services, the lives and work of RFA journalists will be endangered.

10.     Due to the dire cash flow situation caused by USAGM's refusal to provide the funds that Congress appropriated to RFA, RFA has furloughed 75% of its staff in the United States and will be forced to terminate contracts with journalists living outside the United States by the end of April. If these journalists are terminated, they face losing not only their salaries, but also the services that RFA provides to ensure their safety. In my view and experience, in many cases, there is a protective element that comes with being employed by an organization closely affiliated with the U.S. government—by abandoning our journalists now, I worry that it signals open season and that adverse governments will feel that they can move to arrest former RFA employees and contractors with impunity.

**Add. 18**

**B.** **USAGM's Refusal to Provide Appropriated Funds Will Cause RFA Journalists to be Deported to Dangerous Countries Where They Will Be at Risk of Imminent Harm**

11.     RFA's workforce consists of dozens of journalists who fled authoritarian regimes in countries such as Cambodia, Vietnam, Kazakhstan, Cambodia, and China who are living and working on non-immigrant, employment-based visas in the United States. Their residency is dependent on their employment at RFA.  Some of these journalists have shown their faces on broadcasts reporting on their home countries as well as other regions. Should these individuals lose their legal status in the United States, they will be forced to leave the United States and, when they have to return to their home countries, some will likely be arrested upon arrival.  RFA currently has seven people on its staff from Cambodia, Vietnam, and China who would face immediate arrest upon being returned to their home countries.

**C.** **USAGM's Refusal to Provide Appropriated Funds Will Damage RFA's Cyber Security**

12.     RFA is frequently targeted by cyberattacks from the governments of the countries on which RFA reports and in which its journalists operate.  As a result, RFA works with a number of vendors who provide services to identify and respond to cyberattacks and other security threats to RFA servers, cloud-based systems, desktops, laptops and mobile devices.  If RFA is unable to access its congressionally appropriated funding, it will be unable to pay these vendors.  In addition, some of RFA's critical cybersecurity defense digital safety tools have monthly licenses that will lapse in thirty days if there is a delay in payment.

13.     Losing these vendors and tools would severely weaken the organization's cybersecurity posture.  RFA would face increased risks of successful cyberattacks, data breaches, and system instability and its ability to detect, respond to, and prevent security incidents would be significantly impaired.  In addition, ongoing security projects would be disrupted, freezing RFA's current security mechanisms in place and rendering it unable to pursue ongoing and future security upgrades.

14.     Shutting down RFA's cybersecurity mechanisms greatly increases the chances that cyber attackers will gain access to RFA's systems, leading to system damage, network disruption, and data loss—especially because the loss of RFA's funding is publicly known. Such damage would risk the personal data of over 300 people in 34 countries, including in countries where RFA journalists risk their lives to provide accounts of the actions of

**Add. 19**

authoritarian regimes. Allowing these attackers to gain access to RFA's systems endangers the lives of those journalists.

**D.      The Long-Term Impacts of the Funding Freeze to RFA's Operations**

15.      If RFA is forced to close its doors and cease its activities, including essential security services, journalists will be left unprotected and, in many cases, face deportation to dangerous countries, where they will be prosecuted and imprisoned. This will destroy the trust, credibility, and relationships RFA has built over decades with its journalists who rely on RFA for their continued safety.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this **28** day of March, 2025.

Tamara Sabljak Bralo
Director of Newsroom Safety and Security
Radio Free Asia

**Add. 20**

# Second Supplemental Declaration of Deirdre Kline

1.    I am the Chief Operating Officer (COO) of Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.    This declaration supplements my April 9 and April 16, 2025 declarations with an updated snapshot of MBN's current finances.

3.    In my April 16 declaration, I explained that MBN furloughed more than 95% of its domestic staff for a period of two weeks beginning on March 23, 2025.  I also explained that on April 12, 2025—when MBN still had not received its April funds (or any indication of when they might be disbursed)—MBN was forced to terminate the employment of 514 people, more than 90% of its entire organization.

4.    Because MBN did not have sufficient funds to pay out earned annual leave, severance, and other end-of-service benefits, people who worked at MBN for decades, and relied on those benefits, were left with nothing.

5.    In my April 16 declaration, I stated that fewer than 45 people remain employed at MBN.  By May 2, that number will be 36 because MBN will be forced to make additional cuts.  At the start of this litigation, MBN employed more than 500 people, including more than 380 in the United States.

6.    In my previous declaration, I indicated that MBN had approximately $4.3 million cash on hand.  By May 2, that figure will be approximately $2.5 million.

7.    Since I submitted my previous declarations, MBN has informed the State Department that nearly all of MBN's employees on a visa program have been terminated.  Former employees who worked at MBN pursuant to visas must leave the United States within 30 days.  At MBN, these former employees include one person who has stage four cancer and another who is eight months pregnant.  Others have had to pull their children out of school and leave their lives behind to go back to their home countries.

8.    On April 18, 2025, MBN wrote to USAGM's Chief Financial Officer to follow up on MBN's April drawdown request.  MBN specifically noted that its "April funding drawdown request remains pending."  MBN reminded USAGM that USAGM's March 15, 2025 "termination" of MBN's grant had been enjoined, and that its current grant agreement (which USAGM signed on February 27, 2025) therefore was operative.

9.    On April 24, 2025, MBN wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from February "is operative" and that "MBN is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

1

10. MBN specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

11. To date, MBN has not received its April funds, which it historically has received within the first week of the month.

12. MBN currently exists as a shell of its former self. It can further extend its extinction only by taking steps like declaring bankruptcy, ending all content production (already drastically reduced), and laying off its remaining staff.

13. The skeleton staff is still working, many with reduced pay, and like their former colleagues, they will end their time at MBN without severance or annual leave payouts. These employees will also be ineligible to continue their health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act, or COBRA, because without funding, MBN will be forced to cancel its healthcare insurance plan.

14. MBN is delinquent on its leases in Springfield, Virginia, in Washington, D.C., and in Dubai and has been forced to cut back broadcasting, as described in my April 16 declaration. Without access to its annual appropriation, MBN's payments to vendors are also late. Soon, MBN's creditors will no doubt seek to recoup their funds, and MBN will almost certainly be forced into bankruptcy.

15. If MBN's congressionally appropriated funding does not reach MBN before May 31, 2025, the organization will cease to exist except on paper.

16. It will be impossible for MBN ever again to resume its work; its reputation as a faithful employer, trusted news source, and robust independent organization is in tatters.

17. Certainty of funding is critical to MBN's operation and financial management. At the outset of the fiscal year, MBN creates an annual budget and month-by-month financial plan—both premised on the total of its annual appropriation.

18. MBN can function only if it receives its funding at regular, predictable intervals. MBN's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

19. As of April 28, 2025, it will have been two months since MBN received any of its congressional annual appropriation from USAGM.

20. The drastic steps that MBN has taken, outlined above and in my previous declarations, have allowed it to survive despite not receiving its April funding, but it cannot survive past May 31, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this **27** day of April, 2025.

Deirdre Kline
Chief Operating Officer,
Middle East Broadcasting Networks, Inc.

3

## Supplemental Declaration of Deirdre Kline

1.      I am the Chief Operating Officer (COO) of Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      This declaration supplements my April 9, 2025 declaration with an updated snapshot of MBN's current finances.

3.      Since March 15, 2025, MBN has been forced into survival mode and has taken extraordinary steps to preserve its limited remaining cash reserves.

4.      On March 23, 2025, MBN furloughed more than 95% of its domestic staff for a period of two weeks.

5.      During that time, the organization tried in vain to access its annual appropriation.  On March 26, 2025, MBN CEO Jeff Gedmin emailed Defendant Kari Lake requesting a meeting to discuss MBN.  He received no response.  On April 2, 2025, MBN attempted to draw down its April funding.  To date, it has not received disbursement of any funds from that request.

6.      With no additional funds coming in and no sense of when that might change, on April 12, 2025, MBN terminated the employment of 514 people, more than 90% of its entire organization.  Worldwide, fewer than 45 people remain employed by MBN.

7.      Among those terminated were: (a) all staff at MBN's Dubai production center (save two administrative employees); (b) all staff at its Beirut bureau; (c) all overseas correspondents in Egypt, Algeria, Turkey, Jordan, Sudan, Libya, Syria, Yemen, the West Bank, Gaza, Iraq, Israel, Morocco, and Tunisia; (d) all broadcast operations staff (save two people to manage programming reruns on Alhurra TV and two IT administrators); (e) all MBN engineers; (f) members of the finance, human resources, communications, and research teams; and (g) more than 95% of MBN's television staff.

8.      Because of those mass layoffs, MBN has been forced to reduce its live television newscasts and digital presence dramatically.

9.      Once a robust 24/7 news operation with more than 12-hours of live news per day, in addition to award-winning documentary and talk-show programs, Alhurra TV now shows rerun programming 8 hours per day.  The rest of the day, viewers see a notice to tune in later.

10.      No longer able to cover the news round the clock on its website, MBN now produces only four-to-five short videos and a few articles a day, if that.

11.     MBN had no choice but to gut its organization because, without laying off the vast majority of its employees, MBN would have been insolvent by April 18, 2025.

12.     As of April 17, 2025, MBN will have approximately $4.3 million cash on hand.

13.     Even after the drastic cuts described above, MBN will be able to survive only until May 31, 2025.

14.     MBN can further extend its extinction only by taking steps like declaring bankruptcy, ending all content production, and laying off its remaining staff.

15.     Already, MBN is a shell of its former self.

16.     Currently, just 38 staff members are working at MBN.[1]  At the start of this litigation, MBN employed more than 500 people, including more than 380 in the United States.

17.     MBN is delinquent on its leases in Springfield, Virginia, in Washington, D.C., and in Dubai and has been forced to cut back broadcasting, as described above.  Without access to its annual appropriation, MBN's payments to vendors are also late.  Soon, MBN's creditors will no doubt seek to recoup their funds, and MBN will almost certainly be forced into bankruptcy.

18.     If MBN's congressionally appropriated funding does not reach MBN before May 31, 2025, the organization will cease to exist except on paper.

19.     It will be extremely difficult—if not impossible—for MBN ever again to resume its work; its reputation as a faithful employer, trusted news source, and robust independent organization is in tatters.

20.     Many of MBN's former employees—who made enormous sacrifices to move half-a-world away for the opportunity to work in the U.S. and experience a free press—feel betrayed by the same government they once idealized.  Former employees, many of whom immigrated to the United States from the region to serve MBN's mission, also feel betrayed.

21.     Certainty of funding is critical to MBN's operation and financial management. At the outset of the fiscal year, MBN creates an annual budget and month-by-month financial plan—both premised on the total of its annual appropriation.

---

[1] An additional handful remain employed but are currently furloughed and not working.  MBN has not terminated their employment because they are each facing challenging health and other issues.

2

22.     MBN can function only if it receives its funding at regular, predictable intervals.  MBN's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

23.     In the past, MBN and USAGM have negotiated grant agreements for months on end.  During the pendency of those negotiations, USAGM continued to disburse to MBN its funds.  Both parties understood that without regular disbursements, MBN cannot function.

24.     Since 2024, MBN has spent approximately $7 to $8 million per month on expenses such as lease payments, vendor payments, payroll, health insurance, utilities, and other basic operational necessities.

25.     The last time that MBN received a drawdown of its annual appropriation was on February 28, 2025, when it received approximately $7.46 million.

26.     MBN is still waiting on its April funding, which it historically has received within the first week of the month.

27.     The drastic steps that MBN has taken, outlined above, have allowed it to survive despite not receiving its April funding, but it cannot survive past May 31, 2025 without irreparable harm to itself, its future, and its very existence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16 day of April, 2025.


Deirdre Kline
Chief Operating Officer
Middle East Broadcasting Networks, Inc.

3

## Declaration of Deirdre Kline

1.      I am the Chief Operating Officer at Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this Declaration based both on my personal knowledge and on information gained in the performance of my duties.

2.      I have been an employee of MBN since March 2004.

3.      MBN was incorporated as a nonprofit organization on April 25, 2003, in the District of Columbia.  MBN has tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  MBN's registered address is 7600 Boston Boulevard, Springfield, VA, which is the location of its corporate headquarters.

4.      MBN is a self-governing, independent, nonpartisan, not-for-profit news organization.  Over the course of the past two decades, MBN's broadcasting and digital platforms have gained respect and trust in the region they serve.

5.      Consistent with standards set forth in the International Broadcasting Act, MBN's Articles of Incorporation provide that MBN shall "provide news which is consistently reliable, authoritative, accurate, objective, and comprehensive; provide a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society; clearly and effectively present the policies of the United States Government and responsibly discuss those policies and provide information about developments in the Middle East region.  The Corporation shall be a forum for a variety of opinions and voices from within Middle East nations, and thereby promote the right of freedom of opinion and expression, including the freedom to 'seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights and in the spirit of open communication of information and ideas."

55065541.1                                           1

**Add. 27**

6.      Consistent with its Articles, MBN promotes democratic values by providing accurate, uncensored news and open debate in countries throughout the Middle East and North Africa ("MENA"), including in those countries where freedom of expression is constrained and local news media are either controlled by the state or otherwise limited in independence.  Since its inception, MBN has provided a critical counterbalance to the anti-American and sectarian propaganda prevalent in the region's media.  MBN's work is based on its commitment to democracy and its conviction that the first requirement of democracy is a well-informed citizenry.

7.      MBN was created in response to the terrorist attacks of September 11, 2001.  Specifically, the 9/11 Commission called on the United States to fund independent television and radio journalism in the Arab world.  In 2003, Congress recognized that need by setting aside start-up funding for Middle East Television, which later became Middle East Broadcasting Networks, Inc.  Television was chosen as the primary platform for the new enterprise because television—then as now—is by far the most popular platform for receiving news and information in the region.

8.      In the more than two decades since its creation, MBN has, without interruption, fulfilled Congress's mandate by giving people in countries across the region access to accurate and timely information, news, and commentary about events that affect their lives, their region, and the world.  In particular, MBN provides a balanced and complete picture of the United States to viewers in the Middle East and North Africa.  MBN's flagship platform—Alhurra TV—went live on February 14, 2004.  A separate channel—Alhurra TV-Iraq—made its debut in April 2004.  The federal government's Radio Sawa service became part of MBN

in 2005.  MBN also operates the website alhurra.com and multiple branded social media accounts.

9.      MBN provides news and information in Arabic via satellite television and multiple digital platforms to the residents of 22 countries in the Middle East and North Africa. It operates television studios in Dubai and Springfield, Virginia; all broadcasting originates in the United States.  MBN also has staff in Beirut, Lebanon.  Alhurra TV's daily schedule is composed of news, discussion and investigative programs, and documentaries.

10.     MBN has devoted decades to developing the structure, expertise, and trust necessary to operate successfully in a region where religious and political persecution are common, many governments are unfriendly to the United States, and press freedom is virtually non-existent.[1]  MBN's fact-based reporting and investigative programs have provided critical information and perspectives unavailable on other platforms—thus allowing MBN to counter the violent extremism and anti-American propaganda of messaging from groups like the Islamic State of Iraq and Syria and other extremist groups.

11.     Today, according to research conducted by the United States Agency for Global Media ("USAGM") in conjunction with MBN, as many as 28.2 million viewers watch Alhurra TV per week; MBN has a weekly reach of approximately 34 million adults via MBN's platforms as a whole.

---

[1]      The MENA region is among the most dangerous and difficult for journalists in the world.  Each year, Reporters Without Borders conducts a survey of world press freedom, pursuant to which countries are rated from "good" to "very serious" based on political context, legal framework, economic context, socioculture context, and safety.  *See* Reporters Without Borders, 2024 World Press Freedom Index, available at https://rsf.org/en/2024-world-press-freedom-index-journalism-under-political-pressure.  Of the 22 countries served by MBN, only two received satisfactory scores; the remaining 20 are equally divided between "difficult" and "very serious."

12.      MBN's digital platforms also have large audiences. The alhurra.com website enjoyed more than 311 million page views in 2024; more than 33 million people follow MBN's branded social media accounts.

### *Funding Structure*

13.      Congress formally established funding for MBN in 2003, pursuant to the Emergency Wartime Supplemental Appropriations Act.

14.      From its inception in April 2003, MBN has been funded pursuant to a series of Grant Agreements with USAGM, an independent federal agency. MBN is a grantee of USAGM. USAGM (and its predecessor, the Broadcasting Board of Governors) has consistently funded MBN for nearly 22 years.

15.      One hundred percent of MBN's funding comes from annual congressional appropriations. Without access to its congressionally appropriated funding, MBN cannot continue to operate and will be forced to shut down.

16.      Every year, MBN enters into a Grant Agreement with USAGM. Its most recent Grant Agreement was signed by USAGM on February 27, 2025.

17.      Before the new fiscal year even begins, MBN prepares projected monthly financial plans for the entire upcoming fiscal year.

18.      Concurrently, USAGM and MBN begin the separate process of negotiating a grant agreement for that year. During those negotiations, which can sometimes last months, USAGM continues to make disbursements, in accordance with the projected monthly financial plans.

19.      USAGM typically disburses funds to MBN on a monthly basis.

20.      At the end of a month, MBN gets ready to request, and USAGM gets ready to disburse, annual appropriation funds for the coming month.

21.    **First**: The process typically begins with USAGM requesting from MBN a financial plan for the next quarter, meaning financial plans by month for the coming three months.

22.    **Second**: MBN prepares and returns a financial plan (by month) for the upcoming quarter. In MBN's experience, these monthly plans are a formality because USAGM already has received and reviewed all of the monthly plans at the outset of the fiscal year. The monthly plan is a *pro forma* document disclosing how MBN intends to use the funds for the coming months. It also serves as a schedule reflecting drawdown requests against the annual appropriation total.

23.    **Third**: Within a matter of days, USAGM prepares and sends to MBN a grant agreement "amendment" which covers the next month. Sometimes, USAGM chooses to prepare an amendment for multiple months' worth of funding at a time.

24.    **Fourth**: MBN signs the amendment and typically returns it to USAGM along with a letter drawdown request. The letter drawdown request includes the dollar amount to be deposited in MBN's bank account, as reflected in the corresponding monthly financial plan.

25.    **Fifth**: USAGM countersigns the amendment and sends it back to MBN. At the same time, USAGM acknowledges receipt of MBN's letter request and coordinates with the Department of the Treasury to transfer the funds into MBN's account. MBN typically receives the funds within two-to-four business days.

26.    Other than returning the countersigned amendment and disbursing the funds, there is no discrete step whereby USAGM "approves" the monthly financial plan.

27.    Steps one through five above are typically completed within five-to-ten business days, usually beginning the penultimate week of the outgoing month. As a result,

MBN receives its monthly funding at the end of the outgoing month or during the first few days of the new month.

28.     On March 14, 2025, Congress passed a continuing resolution appropriating funding for MBN from March 15, 2025, through September 30, 2025, at the same level as fiscal year 2024.

29.     On March 15, 2025, Defendant Kari Lake, Senior Advisor to the Acting CEO of USAGM, sent a letter to MBN.  A true and correct copy of the letter is attached as Exhibit 1 to this Declaration.  Defendant Lake's Letter purported to terminate MBN's February 27, 2025 Grant Agreement, effective immediately.

30.     The letter also instructed MBN that it needed to commence its "closeout responsibilities as set forth in 2 CFR § 200.344-46."  The letter threatened MBN with "appropriate enforcement actions" for any failure to comply.  At present, MBN cannot do so.

31.     The cited regulations state that a grantee "must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance [i.e., March 15, 2025]." 2 C.F.R. § 200.344(c).

32.     MBN estimates that complying with its obligation to wind down operations could cost up to $50,000,000.  Those costs include contractual termination fees on leases; payments of outstanding invoices and cancellation fees to vendors; mandatory end of service and other payments to its overseas staff; financial obligations (including severance) to its staff in the United States; and relocation expenses for the more than 100 employees whose visas are employment-based and who would be forced to leave the United States and the United Arab Emirates if their jobs were eliminated.  MBN does not have sufficient funds to honor these obligations or pay these costs.

33.    Defendant Lake's letter further advised that MBN could "object to or challenge" the termination decision by submitting an appeal directly to Defendant Lake within 30 days.  MBN timely submitted its appeal on March 27, 2025, explaining that USAGM "has no lawful basis to withhold funds that Congress specified must reach MBN's coffers."  MBN requested that USAGM respond to MBN's appeal by 5:00 PM on March 31, 2025, and advised USAGM that, absent rescission of the grant termination, "considering the severe and irreparable harm that MBN is already experiencing, MBN will be forced to take appropriate legal action to restore its funding."  USAGM has not provided a response to the appeal even though the 5:00 PM March 31, 2025 deadline has come and gone.

34.    On March 31, 2025, confronting an increasingly dire financial situation, MBN submitted a drawdown request for its April funding along with financial plans by month for the remainder of the fiscal year.  For the month of April, USAGM and MBN do not have a signed grant agreement "amendment" (due to the March 15 grant termination).

35.    On the same day, March 31, USAGM pointed out an administrative error (an inconsistency between the amount listed in the April financial plan and the letter drawdown request).  MBN corrected the error by submitting a revised funding request that same day.

36.    If March had proceeded as normal (without the March 15 termination letter), USAGM and MBN would have had a finalized grant agreement amendment no later than March 28, and MBN would have received its April disbursement between March 31 and April 3, 2025.  To date, no funds have been disbursed.

### *Financial Impact of Grant Termination*

37.    USAGM's refusal to provide congressionally appropriated funds to MBN has already *significantly* affected MBN and threatens to permanently shutter MBN.

38.     MBN currently employs more than 500 people: including approximately 386 in the United States (its headquarters), 99 in Dubai (its regional production hub), and 18 in Beirut, Lebanon.

39.     In the days following USAGM's March 15, 2025 Letter, MBN was forced to take extraordinary steps to preserve its limited remaining cash reserves. On March 23, 2025, MBN was forced to furlough more than 360 of its U.S. employees (about 95% of its domestic staff) for a period of 14 days. Without funds available, MBN anticipates that it will need to lay-off the majority of its staff both in the United States and abroad—at least 400 people. On April 9, 2025, MBN sent a Worker Adjustment and Retraining Notification ("WARN") Act notice to all employees, domestic and international, indicating that MBN will be "forced to terminate the employment of a significant number of people in the coming days or weeks." According to the notice, "by the end of next week, most employees will no longer be employed."

40.     The staffing changes caused by the furlough forced MBN to reduce its live television newscasts and digital presence.

41.     Any failure by USAGM to provide MBN with its congressionally appropriated funding will continue to have dire consequences for MBN and its employees and will fundamentally interfere with MBN's congressionally mandated mission.

42.     First, a loss of funding would require MBN to cease all broadcasting and all news operations.[2] The anticipated lay-offs described above are intended to help MBN stay

---

[2]    USAGM's actions have already damaged MBN's ability to provide complete coverage of important news to the critical region it serves. For more than a decade, USAGM has had enterprise-wise newswire service contracts with the Associated Press, Reuters, and Agence-France Presse. Prior to its participation in these enterprise-wide contracts, for which MBN pays

Add. 34

afloat a few weeks past April but not in any recognizable or near operational capacity. Indeed, MBN's brand is centered on its television channel, Alhurra TV, which will soon go off the air unless MBN receives its congressionally appropriated funds.

43.    MBN has an unduplicated weekly reach of approximately 34 million adults in the region. If the Alhurra TV Channel goes dark, it will halt news coverage provided to countries where there are few, if any, alternative news sources save state-influenced or sectarian media. This will mean that millions of people will be cut off from their only source of free and independent media coverage of critical events, including, particularly, events in the United States. It will also mean that America will lose its voice in the region, allowing hostile regimes to fill the gap with skewed coverage. These consequences are anathema to MBN's mission and will irrevocably harm MBN's reputation, trust, and credibility with everyone who relies on its platforms for news.

44.    Second, loss of funding would mean that approximately 350 people in the United States would lose their jobs in the near future. Approximately 40 members of MBN's U.S. staff work pursuant to work-related visas, which require them to be working and paid for their work to remain here; otherwise, they and their families would be required to leave the United States within 30 days, many to home countries (including Syria and Yemen) with

---

significant fees, MBN had its own contracts with these companies. Having access to Associated Press, Reuters, and Agence-France Presse is essential to MBN's ability to fulfill its mission, as these services have global infrastructure that allows them to reach locations to which MBN has no access. MBN, for example, cannot afford to hire journalists to cover all the regions outside the Middle East and North Africa. For those reasons, MBN relies on video, audio, and text reports from these reputable sources to supplement its own news reporting. Yet, without any notice to MBN, USAGM terminated its contracts with the Associated Press and Agence-France Presse on March 13, 2025. Defendant Lake posted on social media about the terminations prior to notifying MBN about them. *See* Exhibit 2. MBN further lost access to Reuters under the enterprise-wide contract as of March 31, 2025.

populations or governments hostile to MBN's mission, to journalists in general, and, particularly, to the work done by those employed at MBN. Already the Department of State has asked MBN to confirm the status of these employees.

45.     Third, in Dubai, where MBN operates its regional production center, most employees' residency is based on their work for MBN. For them, loss of funding would mean loss of employment status, putting them at risk of losing their work visas, leading to their deportation and that of their families. Because many of these employees' home countries are hostile to the United States and to a free and open press, they could face significant consequences upon their return. Without funding, MBN will be forced to lay-off nearly every employee in Dubai and Lebanon.

46.     Fourth, loss of funding will impose unrecoverable financial losses on MBN. MBN is responsible for leases and other significant financial obligations in the United States and throughout the region. Absent funding, MBN will be forced to default on these obligations. For example, MBN has payments due on its lease for its offices in Dubai and Washington, D.C. that it is unable to pay.

47.     Fifth, terminating MBN's operations and laying off almost its entire staff, even temporarily, would damage MBN's reputation as an employer and a reliable partner both at home and throughout the region, particularly in countries where that reputation was hard won and remains fragile. MBN has devoted significant resources and decades of work to building its relationships and brand. Due to the environment in which it works, reestablishing trust and credibility will be difficult if not impossible.

48.     Sixth, MBN's loss of funding would have a devastating impact on its ability to recruit reporters throughout the region. MBN's reporting operations depend heavily on its

ability to recruit and retain journalists from the countries it serves. Nearly all of MBN's reporters, editors, and producers are originally from the Middle East and North Africa. Their native language fluency and deep cultural understanding are critical to producing high-quality journalism that resonates with audiences in 22 Arabic-speaking countries. Moreover, MBN contracts with journalists who report from some of the countries most hostile to independent reporting, including Syria, Sudan, and Yemen. Recruiting freelance journalists in these countries is extremely challenging due to the personal and professional risks involved. MBN has spent two decades developing relationships with local journalists in the region. Terminating those relationships will undermine MBN's reputation as a reliable partner and in some cases may prevent MBN from being able to reestablish relationships with those journalists and their sources again. Put simply, trust may be irrevocably broken.

49.     Seventh, MBN's mission is to provide independent news coverage outside of the control of the governments in the countries to which it broadcasts. Ceasing news coverage, even temporarily, will allow state-influenced media in these countries to fill that empty space with coverage—particularly of the United States—that is distorted to favor the narratives favored by local governments and extremists. Indeed, local extremists have already celebrated news of the cancellation of MBN's grant online, labeling MBN's staff members "traitors," "mercenaries," and "American mouthpieces." These tweets are meant to incite and to put MBN staff members at risk.

50.     Eighth, MBN relies on journalists throughout the region to do some of its most critical reporting. Some of these journalists have faced threats to their personal security arising from their reporting. MBN journalists and their family members have been targeted by the groups and governments that they cover; they have been threatened, surveilled,

**Add. 37**

harassed online, and subjected to physical violence. MBN helps protect its journalists from these dangers by advising on physical safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, and assisting staff with relocation. If MBN's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, endangering the security of those journalists and their families.

### *MBN's Journalists Deserve Continued Support for Their Critical Work*

51. MBN's journalists provide timely, uncensored, factual news and information to millions of viewers and readers throughout the Middle East and North Africa. Their television audience stretches across five time zones, from the Atlantic Ocean to the Arabian Sea; their digital audience is global.

52. From its inception, MBN's journalists have reported on the ground from regional hot spots and war zones, including Iraq, Lebanon, Israel, Sudan, and Gaza. Their daily work has placed them in danger. Their continued commitment to MBN's mission under these circumstances continues to be remarkable and deserves continued support.

53. MBN opened its first office in Baghdad in 2004; the location was bombed twice during MBN's tenancy.

54. MBN's accurate and in-depth coverage of religious and governmental corruption in Iraq has led to government sanctions and personal threats to its journalists.

55. On August 31, 2019, MBN broadcast a documentary (produced in-house) about corruption within the Sunni and Shiite Muslim endowments (bodies that administer religious sites and real estate), including institutions tied to the Grand Ayatollah Ali al-Sistani. Two days later, Iraq's Communications and Media Commission suspended MBN's license

and business operations, and ordered its Baghdad office closed for three months. Protests against MBN (ordered or encouraged by the officials identified in the documentary) erupted; protesters were encouraged to attack MBN's office and its journalists. MBN's journalists were threatened in broad daylight; some needed to be extracted for their own safety. MBN's journalists were surveilled, and the named targets of a publicly circulated "arrest list." MBN eventually moved its local operations center to Erbil. On local Iraq television, leaders of pro-Iranian militias vowed revenge on the "enemy" (including Israel, America, and Alhurra TV).

56.    In addition to the attacks in Iraq following the August 2019 documentary, MBN journalists have faced numerous other threats, further underscoring the importance of their work in providing independent journalism in the MENA region.

57.    For example, in May 2005, an MBN reporter was shot and killed as he left his home in Basra. A group calling itself "The Iman al-Hassan al-Basri Brigades" claimed credit for his murder.

58.    In August 2012, an MBN reporter crossed into Syria, where witnesses later told MBN he came under gunfire. He was never heard from again.

59.    In January 2017, two Baghdad-based reporters were injured while covering the liberation of Mosul.

60.    In April 2023, MBN journalists in Sudan were shot at and had to be relocated.

61.    In November 2023, a Gaza-based reporter had to evacuate her hotel room when it came under rocket fire; she was forced to take shelter in her car near a hospital, where she continued to work.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Add. 39**

Executed on the 9th day of April 2025, in _Springfield, VA._

Deirdre Kline

# EXHIBIT 1



**U.S. AGENCY FOR GLOBAL MEDIA**

330 Independence Ave SW, Washington, D.C. 20237

## NOTICE OF GRANT TERMINATION

March 15, 2025

Dear Middle East Broadcasting Networks, Inc. (Raji Kalra | rkaira@mbn-news.com),

 This letter provides notice that the U.S. Agency for Global Media (USAGM) is terminating your federal grant, FAIN: MN01-25-GO-00001 and any other grants with USAGM, effective March 15, 2025. *See* 2 C.F.R. § 200.341.

 The award no longer effectuates agency priorities. Therefore, pursuant to 2 C.F.R. § 200.340, Article VIII(a) in your grant award, and the President's March 14, 2025 executive order mandating that the USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby terminates grant FAIN: MN01-25-GO-00001 and any other grants with USAGM in its entirety effective March 15, 2025. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. (March 14, 2025).

 If you wish to object to or challenge this termination decision, you must do so either via email or certified mail within 30 days of the date of this termination notice. Your appeal should contain the following:

1. a copy of the written notice of termination;
2. the date you received the written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of disallowed costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342. Appeals should be addressed to the undersigned.

 You are encouraged to carefully review and discharge your closeout responsibilities as set forth in 2 C.F.R. § 200.344-46, your award instrument, and the USAGM's Terms and Conditions of the Award Agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the USAGM filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking other appropriate enforcement actions, which could impact your eligibility for future grants. *See id.* § 200.344(i). Finally, you are reminded of your duties regarding retention of grant records for at least three years after the submission of your final financial report. *See* 2 C.F.R. § 200.334.

Thank you,

*Kari Lake*

Kari Lake
Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO

1

**Add. 42**

klake@usagm.gov
330 Independence Ave SW, Washington, D.C. 20237

**Add. 43**

# EXHIBIT 2



INTERNATIONAL FISHERIES COMMISSIONS

The agreement includes $65,719,000 for International Fisheries Commissions. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL FISHERIES COMMISSIONS
[Budget authority in thousands of dollars]

| Commission/Activity | Budget Authority |
|---|---|
| Great Lakes Fishery Commission | 50,000 |
| *Lake Champlain and Lake Memphremagog Basins* | *10,000* |
| *Grass Carp* | *1,000* |
| *Lake Memphremagog Fishery* | *500* |
| Inter-American Tropical Tuna Commission | 1,750 |
| Pacific Salmon Commission | 5,868 |
| International Pacific Halibut Commission | 4,582 |
| Other Marine Conservation Organizations | 3,519 |
| **Total** | **65,719** |

## RELATED AGENCY

### UNITED STATES AGENCY FOR GLOBAL MEDIA

INTERNATIONAL BROADCASTING OPERATIONS

The agreement includes $857,214,000 for International Broadcasting Operations, of which $42,861,000 may remain available until September 30, 2025. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL BROADCASTING OPERATIONS
[Budget authority in thousands of dollars]

| Entities/Grantees | Budget Authority |
|---|---|
| Federal Entities | |
| Mission Support | 225,640 |
| *Office of Technology, Services, and Innovation* | *174,440* |
| Office of Cuba Broadcasting | 25,000 |
| Voice of America | 260,032 |
| Subtotal | 510,672 |

14

| Independent Grantee Organizations | |
|---|---|
| Radio Free Europe/Radio Liberty | 142,212 |
| Radio Free Asia | 60,830 |
| Middle East Broadcasting Networks | 100,000 |
| Open Technology Fund | 43,500 |
| Subtotal | 346,542 |
| **Total** | **857,214** |

*Consultation.*—Not less than 30 days prior to the submission of the operating plan required by section 7062(a) of the Act for funds appropriated or otherwise made available under this heading, the United States Agency for Global Media (USAGM) Chief Executive Officer (CEO) shall consult with the Committees on Appropriations on the allocation of funding by entity and the use of the 2023 Language Service Review (LSR) and other information to inform agency operations. The operating plan shall also clearly identify resources allocated in fiscal year 2024 for the new headquarters building.

*Language Service Review.*—Not later than 60 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing the process and outcome of the 2023 LSR and the status of implementation of strategies for language services following the 2022 LSR.

*Mission Support.*—The agreement updates the name of "International Broadcasting Bureau" in the above table to "Mission Support", consistent with the December 2023 congressional notification to the Committees on Appropriations.

*Networks.*—The USAGM CEO is directed to use the expertise of Office of Cuba Broadcasting to inform programming about Cuba by other USAGM networks.

*New Headquarters Building.*—Not later than 90 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing updated plans for the new headquarters relocation, including timelines and estimated costs.

*Open Technology Fund.*—Funds made available for the Open Technology Fund should be made available for grants for innovative methods to reach audiences inside of Cuba. Not later than 45 days after the date of enactment of the Act, the USAGM CEO shall consult with the Committees on Appropriations on such grants.