**ORAL ARGUMENT NOT YET SCHEDULED**

**Nos. 25-5150, 25-5151**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

---

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

---

On Appeal from the United States District Court
for the District of Columbia
Nos. 25-cv-907, 25-cv-966
The Hon. Royce C. Lamberth, U.S. District Judge

---

**EMERGENCY PETITION FOR REHEARING EN BANC**

---

Kristin Bateman*
Jennifer Fountain Connolly
Robin F. Thurston
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org

Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Plaintiffs-Appellees (additional counsel listed on inside cover)*

May 5, 2025

---

Hailyn J. Chen
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave.,
 Fiftieth Floor
Los Angeles, CA 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn
MUNGER, TOLLES & OLSON LLP
560 Mission St.,
 Twenty-Seventh Floor
San Francisco, CA 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS...........................................................i

TABLE OF AUTHORITIES ....................................................ii

GLOSSARY OF ABBREVIATIONS ........................................ v

INTRODUCTION AND RULE 40(b)(2) STATEMENT .............................. 1

BACKGROUND ................................................................ 2

    A.   Factual and Legal Background................................... 2

    B.   Procedural Background ......................................... 4

ARGUMENT ................................................................... 6

I.    The Government Is Not Likely to Succeed on Appeal. ...................... 6

    A.   Article III Courts May Hear the Networks' Statutory and Constitutional Claims............................................ 7

    B.   *Department of Education v. California* Does Not Support a Stay ............................................................. 13

II.   The Panel Erred in Evaluating the Remaining Stay Factors. ............. 16

CONCLUSION ............................................................... 19

CERTIFICATE OF COMPLIANCE............................................ 20

CERTIFICATE OF SERVICE ................................................ 21

i

# TABLE OF AUTHORITIES

P<small>AGE</small>(S)

F<small>EDERAL</small> C<small>ASES</small>

*Albrecht v. Comm. on Emp. Benefits*,
    357 F.3d 62 (D.C. Cir. 2004)..................................................................8

*Alpine Sec. Corp. v. FINRA*,
    121 F.4th 1314 (D.C. Cir. 2024)..........................................................16

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011)............................................................................15

*\*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)...........................................................9, 14, 15, 16

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)............................................................16

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022)........................................................9, 15

*Dalton v. Specter*,
    511 U.S. 462 (1994)..............................................................................8

*\*Department of Education v. California*,
    145 S. Ct. 966 (2025)..............................................................13, 14, 17

*Gomez v. United States*,
    490 U.S. 858 (1989)............................................................................12

*\*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)..............................................................14

\*  Authorities upon which we chiefly rely are marked with astericks.

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

*KalshiEX LLC v. CFTC*,
   119 F.4th 58 (D.C. Cir. 2024).......................................................6

*Kingdomware Techs, Inc. v. United States*,
   579 U.S. 162 (2016)....................................................................11

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016).........................................................17

*LeBlanc v. United States*,
   50 F.3d 1025 (Fed. Cir. 1995) ...................................................8, 9

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982)................................................10, 15

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017)..................................................9, 10

*Quarles v. United States*,
   587 U.S. 645 (2019)....................................................................12

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006).......................................................8

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992)........................................................9

*Webster v. Doe*,
   486 U.S. 592 (1988)........................................................................8

## FEDERAL STATUTES

22 U.S.C. § 6201(3) .......................................................................18

22 U.S.C. § 6202(b) .......................................................................11

*22 U.S.C. § 6204(a)(5)....................................................................3

iii

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

*22 U.S.C. § 6204(a)(6)...................................................................................3

22 U.S.C. § 6208(a) ......................................................................................11

22 U.S.C. § 6208(b) ......................................................................................11

22 U.S.C. § 6208(g) ..................................................................................11, 12

Pub. L. No. 103-236, 108 Stat. 382 (1994)...............................................2, 3

Pub. L. No. 108-11, 117 Stat. 559 (2003)......................................................3

*Pub. L. No. 118-47, 138 Stat. 460 (2024).............................................3, 11

RULES - OTHER

Fed.R.App.P. 40(b)(2)(A) ...............................................................................6

Fed.R.App.P. 40(b)(2)(B) ...............................................................................6

Fed.R.App.P. 40(b)(2)(D) ...............................................................................6

OTHER AUTHORITIES

Allocate, Black's Law Dictionary (12th ed. 2024)......................................11

iv

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFC | Court of Federal Claims |
| FY | Fiscal Year |
| IBA | United States International Broadcasting Act |
| MBN | Middle East Broadcasting Networks, Inc. |
| RFA | Radio Free Asia |
| USAGM | United States Agency for Global Media |

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

The Executive Branch has impounded millions of dollars in appropriated funds in defiance of Congress's express directive that the funds "shall be allocated" to Radio Free Asia ("RFA") and the Middle East Broadcasting Networks ("MBN," and collectively, the "Networks").  A divided motions panel of this Court held that Article III courts are powerless to enjoin this brazenly unlawful action because the Tucker Act diverts contract disputes to the Court of Federal Claims ("CFC").  But this is not a contract dispute suitable for Article I courts.  This is a constitutional dispute that lies at the very core of the Article III judicial power.  The Executive is violating Congress's statutory command that specific appropriated amounts "shall" be disbursed to the Networks, as well as the Take Care Clause and separation of powers principles.  The panel's conclusion that Article III courts cannot adjudicate those claims merely because the Networks' funds are disbursed through contracts that parallel the statutory scheme raises issues of profound importance, especially at this moment in our history.  It conflicts with decades of precedent holding that the Tucker Act does not divest district courts of jurisdiction to hear claims based on a *statutory* entitlement to funds or to enforce the separation of powers.  And it countenances the Executive's evident conclusion that it is free to ignore the law based on nothing more than the Executive's preference for a different policy than the one Congress enacted.

1

The Networks have taken the unusual step of seeking en banc review of the panel's stay order not only because immediate correction of that misguided decision is a matter of pressing national importance, but also—and more fundamentally—because the stay is a death sentence for the Networks.  On May 9—just days from now—RFA will be forced to terminate its staff and will exist in name only.  MBN, too, teeters on the brink of extinction; even after terminating over 500 employees, it cannot survive past May 31.  Plainly put, the Networks will not exist by the time this Court has a chance to adjudicate the government's appeal.  By contrast, the government suffers no cognizable harm—and nothing comparable to what the Networks are suffering—from being enjoined, during this appeal, to continue disbursing funding that Congress already earmarked for the Networks.

The Networks respectfully request vacatur of the stay by Wednesday, May 7, to ensure that the government has time to process disbursement of the Networks' funds by Friday, May 9.

## BACKGROUND

### A.    Factual and Legal Background

For decades, RFA and MBN have provided independent, objective journalism in countries that otherwise lack free media.  RFA was established in 1996, after Congress called for a broadcasting service for "Asian nations whose people do not fully enjoy freedom of expression."  United States International

2

Broadcasting Act, Pub. L. No. 103-236, Title III, § 309(b), 108 Stat. 382, 440

(1994) ("IBA").  MBN was established in the wake of the terrorist attacks of 9/11

to bring uncensored journalism to the Middle East and North Africa, ensuring

impartial coverage of the United States.  Opp.Add.28; *see* Pub. L. No. 108-11, 117

Stat. 559, 562 (2003).[1]

Congress has directed the Executive Branch—specifically, the U.S. Agency

for Global Media ("USAGM")—to disburse appropriated funds to the Networks to

fulfill their missions.  The Networks have no other source of funding.  Opp.Add.7,

30.  In FY2024, Congress appropriated about $857 million to USAGM, specifying

that $60.83 million "shall be allocated" to RFA, and $100 million to MBN.  Pub.

L. No. 118-47, div. F, 138 Stat. 460, 735 (2024); Add.87.  Congress extended that

same funding directive for FY2025 through continuing resolutions.  Under the

IBA, USAGM "allocat[es] funds appropriated for international broadcasting

activities" by "mak[ing] and supervis[ing] grants."  22 U.S.C. § 6204(a)(5), (6).

USAGM is prohibited from reprogramming more than 5% of a network's annual

appropriation.  138 Stat. at 735.

On March 15, 2025, USAGM terminated each Network's funding ostensibly

because it "no longer effectuates agency priorities."  Opp.Add.15, 42.  The

---

[1] "Opp.Add." refers to the addendum to the Networks' stay opposition in this
Court.  *E.g.*, MBN, 25-5150 (D.C. Cir. Apr. 28, 2025), ECF No.2113206.

impoundment of the Networks' funds has devastated the Networks.  If RFA does

not receive funding by May 9, it will be forced out of existence unless it terminates

approximately 340 employees—leaving behind a shell with "minimal

broadcasting," facing "bankruptcy in late summer."  Add.89.  MBN has already

terminated the employment of 514 individuals; it cannot survive past May 31

without funding.  Add.91-92.

### B.    Procedural Background

RFA and MBN each filed suit and sought emergency relief.

Contemporaneously, a related case was transferred to D.D.C.  That case,

*Widakuswara v. Lake*, 25-cv-1015 (D.D.C.), challenged the government's efforts

to dismantle USAGM, including its termination of funding to the Networks.

The district court entered a preliminary injunction in *Widakuswara*.  It held

that the plaintiffs were likely to show that USAGM's dismantling gambit was

unlawful and, as relevant here, that USAGM's termination of the Networks'

funding violated the IBA and appropriations statutes, as well as the Take Care

Clause and separation-of-powers principles.  Add.74-76.  The district court

rejected the government's Tucker Act jurisdictional argument because the

Networks' rights arise from the relevant statutes, not the grant agreements.

Add.65-66.  The injunction required the defendants to reverse the dismantling and

to restore the Networks' grants.  Add.84-85.  Days later, the court entered a

preliminary injunction in the Networks' lawsuits likewise requiring USAGM to restore the Networks' grants.  Add.43-46.

The government appealed and sought a stay in *Widakuswara* and the Networks' lawsuits before funds would be disbursed on May 2.  *See* Nos. 25-5144, 25-5150, 25-5151 (D.C. Cir.).  A motions panel issued an administrative stay the night before the Networks were to receive the funds they need to survive.

On May 3, a divided motions panel granted a stay.  Add.5-6.  The panel held that the government would likely prevail on appeal because the Networks' claims sound in contract, and so the district court lacked jurisdiction under the Tucker Act.  The panel recognized the Networks' statutory and constitutional claims, but rejected them out of hand at the jurisdictional stage because it believed that the statute only requires USAGM to "enter grants obligating the appropriated amounts to the networks"—not to actually disburse the funds Congress expressly allocated. Add.13-14.  The panel also concluded that the remaining factors supported a stay, despite the "possible collapse of MBN and RFA" during appeal.  Add.17.

Judge Pillard dissented.  In her view, the majority's decision was "inconsistent with both this court's and the Supreme Court's longstanding understanding of the Tucker Act."  Add.28.  She explained that under the governing test the "Networks' claims belong in the district court," because the "Congressional basis of [the Networks'] entitlement precedes the individual grants

5

that deliver their allocations" and because the Networks do not seek money damages for breach of contract.  Add.30, 33-34.  On the equities, Judge Pillard emphasized that the Networks "are on the verge of collapse."  Add.36, 39.  She explained that the purpose of a stay is "to maintain the status quo until a case can be fully adjudicated," but the stay here "does the opposite" by eliminating the Networks' "ability to see this case through."  Add.19.

## ARGUMENT

The decision of the motions panel conflicts with decisions of this Court and the Supreme Court on a question of exceptional national importance.  *See* Fed.R.App.P. 40(b)(2)(A), (B), (D).  This Court should grant rehearing en banc, vacate the stay, and hold that the circumstances do not justify the "'extraordinary' remedy" of a stay pending appeal.  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted).

## I.    The Government Is Not Likely to Succeed on Appeal.

The panel held that Article III courts cannot enjoin an impoundment of federal funds directed to an entity by *statute* whenever those funds are distributed through the mechanism of a contract.  That remarkable ruling conflicts with decades of precedent and disempowers federal courts precisely when they are most needed to fulfill their constitutional function.

A.    **Article III Courts May Hear the Networks' Statutory and Constitutional Claims.**

Jurisdiction over the Networks' statutory and constitutional claims plainly lies in the Article III federal courts.  The panel's contrary decision conflates jurisdiction and the merits, and in any event gets the merits badly wrong.

1.  The Networks brought statutory and constitutional claims that Article III courts can and must adjudicate.

It is undisputed that the Networks allege Defendants violated federal statutes and the Constitution.  Each Network's complaint argues that Defendants' actions are "contrary to law and in excess of statutory authority because the [IBA] and the relevant appropriations laws create a mandatory, non-discretionary duty for Defendants to make available to [the Networks their] congressionally appropriated funds."  25-cv-907, ECF No.1, ¶ 58; 25-cv-966, ECF No.1, ¶ 58.  Each Network's complaint further alleges that Defendants' actions are "contrary to" the "Constitution because Defendants are unlawfully withholding funds appropriated by Congress."  *E.g.*, 25-cv-907, ECF No.1, *Id.* ¶ 60.  To vindicate these statutory and constitutional violations, each Network brought two claims under the Administrative Procedure Act ("APA"), one under the Mandamus Act, four under the Constitution, and one to enjoin ultra vires conduct.  *E.g.*, *id.* Counts One-Nine. The Networks have *never* argued that they are entitled to funds because Defendants violated a contract.

7

In those circumstances, the law is crystal clear: Jurisdiction lies with Article III courts. That conclusion is inescapable as to the Networks' non-APA claims. The government argues that the APA's waiver of sovereign immunity is inapplicable as to claims encompassed by the Tucker Act. *See Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004). But the Networks do not rely on the APA's waiver of sovereign immunity for seven of their nine claims, including the separation-of-powers and Take Care Clause claims accepted below. Add.75-76. Indeed, "[c]onstitutional claims for injunctive or declaratory relief face no sovereign immunity bar." Add.32 (Pillard, J., dissenting).

The Tucker Act provides no other basis to divest Article III courts of jurisdiction over constitutional claims. It does not say so expressly, as would be required for such a drastic encroachment on the judicial power. *See Webster v. Doe*, 486 U.S. 592, 603 (1988).[2] And the Tucker Act cannot divest Article III courts of jurisdiction over claims the CFC cannot hear, *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)—a category that includes claims based on non-money mandating provisions of the Constitution, such as the "doctrine of separation of powers," *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir.

---

[2] The panel is wrong to suggest (Add.15) that *Dalton v. Specter*, 511 U.S. 462 (1994), is to the contrary. *See id.* at 474 (rejecting non-APA review of constitutional claims against the President when "the statute in question commits the decision to the discretion of the President").

8

1995).  Otherwise, a federal funding recipient whose contract was terminated based on race would have no remedy whatsoever.  That result is intolerable—yet it is precisely the implication of the panel decision.

The Tucker Act also does not apply to the Networks' APA claims that "enforce [a] statutory mandate," as opposed to a contractual one.  *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988).  Until the panel's decision, this Court has dutifully followed that rule.  It has time and again inquired whether APA claims are "founded *only* on a contract," or instead "stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added), *overruled on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also, e.g.*, *Crowley Gov't Servs., Inc. v. GSA.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (considering whether "plaintiff's asserted rights … arise from statute").  That inquiry is straightforward here:  The Networks base their claims on a *statute* providing that RFA and MBN, by name, "shall be allocated" specified sums of appropriated funds; a *statute* telling USAGM to effectuate that direction through grant agreements; and a *statute* prohibiting USAGM from disbursing any less than Congress specified, subject to tightly circumscribed reprogramming authority that USAGM has not invoked.  The terms of the individual grant agreements are irrelevant to the Networks' claims.

9

2.  The panel's decision contravenes this foundational precedent.  Its basis for doing so is essentially its disagreement with the Networks on the merits.  *See* Add.13-15.  But disagreement on the *merits* is no basis for depriving Article III courts of *jurisdiction*, and in any event the Networks' claims are plainly meritorious.

a.  The panel's analysis conflates jurisdiction and the merits.  The law is clear:  the primary inquiry under the Tucker Act is the source upon which the plaintiff "*bases* its claims."  *Perry Cap.*, 864 F.3d at 619 (emphasis added); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982) (Tucker Act inapplicable because plaintiff did not "claim" a breach of contract and its "position [was] ultimately based" on an "alleged" violation of federal law).  The panel strayed far beyond that inquiry, despite the government's choice to seek a stay exclusively on Tucker Act grounds.  *See* Stay Mot. 11-18, *Widakuswara*, 25-5144 (D.C. Cir. Apr. 25, 2025).  If this Court is skeptical of the Networks' claims on the merits (it should not be), that skepticism can be resolved on appeal.  It is no basis for a stay on jurisdictional grounds.

b.  In all events, the panel's conclusion that the Networks lack a statutory entitlement to their appropriated funds is wrong.

i.  The IBA states that "United States international broadcasting"—which encompasses both RFA and MBN—"shall" fulfill several statutorily-prescribed

10

functions, including providing "news which is consistently reliable and authoritative," and a "balanced and comprehensive projection of United States thought." 22 U.S.C. § 6202(b); *id*. § 6208(b) (additional "functions" for RFA).

To ensure these statutory functions are carried out, Congress has repeatedly appropriated funds expressly for the Networks and instructed USAGM to pass through those amounts. Because appropriated funds are the Networks' sole funding, Congress's provision of funds is necessary to enable them to perform their statutory functions. Congress appropriated $60.83 million to RFA and $100 million to MBN for FY2025, directing that those funds "shall be allocated" to the Networks. 138 Stat. at 735.[3] The use of "shall" imposes an unambiguous mandatory duty on USAGM to allocate the money appropriated to the Networks. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-72 (2016). "Allocate," in the appropriations context, means "distribute." *See* Allocate, Black's Law Dictionary (12th ed. 2024). USAGM thus has a mandatory statutory duty to disburse $60 million to RFA and $100 million to MBN in FY2025.

Confirming that conclusion, Congress provided USAGM with only carefully circumscribed reprogramming authority. USAGM may reprogram up to 5% of the Networks' appropriated funds, 138 Stat at 735, and may redirect RFA's funds to

---

[3] As to RFA, Congress has further specified that USAGM grants "shall be available to make annual grants" to RFA. 22 U.S.C. § 6208(a).

"another entity" only if RFA "is not carrying out the [statutory] functions … in an effective and economical manner," 22 U.S.C. § 6208(g).  Congress's provision of "carefully defined grant[s] of authority" to withhold funds in certain circumstances "should be construed as an implicit withholding of the authority to" do so when those circumstances are not present.  *Gomez v. United States*, 490 U.S. 858, 872 (1989).  USAGM's disagreement with Congress's policy judgments therefore cannot justify its refusal to disburse funds altogether.

ii.  The panel decision renders that unambiguous statutory framework a nullity.  In the panel's view, the statute only requires USAGM to earmark the Networks' funds *on paper* by executing a grant agreement, but has nothing to say about whether the Networks actually get those funds.  Add.14.  That makes no sense.  Congress directed the Networks to perform statutory functions which they cannot carry out without funds.  Congress obviously intended that the Networks would *receive* the appropriated funds and use them to perform their assigned responsibilities.  It is inconceivable that Congress silently gave USAGM authority to void the statutory framework by denying the Networks funds and preventing them from doing the work Congress directed.  Courts should not lightly "conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019).  But that is exactly what the panel did.

Strikingly, the panel ignored Congress's directive that USAGM may not reprogram any more than 5% of the amount appropriated to each Network. That provision establishes that USAGM lacks any authority to refuse to disburse the vast majority of the Networks' FY2025 funds. In addition, the panel's construction renders the reprogramming provision superfluous. If USAGM can refuse to disburse whatever portion it chooses of the Networks' appropriated amounts, Congress would not have specified that USAGM may reprogram only up to 5%.

**B.    *Department of Education v. California* Does Not Support a Stay**

The panel believed that the Supreme Court's stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), "controls this case." Add.12. The opposite is true.

The *California* plaintiffs represented discretionary grantees who did not allege that the termination of their grants violated *any statute*, much less the Constitution. Compl. at 46-51, *California*, 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No.1. No statute entitled the plaintiffs to specified sums of appropriated funds; rather, any entitlement arose solely from grant agreements following a competitive process. The plaintiffs therefore contended that "[n]o term or condition of" their grant awards "authorized termination" on the ground that the government had invoked, rendering the termination contrary to the APA. *Id.* at 49

13

The Court concluded that the plaintiffs sought to "enforce a contractual obligation to pay money," notwithstanding their invocation of the APA. *California*, 145 S. Ct. at 968 (citation omitted). That conclusion is consistent with this Court's decision in *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), which involved a competitive contract recipient with no statutory or constitutional entitlement to appropriated funds. Here, in vivid contrast, the Networks claim just such a statutory and constitutional entitlement, making *California* and *Ingersoll-Rand* inapplicable.

The panel nonetheless treated *California* as controlling for two reasons, both wrong. First, the panel asserted, Add.13-14, that the Networks lack any statutory entitlement to funding; that argument fails for the reasons stated above. Second, the panel believed that the relief afforded by the district court—"disbursement to RFA and MBN of the funds Congress appropriated"—is "inherently contractual" because it "in substance orders specific performance," making the CFC the "exclusive forum for this suit." Add.12. That reasoning flies in the face of binding precedent.

In *Bowen v. Massachusetts*, 487 U.S. 879, 900-01 (1988), the Supreme Court recognized that the mere fact that an order requires the government to pay money—in other words, *ordering specific performance*—does *not* render the action contractual. There, the Court held that the district court had jurisdiction to

14

enter an injunction enforcing a statutory directive that the government "shall pay" funds. *Id.* So too here: By requiring "disbursement," the district court's order enforces Congress's direction that specific funds "shall be allocated" to the Networks.

The fact that the Executive and the Networks have *also* entered into grant agreements that parallel the appropriation does not somehow deprive the Article III courts of jurisdiction to enforce the very statutory command that the agreements implement. The grants are simply the means by which the Executive implements the appropriation. That the Networks might also have contractual rights does not vitiate their statutory entitlement. Nor does that alter their claim here: that Defendants have "acted beyond the scope of their statutory authority" by refusing to disburse appropriated funds. *Crowley,* 38 F.4th at 1107. Contrary to the panel's view, this Court has repeatedly recognized that such claims lie within the district court's jurisdiction. *Id.*; *Megapulse*, 672 F.2d at 969.

The panel's ruling thus effects an extraordinary constriction of Article III jurisdiction. Congress often instructs the Executive to use contracts to implement statutes directing appropriations to private entities. *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011). If the panel were correct, Article III courts would be powerless to adjudicate claims that the Executive has violated such statutes and even the Constitution. And plaintiffs whose directly appropriated

15

funds are delivered using grant agreements would be relegated to the CFC, which can award only retrospective damages. Those are no "substitute for prospective relief" enforcing the Executive's *ongoing* obligation to follow the statute. *Bowen*, 487 U.S. at 905. It cannot be that in enacting the Tucker Act, Congress constrained the Article III courts' authority in that manner, giving the Executive a blank check to violate statutory commands directing specific funds to recipients charged with implementing Congress's directives, and upending the separation of powers in the process.

## II. The Panel Erred in Evaluating the Remaining Stay Factors.

The difference in irreparable harm between the parties could not be more stark. If this Court grants a stay, the Networks will cease to exist before the appeal is adjudicated. If the Court rejects the stay, the government will make payments that Congress has expressly directed, in accordance with decades of uncontroversial practice. That vast disparity in harms alone justifies denying the stay. *See* Add.40-41 (Pillard, J., dissenting); *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1330 (D.C. Cir. 2024) (equity favors allowing a party to "fully litigate[]" its claims "without being throttled by a shutdown of its business"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (movant's failure to show irreparable harm is "grounds for refusing to issue a [stay], even if the other three factors entering the calculus merit such relief").

16

Any harm the government incurs cannot possibly justify a stay that destroys the Networks before an appeal is adjudicated.  The panel expressed concern that the government will be "forced to imminently pay out" the Networks' April funds.  Add.16.  But that harm is insubstantial:  The funds at issue are "statutorily earmarked for the very purpose and entity to which the injunction directs them," and are "legally restricted against reprogramming to other functions or entities."  Add.41 (Pillard, J., dissenting).  The government already paid out March funds pursuant to an injunction previously issued in *Widakuswara*; payment of April funds is a marginal additional cost to the government, but is the difference between life and death for the Networks.

The panel invokes *California* on the equities too, but its reliance is again misplaced.  In that case, the grantees "represented in th[e] litigation that they have the financial wherewithal to keep their programs running," so the equitable stay factors tipped in the government's favor.  145 S. Ct. at 969.  Here, even with the drastic steps both Networks have taken—including mass furloughs and layoffs— neither Network can last through this litigation.  *See* p.4, *supra*.

The balance of equities and public interest also weigh powerfully against a stay.  Beyond the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted), here

17

Congress has already determined where the public interest lies: it is "in the interest of the United States to support broadcasting to other nations." 22 U.S.C. § 6201(3). A stay would leave that mission unfulfilled for the first time in decades— which "cannot be squared with the public interest." Add.41 (Pillard, J., dissenting).

## CONCLUSION

The Court should grant en banc review.

Dated May 5, 2025                           Respectfully submitted,

                                            /s/ Donald B. Verrilli, Jr.

Kristin Bateman*                            Donald B. Verrilli, Jr.
Jennifer Fountain Connolly                  Ginger D. Anders
Robin F. Thurston                           Jeremy S. Kreisberg
Skye L. Perryman                            Helen E. White
DEMOCRACY FORWARD FOUNDATION                 Esthena L. Barlow
P.O. Box 34553                              MUNGER, TOLLES & OLSON LLP
Washington, D.C. 20043                      601 Massachusetts Ave. NW,
(202) 448-9090                                Suite 500E
kbateman@democracyforward.org               Washington, D.C. 20001
jconnolly@democracyforward.org              (202) 220-1100
rthurston@democracyforward.org              Donald.Verrilli@mto.com
sperryman@democracyforward.org              Ginger.Anders@mto.com
                                            Jeremy.Kreisberg@mto.com
                                            Helen.White@mto.com
                                            Esthena.Barlow@mto.com

                                            Hailyn J. Chen
                                            Adeel Mohammadi
                                            MUNGER, TOLLES & OLSON LLP
                                            350 S. Grand Ave.,
                                              Fiftieth Floor
                                            Los Angeles, CA 90071
                                            (213) 683-9100
                                            Hailyn.Chen@mto.com
                                            Adeel.Mohammadi@mto.com

                                            Gabriel M. Bronshteyn
                                            MUNGER, TOLLES & OLSON LLP
                                            560 Mission St.,
                                              Twenty-Seventh Floor
                                            San Francisco, CA 94105
                                            (415) 512-4000
                                            Gabriel.Bronshteyn@mto.com

*Counsel for Plaintiffs-Appellees*

*Admitted in California only; practicing under the supervision of District of
Columbia Bar members

19

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation in Federal Rule of

Appellate Procedure 40(d)(3) because it contains 3,884 words.  This brief complies

with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)

and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word in 14-point Times New Roman font.

Dated:  May 5, 2025                    */s/ Donald B. Verrilli, Jr.*
                                      Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I certify that on May 5, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.

Dated:  May 5, 2025                    */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr.

# ADDENDUM

Circuit Rule 40(c) Materials

Certificate as to Parties, Rulings, and Related Cases ......................................Add. 1

Corporate Disclosure Statement ......................................................................Add. 3

D.C. Circuit Opinion and Order

Order Granting Stay Pending Appeal in *MBN*, 25-5150, and
    *RFA*, 25-5151 (D.C. Cir. May 3, 2025)....................................................Add. 4

District Court Opinions and Orders

Orders Granting Preliminary Injunctions in *RFA*, 25-cv-907,
    and *MBN*, 25-cv-966 (D.D.C. Apr. 25, 2025)......................................Add. 43

Memorandum Opinion Granting Preliminary Injunction in
    *Widakuswara*, 25-cv-1015 (D.D.C. Apr. 22, 2025) .............................Add. 47

Order Granting Preliminary Injunction in *Widakuswara*, 25-cv-
    1015 (D.D.C. Apr. 22, 2025)..................................................................Add. 84

Statutory Material

Explanatory Statement Submitted by Ms. Granger, Chair of the
    House Committee on Appropriations, Regarding H.R.
    2882, Further Consolidated Appropriations Act 2024,
    170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) ..................................Add. 86

Supporting Material

Second Supplemental Declaration of Kevin W. Fleming (RFA)
    (Apr. 27, 2025) ......................................................................................Add. 88

Second Supplemental Declaration of Deirdre Kline (MBN)
    (Apr. 27, 2025) ......................................................................................Add. 91

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties**

Petitioners (Plaintiffs-Appellees):  Radio Free Asia and Middle East Broadcasting Networks, Inc.

Respondents (Defendants-Appellants):  United States of America; the United States Agency for Global Media; Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; Victor Morales, in his official capacity as Acting CEO; the Office of Management and Budget; Russell Vought, in his official capacity as Director of the United States Office of Management and Budget; the United States Department of Treasury; and Scott Bessent, in his official capacity as United States Secretary of the Treasury.

Intervenors and amici curiae:  Reporters Committee for Freedom of the Press filed a motion for leave to file an amicus brief in district court proceedings.

**B.    Rulings Under Review**

The Networks commenced this action challenging the government's impoundment of their congressionally appropriated funds on March 27, 2025 (RFA) and April 1, 2025 (MBN).  On April 25, 2025, the Honorable Royce C. Lamberth of the U.S. District Court for the District of Columbia granted the Networks' respective motions for a preliminary injunction.  *See Radio Free Asia v. United States*, 25-cv-907 (D.D.C. Apr. 25, 2025), ECF No. 25; *Middle East*

*Broadcasting Networks, Inc. v. United States*, 25-cv-966 (D.D.C. Apr. 25, 2025),

ECF No. 23.  No official citations exist, but both orders are included in this

addendum.  Those orders were granted for substantially the same reasons

explained in *Widakuswara v. Lake*, 2025 WL 1166400 (D.D.C. Apr. 22, 2025),

which is also included in this addendum.

On April 25, 2025, the government noticed an interlocutory appeal, and on

April 26, 2025, the government moved for a stay pending appeal.  On May 3,

2025, a divided panel of this Court granted the government's motion for a stay

pending appeal.  *See Middle East Broadcasting Networks, Inc. v. United States*, 25-

5150 (D.C. Cir. May 3, 2025), ECF No. 2114139; *Radio Free Asia v. United*

*States*, 25-5151 (D.C. Cir. May 3, 2025), ECF No. 2114139.  No official citation

exists, but the per curiam order is included in this addendum.

## C.    Related Cases

There are three related cases currently before this Court: *Widakuswara v.*

*Lake*, 25-5144 (D.C. Cir.); *Abramowitz v. Lake*, 25-5145 (D.C. Cir.); *RFE/RL,*

*Inc. v. Lake*, 25-5158 (D.C. Cir.).  In addition, there is one related case currently

pending in the U.S. District Court for the District of Columbia:  *Open Technology*

*Fund v. Lake*, 25-cv-840 (D.D.C.).


Dated:  May 5, 2025                          */s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

I state that neither Radio Free Asia nor Middle East Broadcasting Networks, Inc.,

has any parent company and that no publicly held company has a 10% or greater

ownership interest in either entity.

Dated:  May 5, 2025                    */s/ Donald B. Verrilli, Jr.*
                                       Donald B. Verrilli, Jr.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 3, 2025

Patsy Widakuswara, et al.,

      Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

      Appellants


**No. 25-5145**                    **1:25-cv-00887-RCL**


Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

      Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

**Add. 4**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## No. 25-5144                September Term, 2024

## No. 25-5150

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

        Appellee

    v.

United States of America, et al.,

        Appellants

## No. 25-5151

**1:25-cv-00907-RCL**

Radio Free Asia,

        Appellee

    v.

United States of America, et al.,

        Appellants

**BEFORE:**    Pillard*, Katsas, and Rao, Circuit Judges

## O R D E R

      Upon consideration of the motions for stay pending appeal filed in the above-captioned cases, the responses thereto, and the replies; and the administrative stay entered on May 1, 2025, it is

\*Judge Pillard dissents from the grant of the motions for stay.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                              **September Term, 2024**

**ORDERED** that the motions for stay pending appeal be granted. The following orders, or parts thereof, are stayed pending further order of the court:

In No. 25-5144, provisions (1) and (2) of the district court's preliminary injunction filed April 22, 2025;

In No. 25-5145, the district court's preliminary injunction filed April 22, 2025, to the extent the relief granted falls within provisions (1) and (2) of the April 22, 2025 preliminary injunction in No. 25-5144;

In No. 25-5150, the district court's preliminary injunction filed April 25, 2025;

In No. 25-5151, the district court's preliminary injunction filed April 25, 2025.

A _per curiam_ concurring statement and a dissenting statement of Judge Pillard are attached. It is

**FURTHER ORDERED** that the administrative stay entered in Nos. 25-5144, 25-5150, and 25-5151 be dissolved.

**Per Curiam**

FOR THE COURT:
Clifton B. Cislak, Clerk

BY:     /s/
Amy Yacisin
Deputy Clerk

Page 2

**Add. 6**

PER CURIAM: For the following reasons, we grant the government's motion for a stay pending appeal.

I

The United States Agency for Global Media oversees six federally funded broadcast networks. One of these, Voice of America, is operated by government employees and contractors. Others, including Radio Free Asia and Middle East Broadcasting Networks, operate as private, non-profit corporations. Through appropriations, Congress has allocated specific funding for the private networks, which USAGM disburses through grants. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043. In response, USAGM placed over 1,000 employees on administrative leave, terminated nearly 600 personal-service contractors, and terminated RFA's and MBN's grant agreements for the 2025 fiscal year. *Widakuswara v. Lake*, No. 25-CV-1015, 2025 WL 1166400, at *3 (D.D.C. Apr. 22, 2025). USAGM further directed its personnel abroad to cease broadcasting through VOA. *Id.*

Various plaintiffs, including USAGM employees, contractors, and grantees, filed lawsuits to challenge these actions in our district court. In one of the cases, the district court granted a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with RFA and MBN, and (3) restore VOA as "a consistently reliable and authoritative

Add. 7

2

source of news." *Widakuswara*, 2025 WL 1166400, at *18. The court granted parallel relief in the other cases.

USAGM appealed and sought a stay of the first two portions of the preliminary injunction. Because of imminent funding deadlines, parties on both sides have requested expedited consideration of the stay motion.[1]

II

To resolve the stay motion, we consider whether the government is likely to prevail on appeal, any irreparable harm to the government, harms to the plaintiffs and others, and the public interest. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009). Applying these factors, we conclude that a stay is warranted.

A

The government is likely to succeed on the merits because the district court likely lacked subject-matter jurisdiction to enjoin USAGM's personnel actions and to compel the agency to restore RFA's and MBN's FY 2025 grants.

1

The district court likely lacked jurisdiction over USAGM's personnel actions. "We have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't*

---

[1] Radio Free Europe, another private network funded by USAGM, filed a similar suit and received a temporary restraining order. *See RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 1232863 (D.D.C. Apr. 29, 2025). The government has filed a separate motion to stay that order, which we do not resolve here.

3

*of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government.[2] *See*, *e.g.*, 5 U.S.C. §§ 1204, 7121–22, 7701 (Merit Systems Protection Board); *id.* § 1214 (Office of the Special Counsel); *id.* § 7104 (Federal Labor Relations Authority); 22 U.S.C. § 4107 (Foreign Service Labor Relations Board); *id.* § 4136 (Foreign Service Grievance Board); 41 U.S.C. §§ 7103–05 (Civilian Board of Contract Appeals). These remedial schemes "provide[] the exclusive procedures by which federal employees" may pursue employment- and contractor-related claims. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *see, e.g.*, *Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461–62 (D.C. Cir. 1990) (foreign-service labor-related claims must go through FSLRB); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) (Contract Disputes Act provides exclusive remedial scheme for covered contracts). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009). "And that principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

---

[2] The dissent doubts that Congress's chosen administrative methods could meaningfully process agency-wide claims for over 1,000 employees. But administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters. *See* Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees).

4

The district court nonetheless justified the injunction on the ground that "this case is not simply a collection of employment disputes" because the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara*, 2025 WL 1166400, at *11. And in their stay briefing, plaintiffs expressly frame their claims as challenging the "wholesale shuttering of VOA" and seeking to undo "broad government actions" to "dismantl[e] an entire federal agency." Abramowitz Opp'n to Stay Mot. at 13, 18; Widakuswara Opp'n to Stay Mot. at 14. Yet plaintiffs may not use the APA to mount "wholesale" challenges to an agency's "entire program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (cleaned up). The APA cause of action, like its sovereign-immunity waiver, provides for judicial review of "discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* 5 U.S.C. §§ 702, 704. The "dismantling" that plaintiffs allege is a collection of "many individual actions" that cannot be packaged together and "laid before the courts for wholesale correction under the APA." *Nat'l Wildlife Fed'n*, 497 U.S. at 893.[3] Thus, while USAGM's employees and contractors might have viable, discrete claims with respect to their individual personnel actions, those claims must be pursued through other remedial channels.

2

The district court also likely lacked jurisdiction to restore RFA's and MBN's FY 2025 grants.

---

[3] Before the district court and here, the government maintained that plaintiffs fail to challenge any discrete, circumscribed agency action as required under the APA and instead seek judicial review of the agency's general compliance with its statutory mandate. *See* Opp. to Preliminary Injunction 30; Stay Mot. 22–23.

5

The Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  We have long held that this jurisdictional grant, where it applies, is exclusive and thus bars application of the sovereign-immunity waiver set forth in the APA.  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022); *see* 5 U.S.C. § 702 (providing that APA waiver of sovereign immunity is inapplicable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought").  For Tucker Act purposes, whether a claim is "founded upon" a contract hinges on "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley*, 38 F.3d at 1106 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).  If a claim against the United States is contractual "at its essence," district courts have no power to resolve it.  *Id.* (quoting *Megapulse*, 672 F.2d at 967).  The same rule applies to claims for breach of grant agreements executed through binding government contracts. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–40 (Fed. Cir. 2021).

The Supreme Court recently applied these principles to issue a stay pending appeal in a case substantially similar to this one.  In *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), a district court entered an order "enjoining the Government from terminating various education-related grants." *Id.* at 968.  The Supreme Court stayed the order pending the disposition of an appeal to the First Circuit and any ensuing petition for certiorari.  *Id.* at 696.  The Court concluded that the district court likely lacked jurisdiction to bar termination of the grants, because the Tucker Act likely conferred jurisdiction over the dispute on the CFC. *Id*.  Therefore, "the APA's limited waiver of immunity d[id]

6

not extend" to the injunction at issue, which the Court described as an "order[] to enforce a contractual obligation to pay money." *Id.* (cleaned up).

That reasoning controls this case. Congress created a contractual scheme for allocating funds to the grantees. It authorizes USAGM to fund RFA, MBN, and other networks through "grants and cooperative agreements." 22 U.S.C. § 6204(a)(5). Likewise, the governing appropriation statute allocates specific funding amounts for "grants" to those networks. 2024 Appropriations Act, 138 Stat. at 735. In the grants at issue here, USAGM, acting through its Chief Executive Officer, promised to pay the appropriated funds to the networks in monthly installments. In return, the networks promised to use the funds to advance statutory objectives and to comply with all program requirements. These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes. *Columbus Reg'l Hosp.*, 990 F.3d at 1338–39.

By the district court's own telling, the dispute here arose when USAGM terminated these agreements. *Widakuswara*, 2025 WL 1166400, at *3. The district court ordered "restor[ation] [of] the FY 2025 grants" and "disbursement to RFA and MBN of the funds Congress appropriated." *Id.* at *18. Whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985). And it is the inherently contractual nature of the relief afforded—

7

*not* any characterization of the relief as money damages—that makes the CFC the exclusive forum for this suit.  *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding a plaintiff "may not sidestep" CFC jurisdiction by "avoiding a request for damages," when their request relief "amount[s] to a request for specific performance"); *see also Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints … to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

To distinguish *California*, the plaintiffs stress that Congress appropriated specific sums for RFA and MBN. Accordingly, plaintiffs contend, they may file an APA claim—independent of and antecedent to their grant agreements—to force USAGM to disburse the appropriated amounts.  But plaintiffs overread the governing statutes, which do not give the networks an unqualified right to the appropriated funds. Rather, they allocate funds for the networks, which may be disbursed only as grants.  *See* 2024 Appropriations Act, 138 Stat. at 735.  If these statutes created any entitlement for the networks at all, they at most would require USAGM to enter grants obligating the appropriated amounts to the networks.  *Cf. Train v. City of New York*, 420 U.S. 35, 40–43 & n.9 (1975).[4] Thus, any APA claim under these statutes would have to allege that the government failed to enter a grant agreement obligating

---

[4]  And even then, USAGM may impose various conditions on a network's receipt of the appropriated funds.  *See* 22 U.S.C. § 6208(c) (listing "limitations and restrictions" to be contained in "[a]ny grant agreement"); 2024 Appropriations Act, 138 Stat. at 735 ("funds appropriated under this heading shall be made available in accordance with the principles and standards" of the statute). Moreover, even after USAGM has entered into grant agreements, the agency still may "award the grant … to another entity" if, "at any time," it determines that the network "is not carrying out the [statutory] functions … in an effective and economical manner." 22 U.S.C. § 6208(g).

8

the appropriated amount. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199–200 (Fed. Cir. 1997) (*NCMS*). But here, USAGM *did* obligate the appropriated funds through grants, thereby satisfying whatever duty (if any) it had under the appropriation statutes. *See Widakuswara*, 2025 WL 1166400, at *4–*5. Once the agency entered these contracts, it incurred a new obligation: Unlike the relevant statutes, the grant agreements require the government to make *monthly* payments to the networks—the very obligation prompting this highly expedited stay litigation. Accordingly, the claims of government nonpayment necessarily challenge its performance under the grants. Such claims are squarely contract claims under the Tucker Act. *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368–69 (Fed. Cir. 2021) (explaining *NCMS*); *see also Ingersoll-Rand*, 780 F.2d at 78–80 (Tucker Act applies to claims that the government's termination of a contract violated statutes or regulations incorporated therein).[5]

The plaintiffs' non-APA claims regarding grant money are unlikely to fare any better. Below, plaintiffs raised mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers,

---

[5] The dissent describes 22 U.S.C. § 6208(c)(5) as significantly limiting the circumstances in which USAGM may terminate grants. However, that provision sets forth when grants may be "terminated *without fiscal obligation to the United States*." 22 U.S.C. § 6208(c)(5) (emphasis added). It thus confirms our conclusion that Congress contemplated financial liability under the grant as the remedy for any breach. The dissent also notes that the government cannot prevent enforcement of statutes through the APA merely by incorporating the statutes into contracts. The dissent is correct on that point. *See Megapulse*, 672 F.2d at 967. But in this statute, Congress chose to use a contractual mechanism for obligating the appropriated funds, rather than creating a freestanding statutory entitlement.

9

and *ultra vires* claims. And before our Court, plaintiffs argue that "serious constitutional question[s]" would arise if we concluded that the CFC had exclusive jurisdiction, as that would deprive them of meaningful judicial review of their constitutional claims. Widakuswara Opp'n to Stay Mot. at 18 (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). But these constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims. *Dalton v. Specter*, 511 U.S. 462, 472–74 (1994); *see also Ingersoll-Rand*, 780 F.2d at 78 (Tucker Act governs challenge to contract termination, "despite plaintiff's allegations of statutory and constitutional violations" (cleaned up)).[6] Moreover, these claims fall short for the same reason as plaintiffs' APA claims: At most, the statutes in question required USAGM to allocate the appropriated amounts through grants enforceable as contracts, which USAGM has done.

B

On balance, the remaining *Nken* factors support a stay.

*Irreparable Harm*. The government has shown that it will face irreparable harm absent a stay. As to the reinstatement of USAGM employees and personal-service contractors: The Executive Branch has a significant interest in maintaining control over personnel matters. *See Sampson v. Murray*, 415

---

[6] In the district court, the *Widakuswara* plaintiffs also raised Appointments Clause and First Amendment claims. The district court did not address them in granting the preliminary injunction, *Widakuswara*, 2025 WL 1166400, at *5 n.13, *15 n.26, and the plaintiffs do not assert them as grounds for denying a stay. So, we do not consider these claims in resolving these stay motions.

10

U.S. 61, 83 (1974). In requiring the restoration of all employees and contractors to their pre-March 14 status, the injunction interferes with this important responsibility. This intrusion is particularly harmful because it implicates the Executive Branch's foreign-affairs authority. USAGM is responsible for "present[ing] the views of the United States Government" and "support[ing] United States foreign policy objectives" in the international community. 22 U.S.C. § 6202(b)(3), (4). By depriving the Executive Branch of control over the individuals involved in its international broadcasting, the injunction threatens its prerogative to "speak with one voice" on behalf of the United States in foreign affairs. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

As to the restoration of the grants: Absent a stay, USAGM would be forced to imminently pay out some $15 million to RFA and MBN. And RFA and MBN have attested they intend to spend these funds "immediately." Network Opp'n to Stay Mot. at 22. Because the district court did not require plaintiffs to post any injunction bond, *Widakuswara*, 2025 WL 1166400, at *17,[7] USAGM cannot recover these funds even if it should prevail in its appeal. Under these circumstances, harm to the government is irreparable. *See California*, 145 S. Ct. at 969.

---

[7] Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The "precise purpose" of such a bond is to ensure that a defendant can be fairly compensated for injury stemming from a wrongfully granted injunction. *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

11

*Harm to Others*. Plaintiffs identify various harms that they and others may incur absent a stay, including loss of employment, the possible collapse of MBN and RFA, the elimination of a union's bargaining unit, and the removal of alien employees and contractors to countries hostile to the free press. Although we appreciate the gravity of these harms, there remain several avenues for their remediation. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be beyond remediation."). Loss of government employment generally does not constitute irreparable injury, *see Sampson*, 415 U.S at 91–92 & n.68, especially since employees seeking to challenge their termination or placement on administrative leave may seek emergency stays from the Office of Special Counsel and MSPB, *see* 5 U.S.C. § 1214(b). Personal-service contractors may likewise challenge their termination under the Contract Disputes Act, and unions may file complaints on behalf of their members before the FLRA. *E.g.*, *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001) (CFC exercising jurisdiction over personal-service contract), *aff'd*, 30 F. App'x 964 (Fed. Cir. 2002); *see* 41 U.S.C. § 7101 *et seq.*; 5 U.S.C. § 7118. Journalists may seek relief in immigration proceedings to avoid potential persecution based on their political opinions. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158 (asylum); *id.* § 1231(b)(3) (withholding of removal). As for MBN and RFA, they may seek to recover any wrongfully withheld grant funds in the CFC. 28 U.S.C. § 1491(a)(1). Indeed, for almost a month, the Supreme Court has made clear that the CFC is likely the only forum open to them. *See California*, 145 S. Ct. at 968.[8]

---

[8] We need not consider any potential harm from shuttering VOA; the district court ordered USAGM to resume VOA's statutorily required programming levels, and the government has not sought to stay that provision of the injunction.

12

*Public Interest*.    Plaintiffs allege that USAGM's implementation of the Executive Order has violated numerous statutory requirements.    At this stage of the litigation, the government has raised jurisdictional, not merits, defenses.    Of course, we recognize that the public has an interest in the Executive Branch's compliance with congressional mandates. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).    By the same token, however, the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress.    Because personnel and grant disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the MSPB and the CFC.    We must respect those boundaries no less than the substantive and appropriations provisions governing the operation of USAGM.

PILLARD, *Circuit Judge*, dissenting: Defendants are unlikely to succeed on the merits: They have not persuasively established that the district court lacked authority to enter the preliminary injunction. Meanwhile, Voice of America, Radio Free Asia, and Middle East Broadcasting Networks face severe and irreparable harm absent injunctive relief. Voice of America has gone dark for the first time since 1942. Radio Free Asia and Middle East Broadcasting Networks face imminent collapse if they do not receive the funding Congress directed to each of them by name. The purpose of a stay pending appeal is to maintain the status quo until a case can be fully adjudicated on its merits. This stay does the opposite, silencing Voice of America for the foreseeable future and eliminating Radio Free Asia and Middle East Broadcasting Networks' ability to see this case through to the end.

## I.

Defendants are not likely to succeed on the merits. They do not claim that any court would likely hold that they are carrying out the will of Congress. They argue instead that other entities should have heard plaintiffs' claims. Part A describes the strong likelihood that the plaintiffs who worked for Voice of America did not have to spend years attempting to channel their claims through federal labor and employment administrative processes before they could file this suit under the Administrative Procedure Act to set aside the Agency's efforts to dismantle the work of Congress. It also defends the scope of the district court's preliminary injunction as commensurate with defendants' baby-with-the-bathwater approach to asserting their "policy priorities." Part B turns to the strong likelihood that the district court had jurisdiction over the claims of Radio Free Asia and Middle East Broadcasting

**Add. 19**

2

Networks, contrary to contentions that those claims belong in the Court of Federal Claims.

## A.

On March 14, 2025, the President signed Executive Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, directing USAGM to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law," and to eliminate "the non-statutory components and functions" of the agency "to the maximum extent consistent with applicable law." 90 Fed. Reg. 13043 (Mar. 14, 2025). The EO directed the head of USAGM to report its compliance to OMB with an explanation of "which components or functions of the governmental entity, *if any*, are statutorily required and to what extent." *Id.* (emphasis added).

The very next day, USAGM's website featured a statement announcing that the Agency—which it described as producing "radical propaganda," "rot from top to bottom"—is "irretrievably broken" and "not salvageable."[1] Apparently having concluded that *none* of the functions of Voice of America or the foreign affiliate networks is statutorily required, the agency's acting leadership proceeded to dismantle all of them.

To that end, the district court found, defendants "took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025). The day

---

[1] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://perma.cc/YQA4-3TVA.

3

after the EO was signed, the agency's acting leadership sent a boilerplate e-mail to 1,042 of the 1,147 full-time employees placing them on administrative leave and another such email to each USAGM affiliated network terminating its grant on the ground that it "no longer effectuates agency priorities." *Id.* at *3 & n.5. The next day, the government cancelled all USAGM personal service contracts. It then instructed all the USAGM foreign news services to shut down their transmitters and place locally employed staff on leave. USAGM prepared to send termination notices to every radio broadcast technician working for it anywhere in the world who was not already in the process of retiring. *Id.* at *3. The government informed plaintiff AFGE of its plan to terminate 594 employees who are AFGE members. *Id.*

As a result of those wholesale actions, USAGM's flagship station, Voice of America, stopped reporting the news "for the first time in its 80-year existence." *Id.* Voice of America's affiliate networks abroad went dark or switched to airing only music. Widakuswara Compl. ¶ 82.

The statute is clear: Voice of America must "serve as a consistently reliable and authoritative source of news." 22 U.S.C. § 6202(c)(1). The government touts that it did not challenge part (3) of the injunction compelling its compliance with that statutory directive. Gov't Stay Mot. 1. But the significance of that caveat—beyond the purely symbolic—remains a mystery. The district court found as fact that the Agency has placed on leave or terminated all the VOA employees and contractors who are necessary to fulfilling that mandate. *See* Widakuswara Compl. ¶ 83 (*all* transmitters abroad shuttered and *all* locally employed staff placed on administrative leave). And there is no reason to conclude that the government is in fact complying with the injunction to get Voice of America back up and running. Plaintiff Abramowitz

**Add. 21**

4

emailed Defendants Lake and Morales the morning after the
district court entered the injunction, asking about their plans to
bring VOA staff back to work. He received no response.
Abramowitz Opp'n 21. No status report or other filing or
source of information suggests that Voice of America has
resumed broadcasting the news.

In support of its emergency motion for a stay pending
appeal in the Voice of America cases, the government contends
it is likely to succeed on the merits in its defense against the
claims of Voice of America's employees for two related
reasons. First, as a threshold matter, it asserts that the district
court lacked jurisdiction over the employee plaintiffs' claims
because the employees did not first seek relief from the Merit
Systems Protection Board (MSPB) (for employment disputes),
the Federal Labor Relations Authority (FLRA) (for labor
disputes), or the Office of Special Counsel (for prohibited
personnel practices). Gov't Stay Mot. 20-21. Second, the
government argues that the preliminary injunction is overbroad
in ways that are unsupported by the claims the district court
held were likely to succeed. Gov't Stay Mot. 19-21.

1. The administrative channeling defense is inapposite
here. The government contends that plaintiffs must treat their
wholesale removal from the workplace as if it were an
aggregation of individualized employment actions. It suggests
that the correct response is for each of the hundreds of
employees to proceed with a separate, identical administrative
claim at the MSPB or FLRA. I would not indulge any such
fiction. Defendants themselves never did. They took broad,
blunt, and decisive action to gut USAGM and VOA. They sent
identical notices to all VOA employees. Widakuswara Compl.
¶ 74. Nothing about each decision or its execution was
individualized. No employment-related rationale was

**Add. 22**

5

offered—except the cold comfort that the action was *not* for any "disciplinary purpose." *Id.*

Defendants give no realistic indication why administrative exhaustion is required here other than to weakly suggest that, viewed as individual employment actions, some "may be entirely lawful." Gov't Stay Mot. 21. The government leaves unsaid how review by the agencies it identifies could discern in any individualized sense how a wholesale removal of public sector employees from their jobs without employment-related grounds, notice, or prospects for return "may" be found to be lawful—or not—by the employment-review agencies to which they would direct the plaintiffs.

Even taken at face value, the government's channeling argument is unlikely to succeed. *See Widakuswara*, 2025 WL 1166400, at *10-11. Channeling plaintiffs' claims to administrative bodies designed to adjudicate individual employment or labor disputes would entirely shut off meaningful judicial review of the claims plaintiffs assert. The VOA plaintiffs challenge the dismantling of USAGM through the wholesale placement of employees on administrative leave with one boilerplate letter. The agency took that action without any employee-related justification. The announced reason defendants acted as they did was to dismantle a broadcaster whose mission and operation they disdain. That is not a "*covered* agency action[]" that must proceed through the administrative review scheme. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6, 10 (2012) (emphasis added). Nor is the action challenged here a matter of federal sector "employee relations" that must proceed through the Federal Labor Relations Authority. *Cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). The plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as

6

it is the means by which they challenge defendants' unlawfully halting the work of Voice of America and shutting it down.

The channeling defense does not in any event reach all claims in the VOA cases. As the district court pointed out, *Widakuswara*, 2025 WL 1166400, at *10, there is no scenario in which the claims the nonprofit press organizations or personal service contractors raise could conceivably be channeled through the Federal Service Labor-Management Relations Statute, the Civil Service Reform Act, or the Foreign Service Act. There is no administrative agency from which plaintiffs Reporters Without Borders, Reporters Sans Frontières, or personal service contractors John Does 3 and 4 might seek relief, even if it made sense for them to try. Given defendants' failure to acknowledge or address the lack of any administrative process available to these plaintiffs, there is no basis to conclude the threshold challenge to the district court's jurisdiction to hear these plaintiffs' APA and constitutional claims is likely to succeed.

Plus, all the employees raise constitutional claims, including under the First Amendment, separation of powers, and the Take Care Clause. The government fails to acknowledge those claims. Constitutional claims are collateral to any review afforded by the Civil Service Reform Act and the Federal Service Labor-Management Relations Statute. Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) (retaining jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of the Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (retaining jurisdiction over employee's First Amendment claim). The agencies' lack of expertise or capacity to address plaintiffs' properly framed

7

APA and constitutional claims is another reason the channeling requirement is unlikely to apply to them.  *See generally*, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 194 (2023) ("The Commission knows a good deal about competition policy, but nothing special about the separation of powers."). Far more likely—and certainly more appropriate in every practical sense—is that the government's mass action to eliminate virtually all the agency's employees, like its action of wholesale elimination of the agency's contractors, is subject to review directly in the district court to determine whether it was arbitrary or unlawful under the APA and in excess of the executive's unilateral authority.

2.   The plaintiffs are also likely to succeed in defending the district court's injunction restoring the VOA employees to their pre-March 15 status as relief properly tailored to the employee-plaintiffs' claims.  The government protests that the district court issued a "broad programmatic order" to enforce compliance with a "broad statutory mandate," which they claim exceeds the bounds of judicial review of agency actions set by *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) and *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55 (2004). Gov't Stay Mot. 22-23.  The fashioning of effective equitable relief is highly discretionary and context-specific.  As applied here, the government's cookie-cutter objection to the injunction in this case, entered by a highly experienced and able district judge based on a powerful record of extraordinary and categorical government conduct, does not persuade.

The scope of plaintiffs' claims and the preliminary relief granted to preserve their chance of permanent relief should they prevail differs in important ways from what the Court deemed problematic in *Lujan* and *SUWA*.  The plaintiffs in *Lujan* challenged the Department of the Interior's operations in reviewing, classifying, and developing plans for various public

8

lands.  497 U.S. at 890.  As the Supreme Court observed, the "so-called 'land withdrawal review program'" they challenged was plaintiffs' own construct.  *Id*.  The complaint did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," but to a "continuing" and "constantly changing" amalgam of discretionary activities.  *Id*.  Unsurprisingly, the Court saw no final, reviewable agency action in the "program" to which plaintiffs objected.  The conduct plaintiffs challenge in this case is discrete and clear: halting the work of virtually all the employees working at Voice of America and bringing the operation of that station to a halt.  What they asked the district court to revive and protect is no more than what Congress prescribed.  The kind of difficulty described in *Lujan* is absent here.  Here, there is no "continuing" and "constantly changing" set of agency operations being placed before the court.

This case is also not a "programmatic" challenge to agency policies and does not, contrary to the government's remonstrance, require the court to run the agency.  Defendants rely on *SUWA*, in which the Supreme Court rejected plaintiffs' request to force the Bureau of Land Management to comply with a statutory obligation to manage certain public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness."  542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)).  Plaintiffs there urged the district court to order their preferred managerial regime by making the agency promulgate rules to prohibit the use of off-road vehicles.  The Court observed that the statute at issue "assuredly [did] not mandate, with the clarity necessary to support judicial action . . . the total exclusion of [off-road vehicle] use."  *Id.* at 66.  Unlike in *SUWA*, plaintiffs are not seeking to direct the court to bring into being an alternative suite of broadcast stations to the one that Congress defined and funded.  Instead, there is a "completed universe" of agency actions that plaintiffs have alleged, and the

district court agreed, are unlawful. Again, because they are likely to succeed in that claim, I would deny the stay.

The government cannot seriously contend on this posture that the relevant statutes—or more foundationally the constitutional separation of powers—permit the President to wholly scupper Voice of America and its affiliated Networks. Defendants characterize the claims as an impermissible attempt to clump together "many individual actions" and impermissibly challenge them as one under the APA. The fact that the government elected to take many unlawful agency actions in short order—thereby putting the whole agency on the chopping block—does not exempt their violations from judicial scrutiny. See *Widakuswara*, 2025 WL 1166400, at *11. Yes, the pace and scope of the government's destructive efforts present the courts with remedial challenges in this and many other recent cases. But the very volume of lawbreaking and the scope of operational functioning laid waste does not add up to courts losing the power to determine the lawfulness of agency action. And the government has not meaningfully disputed that the statute mandates "with the clarity necessary to support judicial action" that the USAGM operations Congress ordered be established and funded must continue to exist absent congressional action to the contrary.

**B.**

Defendants are similarly unlikely to succeed on the merits of their challenge to the preliminary injunction as it applies to Radio Free Asia (RFA) and Middle East Broadcasting Networks (MBN) (the Networks). Federal laws passed by Congress require the allocation of specified grant funding to the Networks. Nonetheless, defendants purported to terminate the Networks' grant agreements and are withholding funds allocated to them on the stated grounds that each grant award

10

"no longer effectuates agency priorities." Plaintiffs sued to halt defendants' impoundment of those funds.

The Networks claim that the defendants' funding freeze is in violation of the International Broadcasting Act and related statutes, and that its defiance of Congress's directives in those laws is *ultra vires* and unconstitutional. The government counters that plaintiffs' claims sound in contract, so must be dismissed because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government. That "restrictive—and unprecedented— interpretation of [the district court's jurisdiction] should be rejected because the remedy available to the [plaintiffs] in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA" and the Constitution. *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988).

"This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982), and it is clear from the Networks' complaint that this is not a "disguised," *id.* at 969, run-of-the-mill contract action "within the unique expertise of the Court of Claims," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). At its core, the Networks' suit challenges the government's assertion that it may disregard specific congressional funding directives when it disagrees with Congress's policy choices. Interpreting the Tucker Act to deny the district court jurisdiction over a matter with such "serious implications for our constitutional structure," *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013), is utterly inconsistent with both this court's and the Supreme Court's longstanding understanding of the Tucker Act as providing the exclusive forum for a narrow category of

**Add. 28**

11

"actions based on government contracts." *Megapulse*, 672 F.2d at 967; *see also United States v. Mottaz*, 476 U.S. 834, 851 (1986) (describing "the essence of a Tucker Act claim for monetary relief" as one requesting "damages for the Government's past acts"); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("[W]e have explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'") (quoting *Megapulse*, 672 F.2d at 967-68). "It [is] nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of [constitutional law] to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908.

To determine whether the Court of Federal Claims has exclusive jurisdiction, we must look to the source of the rights plaintiffs assert and the nature of the relief they seek. "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. The following explains in more detail why the district court likely had jurisdiction to declare unlawful and enjoin the challenged agency action.

1. Consider the source of plaintiffs' rights. In identifying their source, we consider factors including whether "the plaintiff's asserted rights and the government's purported authority arise from statute," and "whether the plaintiff's rights exist prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107 (internal citations omitted and

12

formatting altered). Here, the plaintiffs' asserted rights arise from federal statutes and the Constitution, and they exist independent of any contract with USAGM. *See* MBN Compl. ¶¶ 58-60, 65-68, 77-97; RFA Compl. ¶¶ 58-60, 65-68, 77-97. As such, the Networks' claims belong in the district court, not the Court of Claims.

First, the Networks claim that the government has acted contrary to the APA, the Networks' governing statutes, and congressional appropriations. By freezing their funding, defendants have placed them in dire financial consequences and will force them out of existence within a matter of days. Federal law established Radio Free Asia and Middle East Broadcasting Networks and required allocation of funds to those specific, named entities to enable them to "provide accurate and timely information, news, and commentary" to Asia and the Middle East, and to "be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of expression." 22 U.S.C. § 6208(a)-(b); *see* Emergency Wartime Supplemental Appropriations Act of 2003, Pub. L. No. 108-11, 117 Stat. 559, 562 (2003). Congress, with the President's approval, appropriated funds earmarked for MBN and RFA to carry out statutorily assigned functions. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring appropriated funds to be "allocated in accordance with the table included … in the explanatory statement described in section 4"); Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (table designating $60,830,000 to be allocated to RFA and $100,000,000 to MBN).

13

The Networks also point to Congress's direction that funds appropriated for RFA and MBN "*shall* be allocated" to those entities. 2024 Appropriations Act, 138 Stat. at 735 (emphasis added); 22 U.S.C. § 6204(a)(5) (USAGM is to "make and supervise" the grants to the networks). And Congress expressly requires USAGM to provide RFA and MBN virtually all the funds appropriated for each network, strictly confining USAGM's reprogramming authority to at most 5% of a network's allocation. 2024 Appropriations Act, 138 Stat. at 735; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025). The statute allows USAGM to terminate a grant to RFA only for "failure to comply with" the requirement "that grant funds be used only for activities consistent with" the statute. 22 U.S.C. § 6208(c)(5). Those specific provisions govern over the general regulatory prerogative the government cites. The Agency has not asserted that RFA or MBN did anything inconsistent with their statutory mandates, but it has nonetheless acted to "terminate" their grants and freeze all their funding. Plaintiffs bring a classic APA challenge to the Agency's impoundment of funds—agency action that is both arbitrary and heedless of Congress's commands.

In sum, Congress called for the Networks to be established as private nonprofit entities supported by federal appropriations. It called for them to be maintained for the purpose of broadcasting uncensored journalism, especially to countries that restrict freedom of speech. And Congress made appropriations explicitly allocating funds to RFA and MBN by name. Those provisions tightly restrict the use of the Networks' funds for any other purpose. The Networks claim that the Agency acted contrary to those congressional directives when it impounded funds appropriated to support their operations. Their claims that the Agency violated the

14

International Broadcasting Act and the 2024 and 2025 Appropriations Acts thus arise from statute, not from contract.

Second, the complaint raises various constitutional claims. Plaintiffs allege that defendants acted beyond the Executive's authority by effectively repealing duly enacted law establishing the Networks for specified purposes and by freezing the funds Congress allotted to them. They frame those claims as violations of the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause. MBN Compl. ¶¶ 77-97; RFA Compl. ¶¶ 77-97. Constitutional claims for injunctive or declaratory relief face no sovereign immunity bar, per the *Larson-Dugan* exception. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under [the *Larson-Dugan*] exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity") (internal quotation marks omitted); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963). The government's stay motion does not dispute that the Court of Claims could not adjudicate plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and the government does not appear to contest the district court's jurisdiction over them.

Defendants dispute plaintiffs' framing of their claims as statutory and constitutional. They argue that, because the Networks are funded by grants, plaintiffs' challenge to the impoundment must be treated as a breach of contract claim that belongs in the Court of Claims. Reply at 3. That misapprehends the plaintiffs' case. Their claim of entitlement rests on USAGM's alleged contravention of applicable statutory and constitutional constraints—not the terms of any particular contract. As the Networks note, if the grant

15

agreements never existed at all, they would have the same claims against USAGM. RFA/MBN Br. 14. The Congressional basis of their entitlement precedes the individual grants that deliver their allocations. *Cf. Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). USAGM's use of grants as a vehicle to deliver appropriated funds to the Networks does not "automatically transform" their case into a contract action. *Megapulse*, 672 F.2d at 968.

What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual. *Crowley*, 38 F.4th at 1109-10 (claim was statutory, not contractual, when it "require[d] primarily an examination of the statutes"). Judge Bork's opinion for our court in *Maryland Department of Human Resources v. U.S. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), illustrates the point. We recognized there that the state's claim to funding under a federal grant-in-aid program for social workers' training expenses bore some resemblance to "a request for specific performance of a contract that obliges the promisor to pay money." *Id*. at 1449. But we held that, because "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," the state's claim of entitlement was not within the Court of Claims' jurisdiction over contracts with the government. *Id*. (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985)).

The majority submits that, "[o]nce the agency entered these contracts" appropriating the congressionally specified funds to the Networks, "it incurred a new obligation" to make monthly grant payments, and any claims of nonpayment "are squarely contract claims under the Tucker Act." Maj. at 8. But

**Add. 33**

16

we have long since rejected the notion that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971. As we explained in *Megapulse*, the majority's premise allows the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government." *Id*. There, we held that "[w]e cannot accept such an interpretation of the law." *Id*. The majority does not explain under what authority or reasoning it decides that it can accept such an interpretation today.

2. Consider next the type of relief sought. On this point, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit." *Crowley*, 38 F.4th at 1107. Here we must look at the causes of action in plaintiffs' complaints. *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("Jurisdiction is determined by looking to the complaint."). RFA and MBN seek injunctive and declaratory relief. No count sounds in contract, and none seeks money damages for breach. Plaintiffs' claims therefore do not belong in the Court of Claims, which exists to provide a centralized, specialized forum to resolve "actions based on government contracts," *Megapulse*, 672 F.2d at 967, which result in "naked money judgment[s] against the United States," *Bowen*, 487 U.S. at 905; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

True, courts must be wary of plaintiffs who seek to avoid Tucker Act jurisdiction by "disguising a money claim as a claim requesting a form of equitable relief." *Kidwell*, 56 F.3d

17

at 284. But that risk is not present here. The reality that the Networks' *funding* is at stake does not change the analysis: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *Kidwell*, 56 F.3d at 284 (prospect that "success on the merits may obligate the United States to pay the complainant" does not make a claim one for "money damages").

The Supreme Court in *Bowen* distinguished orders for specific relief—there, an order directing the Secretary to reverse his refusal to financially reimburse the state—from money damages. Money damages "refers to a sum of money used as compensatory relief" that "substitutes for that which ought to have been done." 487 U.S. at 895, 910. When plaintiffs seek funds under statutory entitlement, rather than as compensation for losses suffered, the funds are not "money damages" for purposes of the Tucker Act. *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997). Unlike disgorgement of funds owed, "money damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost." *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).

The type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which "has no power to grant equitable relief." *Bowen*, 487 U.S. at 905. RFA and MBN are seeking more than the restoration of their past-due funding for April; they also request a declaration that USAGM is "required by law to take all necessary steps" to ensure that USAGM disburses to them "all congressionally appropriated funds through September 30, 2025" and an injunction against future withholding of congressionally appropriated funds. RFA Compl. 24-25; MBN Compl. 24-25. The Court of Federal

18

Claims' lack of authority to address these aspects of plaintiffs' claims underscores why it is not the appropriate court. *See Crowley*, 38 F.4th at 1109; *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201. When a private entity funded by federal appropriations has "a cooperative, ongoing relationship" with the agency "in the allocation and use of the funds," a simple money judgment is unlikely to be fitting relief. *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.

3.    The stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not change the landscape. Unlike the Networks here, the *Department of Education* plaintiffs raised no constitutional claim. Their only claim was to sums awarded to them in previously awarded discretionary grants. Those plaintiffs were not entities created by statute and designated by Congress to receive specified sums. The equities there were also very different: The Court relied on the *Department of Education* plaintiffs' representation that they had financial resources, even without the grant funding, to keep their programs running during the litigation. RFA and MBN have no financial cushion and are on the verge of collapse.

This case is more like *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025), in which the Supreme Court declined to stay interim injunctive relief despite assertions that the plaintiffs' statutory claims were really claims for monetary relief that belonged in the Court of Claims. *See id.* at 756 (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., dissenting from the denial of the application to vacate the district court's order). The plaintiffs in *AIDS Vaccine Advocacy Coalition*, like the Networks here, claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the

**Add. 36**

19

Constitution. As here, their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes. To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.

## II.

1. Plaintiffs in each case have established that they will suffer irreparable injury if the district court's preliminary injunction is stayed. The plaintiffs in the two VOA lawsuits will be substantially and irreparably injured by the stay. VOA has not published or aired a single piece of news content since March 15, 2025. Abramowitz Decl. ¶ 33. "Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered." *Id.* VOA's journalists have been unable to exercise their First Amendment rights to free speech and free press. And the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 559 (D.C. Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Each day that passes without VOA publishing any content only compounds the irreparable harm: The stifling of its distinctive journalistic voice, the erosion of its audience, and the breach of the trust of every reporter and listener who has relied on its broadcasts. The blight on VOA's reputation, and that of the United States, when a publicly sponsored news source with an eight-decade track record of reliability is shuttered under accusations of fraud, waste, and producing "anti-American content," Abramowitz Decl. ¶¶ 44-45, will

20

only fester while the preliminary injunction is stayed. The asserted harm to VOA's reputation is irreparable. *See, e.g.*, *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

VOA employees also will be exposed to irreparable professional and personal consequences absent injunctive relief. For example, plaintiff John Doe 3, a foreign national on a J-1 visa, is a journalist working for VOA as a personal service contractor. Widakuswara Compl. ¶ 22. His home country is governed by an authoritarian regime that has labeled VOA a "subversive organization." *Id*. John Doe 4 is a VOA contractor whose home country is hostile to LGBTQ people like himself. *Id.* ¶ 23. The district court found that "defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately," and may face elevated risks in their home countries because of the work they did under the auspices of USAGM. *Widakuswara*, 2025 WL 1166400, at *16.

That the USAGM employees and personal service contractors are currently receiving full pay and benefits does not erase the harm. The government's own announced assessment that the existing agency was beyond repair spells widespread terminations once the injunction is stayed. The district court recounted the March 25, 2025, notice from USAGM's HR Director to Plaintiff AFGE that it had decided to terminate 594 AFGE members working for USAGM. *Widakuswara*, 2025 WL 1166400, at *3. That notice is a red flag for USAGM employees once the preliminary injunction is lifted. As to the personal service contractors, they are currently receiving full pay and benefits only because of court intervention; USAGM withheld the termination order only after the U.S. District Court for the Southern District of New York issued a temporary restraining order to halt it.

21

Widakuswara Opp'n 2 n.2. The district court also foresaw irreparable harm to plaintiff Reporters Sans Frontières in the absence of a preliminary injunction because "VOA's silence injured [its] ability to distribute its broadcasting and amplify press freedom concerns." *Widakuswara*, 2025 WL 1166400, at *8. Defendants have not challenged that finding on appeal.

2. RFA and MBN face existential harm absent injunctive relief. Contrary to defendants' assertions, the imminent injuries that the affiliated Networks and their employees face cannot be remedied by money damages at some unspecified date in the future. RFA "now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures." Second Fleming Decl. ¶ 8. At the start of this litigation, MBN employed more than 500 people. Because USAGM withheld its statutorily mandated funding, by April 12 MBN had been forced to lay off 90 per cent of those employees. Second Kline Decl. ¶ 3. Layoffs of remaining staff and the organization's bankruptcy are imminent once the preliminary injunction is stayed. *Id.* ¶ 12. The network "will cease to exist except on paper" no later than May 31, 2025. *Id.* ¶ 15. That existential threat should have moved this court to deny the government's stay motion.

RFA employees, represented by Plaintiff NewsGuild-CWA in the *Widakuswara* suit, also face unplanned, costly, and stressful dislocations they would not have suffered absent the agency's challenged actions. Many RFA employees, including NewsGuild members—work in the United States under H1-B visas. Schleuss Decl. ¶ 8. Losing their jobs likely means deportation to their home countries. Professionals who have served the USAGM mission of bringing objective news coverage to people living under repressive regimes, including in some cases their own home countries, may have to return to countries "that persecute journalists for reporting the news,"

22

making them all the more vulnerable because of the service they have rendered to USAGM. *Id.*

3. Meanwhile, the government is unable to identify substantial harm it would suffer if the preliminary injunction were not stayed. It principally points to the order's restriction of its authority to manage the agency and its employees. The nature of injunctive relief is to interfere with what the enjoined party would otherwise do. And when agency action that a court concludes is likely unlawful is on a grand scale, an appropriate preliminary injunction must have scope commensurate to that of the challenged deeds. That much is unavoidable. The district court nonetheless made clear it respected the government's lawful prerogatives. In denying its motion for stay pending appeal, the court reiterated that USAGM retains its discretionary management authority: "When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order . . . such execution of normal operations would, to the contrary, be *in accordance with* the status quo pre-March 14." Order Denying Motion for Stay Pending Appeal at 5 [ECF No. 104] (emphasis added).

Defendants also protest that the preliminary injunction "does not account for the various costs associated with reinstating all employees and contractors." Gov't Stay Mot. 25. Again, the cost of that restoration is proportionate to the dislocation the government chose to undertake. There are less precarious ways to effect institutional change that might be easier to dial back. In eschewing them, the government presumably accepts the heightened risk calculus attending its preferred approach. But it cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

23

Nor has the government demonstrated that restoration of congressionally appropriated funds to the Networks amounts to irreparable harm. Plaintiffs have shown that they are likely entitled to that relief. The government may be right that it would be unable to recover that money once handed over. The Networks are entirely dependent on it to stay afloat and, if they had it in hand, would promptly use it for that purpose. That said, the harm to the government from being required to release funds that are statutorily earmarked for the very purpose and entity to which the injunction directs them—funds that are legally restricted against reprogramming to other functions or entities—seems less substantial than the loss of the same amount of money might be in another circumstance.

4. That leaves only the public interest. Duly enacted legislation, fashioned by Congress and signed by the President, is a strong indicator of where the public interest lies. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Congress founded, supported, and expanded the family of USAGM broadcast networks. It started with Voice of America to counter Nazi propaganda. In response to the need to more actively counter anti-American narratives with concrete and timely factual reporting, Congress has established affiliate networks in various regions of the world— Europe, Asia, and the Middle East. Dismantling that family of networks cannot be squared with the public interest. By contrast, restoring VOA, RFA, and MBN to operate as Congress intended, providing news that that is "consistently reliable and authoritative, accurate, objective, and comprehensive" serves the interest of the American people. 22 U.S.C. § 6202(b).

The district court's preliminary injunction was tailored to provide necessary relief to the plaintiffs while the courts work to resolve their claims on the merits. The panel errs in staying

24

that injunction.  Rather than preserving the relative positions of the parties, this stay all but guarantees that the networks will no longer exist in any meaningful form by the time this case is fully adjudicated.    I regret that networks charged with exemplifying the ideals of free speech, free opinion, and a free press to the world at large are silenced by our own government's action in disregard of the expressed will of Congress—actions that, as the district court most ably explained, are likely to be found unlawful.

I respectfully dissent.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| RADIO FREE ASIA, | |
| Plaintiff, | |
| v. | No. 25-cv-907-RCL |
| UNITED STATES, et al., | |
| Defendants. | |
| MIDDLE EAST BROADCASTING NETWORKS, INC. | |
| Plaintiff, | |
| v. | No. 25-cv-966-RCL |
| UNITED STATES, et al., | |
| Defendants. | |

### [PROPOSED] ORDER GRANTING RADIO FREE ASIA AND MIDDLE EAST BROADCASTING NETWORKS, INC.'S OPPOSED MOTION TO ENTER ORDER GRANTING PRELIMINARY INJUNCTION

This matter came before the Court on Radio Free Asia and the Middle East Broadcasting

Networks, Inc.'s (together, Plaintiffs) Motions for Preliminary Injunction (Case No. 25-cv-907,

ECF No. 12[1]; Case No. 25-cv-966, ECF No. 11). After consideration of those motions and all

related filings, it is hereby ORDERED that Plaintiffs' motions are GRANTED for substantially

the same reasons raised in Plaintiffs' memoranda in support of their motions. Plaintiffs have

established a likelihood of success on the merits and will suffer irreparable harm in the absence

---

[1] While RFA's motion was initially styled as a motion for a temporary restraining order, as noted in the Court's April 10, 2025 order, "[t]he parties have agreed to convert Radio Free Asia's Motion for a Temporary Restraining Order into a Motion for a Preliminary Injunction."

1

**Add. 43**

of an injunction, and the balance of equities and public interest favor immediate relief. The

Court therefore PRELIMINARILY ENJOINS the Defendants, pending further order of this

Court, to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East

Broadcasting Networks, Inc. such that international USAGM outlets can "provide news which is

consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. §

6202(a), (b), and to that end, provide monthly status reports on the first day of each month

apprising the Court of the status of the defendants' compliance with this Order, including

documentation sufficient to show the disbursement to RFA and MBN of the funds Congress

appropriated.


**SO ORDERED**:


_April 25, 2025_
_3:00 pm_
Date

Royce C. Lamberth
The Honorable Royce C. Lamberth
United States District Judge

2

**Add. 44**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| RADIO FREE ASIA,<br><br>    *Plaintiff,*<br><br>v.<br><br>UNITED STATES, et al.,<br><br>    *Defendants.* | No. 25-cv-907-RCL |
| MIDDLE EAST BROADCASTING<br>NETWORKS, INC.<br><br>    *Plaintiff,*<br><br>v.<br><br>UNITED STATES, et al.,<br><br>    *Defendants.* | No. 25-cv-966-RCL |

**[PROPOSED] ORDER GRANTING RADIO FREE ASIA AND MIDDLE EAST
BROADCASTING NETWORKS, INC.'S OPPOSED MOTION TO ENTER ORDER
GRANTING PRELIMINARY INJUNCTION**

This matter came before the Court on Radio Free Asia and the Middle East Broadcasting

Networks, Inc.'s (together, Plaintiffs) Motions for Preliminary Injunction (Case No. 25-cv-907,

ECF No. 12[1]; Case No. 25-cv-966, ECF No. 11).  After consideration of those motions and all

related filings, it is hereby ORDERED that Plaintiffs' motions are GRANTED for substantially

the same reasons raised in Plaintiffs' memoranda in support of their motions.  Plaintiffs have

established a likelihood of success on the merits and will suffer irreparable harm in the absence

---

[1]    While RFA's motion was initially styled as a motion for a temporary restraining order, as
noted in the Court's April 10, 2025 order, "[t]he parties have agreed to convert Radio Free Asia's
Motion for a Temporary Restraining Order into a Motion for a Preliminary Injunction."

of an injunction, and the balance of equities and public interest favor immediate relief. The

Court therefore PRELIMINARILY ENJOINS the Defendants, pending further order of this

Court, to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East

Broadcasting Networks, Inc. such that international USAGM outlets can "provide news which is

consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. §

6202(a), (b), and to that end, provide monthly status reports on the first day of each month

apprising the Court of the status of the defendants' compliance with this Order, including

documentation sufficient to show the disbursement to RFA and MBN of the funds Congress

appropriated.


**SO ORDERED**:


_April 25, 2025_
_3:00 pm_
Date

_Royce C. Lamberth_
The Honorable Royce C. Lamberth
United States District Judge

2

**Add. 46**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATSY WIDAKUSWARA**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | Case No. 1:25-cv-1015-RCL |
| **KARI LAKE,** *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media*, *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, which seeks to enjoin the defendants from dismantling the United States Agency for Global Media (USAGM) in response to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," announced by President Trump on March 14, 2025. The plaintiffs allege that USAGM's actions, purportedly in furtherance of the Executive Order—terminating and threatening to terminate the majority of USAGM staff, ending grants to its affiliates, and silencing programming—violate the First Amendment, constitutional separation of powers principles, the Take Care Clause, and statutory provisions including the Administrative Procedure Act (APA), International Broadcasting Act, and congressional appropriations acts. Broadly, the plaintiffs ask this Court to order the defendants to take all necessary steps to return USAGM and its employees, contractors, and grantees to their status prior to the March 14, 2025 Executive Order.

For the reasons contained herein, the Motion for a Preliminary Injunction will be **GRANTED IN PART** and **DENIED IN PART**. The Court will **GRANT** the Motion as it applies to the defendants' actions to shutter the USAGM entities Voice of America, Radio Free Asia, and

**Add. 47**

Middle East Broadcasting Networks.  The Court will **DENY** the Motion as to the other affiliated network entities.

## I.    BACKGROUND

### A.  Factual History

USAGM is an independent executive agency established by Congress with the mission to "inform, engage, and connect people around the world in support of freedom and democracy." Mission, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/mission/ [https://perma.cc/PK9M-Y32T].  It oversees six federally funded broadcast networks, the largest being Voice of America (VOA).  VOA's first broadcast took place during World War II, uttering the now "immortal words": "The news may be good or bad; we shall tell you the truth."  History, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/history/ [https://perma.cc/27Y5-A8CP].  Congress codified that promise into law in 1976 in VOA's charter, declaring that VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."  22 U.S.C. § 6202(c).

Since then, five related entities have been established to further USAGM's mission: a federal entity within USAGM known as the Office of Cuba Broadcasting (OCB), and four independent networks: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), Middle East Broadcasting Network (MBN), and the Open Technology Fund (OTF) (collectively, "the Networks").[1]  Together, these entities have "exported the cardinal American values of free

---

[1] Each of the Networks has filed a lawsuit in this Court seeking disbursement of congressionally appropriated funds.  *See RFE/RL v. Lake*, 25-cv-799 (RCL) (filed Mar. 18, 2025); *Open Technology Fund v. Lake*, 25-cv-840 (RCL) (filed Mar. 20, 2025); *Radio Free Asia v. United States*, 25-cv-907 (RCL) (filed Mar. 27, 2025); *Middle East Broadcast Networks v. United States*, 25-cv-966 (RCL) (filed Apr. 1, 2025).  OTF originally sought injunctive relief for access to its March funding, but before the Court ruled on its motion, the government processed OTF's March drawdown request.  *See* Notice of Withdrawal of TRO Motion, *Open Technology Fund v. Lake*, 25-cv-840 (RCL), ECF No. 19. OTF has not moved for any additional injunctive relief since, and as such, the Court will cabin the relief granted herein

2

speech, freedom of the press, and open debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–42 (D.D.C. 2020).

All six of these entities are funded by the United States government. Specifically, VOA and OCB are located within the federal government, whereas RFA, RFE/RL, MBN, and OTF are private non-profit organizations that receive funding through congressional appropriations disbursed via grant agreements with USAGM. Structure, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/organizational-chart/ [https://perma.cc/ZWY5-GGDB]. Every year, Congress appropriates funds to USAGM and further allocates those funds to VOA, OCB, and each of the Networks, with a line-item amount designated to each entity. As is relevant here, in the 2024 Appropriations Act, Congress appropriated $857 million to USAGM for Fiscal Year (FY) 2024 and mandated how those funds "shall be allocated" pursuant to an "explanatory statement." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring funds to be allocated in accordance with table in "the explanatory statement" described in section 4"); *id.* § 4 (identifying explanatory statement). The explanatory statement sets forth a table with earmarked funding amounts for VOA, OCB, and each of the Networks. Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (providing table designating how funds appropriated for international broadcasting "are allocated"). For FY 2024, Congress allocated

---

to only those USAGM affiliated networks that have outstanding motions for injunctive relief. The status of RFE/RL, RFA, and MBN's lawsuits is detailed at Section I.B.i, *infra*.

The OCB, though initially shut down by the EO, has resumed functioning; OCB employees who were placed on administrative leave were called back to work on March 26, 2025, and OCB resumed radio service and television broadcasting within a day. *See* Second Decl. of Crystal Thomas, Human Resources Director for USAGM ("Second Thomas Decl."), at ¶ 6, ECF No. 88-4.

$260 million for VOA; $25 million for OCB; $142.2 million for RFE/RL; $60.8 million for RFA;

$100 million for MBN; and $43.5 million for OTF.  *Id* (listing each entity with a corresponding

funding amount for the fiscal year).

In three continuing resolutions covering FY 2025, Congress funded USAGM at the same

levels, and subject to the same conditions, as it funded USAGM in FY 2024.  *See* Continuing

Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–

25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY 2024

appropriations laws and making them available through December 20, 2024); American Relief

Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution")

(extending funding through March 14, 2025); Full-Year Continuing Appropriations and

Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution")

(extending funding through September 30, 2025).  Most relevant here, effective March 15, 2025,

Congress passed and President Trump signed into law the Third Continuing Resolution, which

appropriates funding to USAGM and the associated Networks through September 30, 2025.  Under

the appropriations acts, USAGM has limited discretion to "reprogram" a small fraction of these

funds among different programs, but only if it gives the House and Senate Appropriations

Committees fifteen days' advance notice. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see*

170 Cong. Rec. at H2087.  And in no event may any reprogramming reduce funding for a program

by more than five percent of what Congress designated.  *Id.*

On March 14, 2025, President Donald Trump issued Executive Order 14238 entitled

"Continuing the Reduction of the Federal Bureaucracy" (the "EO").  90 Fed. Reg. 13043 (Mar.

**Add. 50**

14, 2025).[2]  The EO demands that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and directs the head of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent."  *Id.*

The following day, on March 15, 2025, the White House published an article entitled "The Voice of Radical America," which states: "President Donald J. Trump's [EO] on Friday will ensure that taxpayers are no longer on the hook for radical propaganda."[3]  USAGM also posted an update on its website stating: "This agency is not salvageable.  From top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken.  While there are bright spots within the agency with personnel who are talented and dedicated public servants, this is the exception rather than the rule."[4]

From March 15, 2025 onward, the acting leadership of USAGM has taken a series of actions purportedly in furtherance of the EO's directive.  On March 15, 2025, USAGM placed 1,042 employees on administrative leave.[5]  First Declaration of Crystal Thomas, Human Resources Director for USAGM ("First Thomas Decl.") ¶ 6, ECF No. 43.  That same day, all USAGM grantee networks received an identical letter from the agency immediately terminating their operative grant

---

[2] https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ [https://perma.cc/J4WD-Q2UU].

[3] *The Voice of Radical America*, THE WHITE HOUSE (Mar. 15, 2025), https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/ [https://perma.cc/HL9E-5JBE].

[4] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/ [https://perma.cc/YQA4-3TVA].

[5] USAGM employs 1,147 full-time employees and, as of March 14, 2025, had active employment contracts with approximately 598 personal service contractors (PSCs).  Thomas Decl. ¶ 3.

agreements, with no explanation other than the boilerplate language that "[t]he award no longer effectuates agency priorities" and citing the EO.  Compl. ¶ 78.  On March 16, 2025 "USAGM terminated contracts with all [approximately 598] personal services contractors ["PSCs"]," whose pay was scheduled to end on March 31, 2025.  First Thomas Decl. ¶ 6.[6]  On March 17, 2025, USAGM instructed "all USAGM Foreign Service employees" to shut down all transmitters at their respective stations, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days.  Compl. ¶ 83.  On March 25, 2025, USAGM's HR Director notified union officials at American Federation of State, County and Municipal Employees, AFL-CIO ("ASFCME," a plaintiff in this case) that USAGM intended to "send termination notices" to 29 of USAGM's 32 radio broadcast technicians ("RBT")[7]—and because the three remaining RBTs had already submitted retirement applications, this move would effectively eliminate all RBTs. March 26 Letter to the Court, ECF No. 33 at 2.  Also on March 25, USAGM's HR Director sent a notice to American Federation of Government Employees, AFL-CIO ("AFGE," also a plaintiff in this case) conveying USAGM's decision to terminate 594 AFGE members "including broadcast journalists, technicians, budget analysts, electronics engineers, and others" within weeks.  *Id.*

As a result of the defendants' actions, VOA is not reporting the news for the first time in its 80-year existence.  Its website has not been updated since March 15, 2025, and radio stations abroad that rely on VOA's programming have either gone dark or air only music.  Compl. ¶ 82.

---

[6] The defendants represent that on March 28, 2025, all PSCs were reinstated with full pay and benefits but are not currently working.  PI Opp'n at 3 (citing Second Thomas Decl. ¶ 6).  This appears to be a direct result of the March 28 TRO in this case.  The March 28 TRO, explained in detail *infra*, enjoined the defendants from "proceeding with terminating any USAGM [PSC] who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025."  *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22.

[7] RBTs are essential to carry out broadcasting, as they are required to be on-site 24/7 to broadcast programming, and "it is not possible to operate VOA without radio engineers."  March 26 Letter to the Court, ECF No. 33 at 2.

All VOA employees remain on administrative leave with no indication of returning.  *Id.* ¶¶ 74–75,

85.  PSCs face termination of their contracts and those working in the United States with J1 visas

face the possibility of deportation to home countries, in some instances those with authoritarian

regimes that are hostile to a free press.  *Id.* ¶¶ 22–23.  USAGM's FY 2025 grants with the Networks

either remain terminated in the cases of RFA and MBN, or simply lapsed with no other agreement

in place in the case of RFE/RL, and none of these Networks have received their congressionally

appropriated funds for the month of April, forcing them to wind down operations and in some

instances furlough their employees without pay.  The status of each Network and their lawsuit in

this Court is detailed below.

### B.  Procedural History

#### i.     Network Lawsuits

##### a.   Radio Free Europe/Radio Liberty, No. 25-cv-799 (RCL)

RFE/RL began broadcasting in 1953 and has been funded by the United States government

ever since.  *See* No. 25-cv-799 (RCL), 2025 WL 900481, at *1 (D.D.C. Mar. 25, 2025) (providing

an overview of RFE/RL's history and funding structure).  Following the passage of the First and

Second Continuing Resolutions in which Congress renewed RFE/RL's funding, USAGM

executed grant agreements obligating those funds to RFE/RL through February 28, 2025.[8]  *RFE/RL*

*v. Lake*, No. 25-cv-799 (RCL) ("RFE/RL Docket"), Compl. ¶ 30, ECF No. 1.  In late February

2025, RFE/RL and USAGM exchanged drafts of a FY 2025 grant agreement to cover funding

appropriated to RFE/RL through the end of the fiscal year.  *Id.* ¶ 32.  On February 27, 2025,

---

[8] To be clear, under the Second Continuing Resolution, Congress appropriated funds for RFE/RL through March 14, 2025.  USAGM did not, however, obligate the March 1–14, 2025, funds— which total approximately $7.5 million— in the grant agreement.  Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees.  *RFE/RL v. Lake*, No. 25-cv-799, Compl. ¶ 32.  The Third Continuing Resolution, signed on March 15, 2025, appropriates funds to RFE/RL from March 15 through September 30, 2025.  *Id.* ¶ 28.

USAGM sent a final version of the grant agreement to RFE/RL and requested a "signed version of this Master Grant Agreement at your earliest convenience." RFE/RL responded with the signed grant agreement that same day, but USAGM never countersigned. *Id.*

On March 15, 2025, RFE/RL received the termination letter from USAGM. RFE/RL filed its Complaint on March 18 and moved for preliminary injunctive relief the next day—specifically, RFE/RL sought a TRO for disbursement of funds for the March 1–15 period of performance, and a PI ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025. On March 24, just hours before a scheduled hearing on the TRO motion, USAGM disbursed RFE/RL's funds to cover the March 1–15 grant period, but the Court still granted RFE/RL's TRO to enjoin the "close-out" procedures detailed in the termination letter. *See RFE/RL*, 2025 WL 900481, at *2–5.

On March 26, the day after the Court issued its TRO, USAGM rescinded the termination letter. RFE/RL Docket, Notice of Withdrawal of Grant Termination, ECF No. 15. The grant was therefore "back in effect," according to USAGM. *Id.* RFE/RL has now received its funds for all of March but has not received any funds for April (or the rest of FY 25) because the prior grant agreement has expired—and as stated *supra*, the fully negotiated FY 25 grant agreement was never signed by USAGM. USAGM sent a new proposed FY 25 grant agreement to RFE/RL on April 8, 2025, prompting RFE/RL to file a renewed TRO, which is still pending. RFE/RL Docket, ECF No. 28. RFE/RL argues in its TRO motion that it will soon be forced to shut down without access to its April funds and that the proposed FY 25 grant agreement from USAGM is unreasonable and a pretext for denying RFE/RL its congressional appropriations.

**Add. 54**

### b. Radio Free Asia, No. 25-cv-907 (RCL) and Middle East Broadcast Networks, No. 25-cv-966 (RCL)

RFA was established in 1996 and relies entirely on USAGM grants to fund its operations. Fleming Decl. ¶ 10–11, *Radio Free Asia v. United States*, No. 25-cv-907 (RCL) ("RFA Docket"), ECF No. 12-2. As it has every year for the last three decades, RFA entered a master agreement with USAGM for "FY 2025," which was scheduled to remain in effect through September 30, 2025. RFA Docket, ECF No. 19-2. Like the other Networks, RFA received a termination letter on March 15, 2025. RFA Docket, Fleming Decl. Ex. 1.[9] RFA filed its Complaint on March 27, 2025, and a motion for a TRO,[10] ECF No. 12, the following day. Before this Court acted on the motion, however, Defendants represented that they believed the grant termination had been enjoined by the March 28 TRO, issued by Judge Oetken of the Southern District of New York before the case was transferred to this Court. *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22 (enjoining Defendants from "terminating (or proceeding with terminating as announced) any USAGM grant or contract"). Then, on April 9, 2025, with the TRO still in place, RFA received the funding it was due through the end of March. RFA Docket, Request for Hearing at 2, ECF No. 14. On April 11, 2025, the Defendants emailed RFA representatives with a "revision to the RFA FY-25 Master Grant Agreement between USAGM and RFA," which Defendants encouraged RFA to sign "in order to expedite the payment

---

[9] While the termination letter provided RFA the right to appeal its termination, that turned out to be an empty offer. After RFA "promptly filed an appeal," USAGM informed them that Defendant Lake "did not intend to respond to its appeal." Fleming Decl. ¶ 23.

[10] The TRO motion has since been converted into a PI motion, per agreement from both parties. RFA Docket, Proposed Order, ECF No. 20-5.

**Add. 55**

process" for their April funding.[11]  However, the termination of RFA's grant was never rescinded, and the termination remains in effect.

MBN sits in a similar position as RFA.  MBN has received funding via grant agreements with USAGM since its inception in 2004.  MBN and USAGM entered into a master grant agreement for FY 2025, scheduled to remain in effect through September 30, 2025.  Def.'s Opp'n. App'x. C at 3, *Middle East Broadcasting Networks, Inc. v. United States of America*, No. 25-cv-966 (RCL) ("MBN Docket"), ECF No. 20-2.  Like the other Networks, MBN received the March 15 termination letter,[12] filed a Complaint on April 1, 2025, and filed a motion for a PI, ECF No. 11, on April 9, 2025.  MBN's grant remains terminated absent injunctive relief.

RFA and MBN seek the same relief in their respective PI motions.  They ask for the Court to enter an order enjoining the Defendants "from impounding, blocking, or otherwise interfering with payment of funds appropriated to Plaintiffs" and "from enforcing or otherwise giving effect to the termination of Plaintiffs' grants[.]"  RFA Docket, Proposed Order, ECF No.12-4; MBN Docket, Proposed Order, ECF No. 18-5.

### ii.    The Instant Lawsuit

The plaintiffs in this lawsuit are Patsy Widakuswara, the VOA White House Bureau Chief; Jessica Jerreat, the VOA Press Freedom Editor; Kathryn Neeper, the Director of Strategy and Performance Assessment at USAGM; John Does 1 and 2, journalists at VOA; John Does 3 and 4, independent freelance journalists working as personal service contractors (PSCs) with VOA; Reporters Sans Frontières ("RSF") and Reporters Without Borders, Inc. ("RSF USA"),

---

[11] It is not clear why Defendants styled the new agreement a "revision" while simultaneously representing that the FY-25 Master Agreement has been terminated.

[12] Like RFA, MBN appealed the termination of its grant and requested a response by March 31, 2025, but received none to date.  MBN Docket, Kline Decl. ¶ 33, ECF No. 11-3.

**Add. 56**

nongovernmental organizations of independent journalists; AFSCME, AFGE, and the American

Foreign Service Association ("AFSA") (collectively, the "public-sector unions"); and The

NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor organization of private sector employees

who work for Radio Free Asia.  The plaintiffs filed this lawsuit on March 21, 2025, in the Southern

District of New York against Defendant Kari Lake, Senior Advisor to the Acting CEO of the

USAGM, and Defendant Victor Morales, Acting CEO of USAGM, in their official capacities, as

well as USAGM as an organization (collectively, the "defendants").  Compl., ECF No. 1.  The

plaintiffs allege that the defendants' actions in "dismantling" USAGM violate the plaintiffs' First

Amendment rights, the APA, the constitutional principle of the separation of powers and the Take

Care Clause, the Appointments Clause,[13] congressional appropriations acts, and numerous other

statutory provisions under the International Broadcasting Act and other relevant statues governing

foreign relations and broadcasting.  Compl. ¶¶ 2, 102–60.

On March 24, 2025, the plaintiffs sought emergency relief by filing a motion (styled as a

proposed order to show cause) for a TRO and PI, with an accompanying memorandum in support.

*See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of

Proposed Order to Show Cause (hereinafter "PI Mot."), ECF No. 17.  On March 28, 2025, Judge

Oetken of the Southern District of New York granted the motion for a TRO, concluding that the

defendants likely violated several provisions of the APA, and ordered as follows:

> Defendants, and those acting in concert with them, are temporarily enjoined from
> taking any further actions to implement or effectuate the March 14, 2025 Executive
> Order entitled "Continuing the Reduction of the Federal Bureaucracy" as to
> USAGM and the March 15, 2025 email issued to all VOA staff, or take any action
> to reduce USAGM's workforce (whether employees, contractors, or grantees),
> included but not limited to

---

[13] Plaintiffs did not move for emergency relief based on their Appointments Clause claim (Count IX).  PI Reply, ECF No. 92, at 21 n.8.

**Add. 57**

(i)    proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor,

(ii)    terminating (or proceeding with terminating as announced) any USAGM grant or contract or proceeding with terminating any USAGM Personal Services Contractors (PSCs) who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025, or

(iii)    closing any USAGM office or requiring employees or contractors in overseas offices to return to the United States.

March 28 TRO at 21–22. The TRO was to remain in place "pending the hearing and determination of Plaintiffs motion for a preliminary injunction." *Id.* at 21. One week later, Judge Oetken granted the defendants' motion to transfer to the District of Columbia on April 4, 2025. *See* Transfer Order, ECF No. 61. The case was then assigned to the undersigned on April 8, 2025, with the PI motion still pending. *See* ECF No. 68.

On April 8, the defendants moved to vacate the March 28 TRO. Mot. to Vacate, ECF No. 73. The parties suggested that they cross-brief the PI motion alongside the defendants' motion to vacate on the same expedited schedule. *See* ECF Nos. 78, 79. To that end, on April 14, 2025, the defendants filed an Opposition to the PI Motion ("PI Opp'n"), ECF No. 88, and the plaintiffs filed an Opposition to the motion to vacate ("Mot. to Vacate Opp'n"), ECF No. 89, that same day. On April 16, the plaintiffs filed a reply in support of their PI Motion ("PI Reply"), ECF No. 92, and the defendants filed a reply in support of their Motion to Vacate ("Mot. to Vacate Reply"), ECF No. 93. The Court held a hearing on Thursday, April 17, 2025, during which counsel for the plaintiffs here, as well as counsel for the plaintiffs in a related case, *Abramowitz v. Lake*, 25-cv-887, and the defendants (which are the same in both cases), all presented argument. The Motion for a Preliminary Injunction is now ripe for review.[14]

---

[14] The Court will refer to and incorporate arguments presented in the Motion to Vacate the TRO given the significant overlap with the arguments in opposition to the PI, but because the TRO is expires on April 22, 2025 with this Court's ruling on the preliminary injunction, *see* March 28 TRO at 21–22, the Motion to Vacate the TRO is moot.

**Add. 58**

## II.    LEGAL STANDARDS

### A.  Preliminary Injunction

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  It is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20.  "Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public." *RFE/RL*, 2025 WL 900481, at *2 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts in this Circuit have adopted a "sliding scale" approach to the preliminary relief analysis, "whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential." *Id.* (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

## III.    DISCUSSION

### A.  Plaintiffs Have Sufficiently Shown Standing.

"[A] party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015)).  The defendants argue that the organizational plaintiffs AFSCME, AFGE, and AFSA (the public-sector unions) and RSF and

**Add. 59**

RSF-USA (nongovernmental organizations of independent journalists) have failed to make this showing.  PI Opp'n at 4.

Membership-based associations can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Here, all organizational plaintiffs have asserted both associational and organizational standing.  PI Mot. 34–38.  Despite the defendants' arguments to the contrary, the Court concludes that all organizational plaintiffs have shown a "substantial likelihood" of both associational and organizational standing.

### i.    Associational Standing

To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted, nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  The defendants argue that the union members placed on administrative leave are not injured because "[a]lthough Plaintiffs fear what may happen next in the future, this 'amounts to nothing more than speculation about future events that may or may not occur,' especially given [USAGM] remains operational, contrary to what Plaintiffs suggest."  PI Opp'n at 5 (quoting *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002)).  This argument is easily dispensed with—Defendant Lake has stated that what's "coming up next" is that the agency "is going to be decreased in size significantly" because there is "too much rot in the agency

**Add. 60**

to salvage it," Compl. ¶ 89,[15] plainly illustrating that the union members are relying on more than

mere speculation.  Moreover, as the plaintiffs point out, this position is "flatly inconsistent with

[the Defendants'] later insistence that the same exact action could be brought before the MSPB as

a prohibited personnel practice."  PI Reply at 4.[16]  It also does not account for the defendants'

stated decision to terminate over 600 AFGE and AFSCME members, all employees of VOA.

March 26 Letter to the Court, ECF No. 33.  Regarding prongs two and three of the associational

standing test (which the defendants do not challenge), it is certainly germane to the unions' purpose

to defend "the existence of the agency where their members work, or that funds their members'

work," and "the relief that Plaintiffs seek pertains to Defendants' wholesale dissolution of

USAGM and does not depend on the individual circumstances of any union member."  PI Mot. at

36.  Thus, the Court concludes that the unions have associational standing.[17]

### ii.     Organizational Standing

An organization can establish organizational standing "if it can show that the defendant's

actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more

than simply a setback to the organization's abstract social interests.'"  *Am. Soc'y for Prevention*

*of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  The organization must satisfy two criteria: (1) the

---

[15] Citing Bannon's War Room, "It Is Full of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs, Rumble (Mar. 17, 2025), https://rumble.com/v6qs70g-it-is-full-of-waste-fraud-and-abuse.-kari-lake-reacts-to-1300-voice-of-amer.html [https://perma.cc/YC6G-KEXK].

[16] To the extent the defendants are arguing that the public-sector union plaintiffs cannot bring suit on behalf of their members because the members' claims are channeled to the MSPB, the Court addresses that issue below and resolves it in the plaintiffs' favor.  *See* Section II.C, *infra*.

[17] The defendants do not contest RSF and RSF-USA's associational standing, *see* PI Opp'n at 4–5, and the Court is satisfied that RSF and RSF-USA have met the standard for associational standing at this juncture.  *See* PI Mot. at 35–36 ("RSF's members include journalists who travel to dangerous foreign countries where USAGM broadcasts to report the news.  These journalists have been made less safe and seen their mission of promoting free press severely damaged by the shuttering of USAGM operations. . . . Bringing this lawsuit to defend . . . the continued viability of the international free press to which they have dedicated their careers, is germane to that purpose.").

**Add. 61**

defendants' "action or omission . . . injured the organization's interest;" and (2) the organization "used its resources to counteract that harm." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal citations and quotations omitted).

The defendants argue that the organizational plaintiffs have not identified a "concrete and demonstrable injury to [their] activities," but only speculative ones, because "[VOA] has not been dismantled and [USAGM] remains operational." PI Opp'n at 6. Of course, as this quote concedes, VOA *itself* is not operational, and the Networks are winding down operations. That harm is not speculative—it is currently unfolding. The defendants' actions have interfered with the unions' "core business interests," injuring their ability to provide representational services to employees in affected bargaining units. PI Mot. at 36–37 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Moreover, the defendants have decided to eliminate an entire AFSCME bargaining unit and terminate 594 AFGE members, thereby depriving both unions of dues and "existentially threatening" AFSCME's RBT unit. *See* PI Reply at 3–4; *Nat'l Treasury Emps. Union v. I.R.S.*, No. 04-cv-0820, 2006 WL 416161, at *2 (D.D.C. Feb. 22, 2006) (loss of dues confers standing). As for RSF and RSF-USA, VOA "frequently [reports on] RSF's reports and advocacy efforts," meaning that VOA's silence injured RSF's ability to distribute its broadcasting and amplify press freedom concerns. Declaration of Thibaut Bruttin, Director General of RSF ("Bruttin Decl."), ¶ 19, ECF No. 16-15.[18]

---

[18] Plaintiffs also allege that RSF and RSF-USA have organizational standing "with respect to their First Amendment right-to-receive claim." PI Mot. at 37. However, with the instant PI, the Court does not reach Plaintiffs' First Amendment challenges, and will therefore not address this avenue of establishing standing.

**Add. 62**

Regarding the second prong of organizational standing, the plaintiffs' Complaint, briefing and accompanying declarations show that the public-sector unions are "expending significant resources to counteract USAGM's obstruction of their ability to perform their core services [such as] advising members about the terms of their employment and the implication of Defendants' actions." PI Reply at 3; *see* Compl. ¶¶ 99–101 (explaining the activities of each union in response to Defendants actions since March 15, 2025). The Complaint also indicates that RSF and RSF-USA have used resources to counteract the harm at issue here because "[t]he silencing of VOA . . . force[s] [RSF and RSF USA] to lose and waste material resources it otherwise would not have spent and upon which it relies." Compl. ¶¶ 24, 97. The Court finds these representations sufficient to show a "substantial likelihood" of organizational standing.

Notably, nowhere do the defendants argue that TNG-CWA, the other organizational plaintiff in this case, lacks standing. TNG-CWA represents private sector reporters who work for RFA and who rely on USAGM programs "including but not limited to RFA." First Declaration of Jon Schleuss, President of TNG-CWA ¶ 18, ECF No. 16-16. The defendants' actions directly interfere with TNG-CWA's journalist-members' ability to access VOA and other USAGM grantee broadcasts, which provide a "free flow of information, over radio airwaves and online" in countries where "there is no media freedom." *Id.* ¶¶ 15–17. As of March 21, 2025, 75% of TNG-CWA's members have been indefinitely furloughed without pay and they stand to lose their medical and life insurance at the end of April. Second Declaration of Jon Schleuss, President of TNG-CWA, ¶ 18, ECF No. 92-1. Many of TNG-CWA's members are on nonimmigrant visas and face return to their home countries where they fear potential retaliation from repressive regimes. *Id.* ¶ 8. The Court is satisfied that TNG-CWA has shown a "substantial likelihood" of standing, in addition to

**Add. 63**

all other organizational plaintiffs, and concludes that the defendants' challenges to the contrary are unavailing.

**B.  The Court has Jurisdiction over the Plaintiffs' Claims Regarding the Withholding of Congressional Appropriations from Networks.**

As part of their requested relief, the plaintiffs seek to enjoin the defendants from terminating the grants that Congress directed USAGM to provide to the specified broadcasting Networks in congressionally appropriated amounts.  Proposed PI Order, ECF No. 15 at 2.  The defendants argue that this Court lacks jurisdiction to hear this portion of the dispute, characterizing it as strictly a contractual in nature, but the Court concludes otherwise.

In opposing the initial TRO Motion in the Southern District of New York, the defendants briefly argued that Plaintiffs could not bring that challenge in federal district court because the Tucker Act barred their claims.  *See* ECF. No. 41 at 20 n.3 (Defendants' TRO opposition).  The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits based on 'any express or implied contract with the United States.'"  28 U.S.C. §1491(a)(1).  Judge Oetken, however, disposed of this challenge quickly.  *See* March 28 TRO at 6 n.5 ("While Plaintiffs have certainly raised the cancellation of grant contracts as one concerning fact in a constellation of actions Defendants took to rapidly dismantle USAGM, 'the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have.'") (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

To challenge that conclusion here, the defendants rely on the intervening Supreme Court emergency-docket order, *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), arguing that it "clarifies" that the plaintiffs' claims regarding USAGM's termination of grants cannot be heard in this Court.  Mot. to Vacate at 6; PI Opp'n at 33–34.  That argument fails.

**Add. 64**

In *California*, grantees of the Department of Education sued under the APA to challenge the termination of their grants. 145 S. Ct. at 968. The grantees relied on relevant statutory provisions that directed the Secretary of Education to "use certain funds to make grants to entities," which were awarded pursuant to a "competitive application process." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. 2025). The district court entered a TRO, enjoining the government from terminating the grants and requiring the government to pay out grant obligations to those plaintiffs who had applied for and received a grant award. *California v. U.S. Dep't of Educ.*, No. 25-cv-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). The Supreme Court stayed the TRO because the Court found it "likely" that the district court lacked jurisdiction to issue such relief. *California*, 145 S. Ct. at 968. In so ruling, the Court reiterated that the APA's waiver of sovereign immunity "does not extend to orders to enforce a contractual obligation to pay money," and that, instead, "suits based on 'any express or implied contract with the United States'" must go to the Court of Federal Claims under the Tucker Act. *Id.*

But *California* does not change the conclusion in the March 28 TRO, because *California* does not change the governing law. It was true before *California*, and it remains true now, that "[w]hether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 968). In *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements*—the relevant statute did not entitle any particular grantee to the funds. Here, by contrast, the source of the Networks' rights is not rooted in the grant agreements with USAGM—grants are involved only as a vehicle to distribute congressionally appropriated funds to the Networks because Congress passed laws directing

19

**Add. 65**

USAGM to provide grants to specific grantees, and appropriated funds for those grantees specifically. *See*, *e.g.*, 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208 (International Broadcasting Act); Pub. L. No. 119-4, div. A, § 1101 (2025) (Congressional Appropriations Act).

The D.C. Circuit has cautioned that the Tucker Act should not be interpreted "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government," *Megapulse*, 672 F.2d at 968, and a claim of entitlement to congressional appropriations is certainly one over which the Court can exercise jurisdiction. *See Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Plaintiff] will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) ("[Plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages.'"). Therefore, the Court has jurisdiction to review the defendants' termination of congressionally appropriated funds to the Networks.

## C. The Court Has Jurisdiction Over Plaintiffs' Claims Regarding the Defendants' Personnel Actions.

The defendants argue that the Court lacks jurisdiction to enjoin USAGM's personnel actions as to individual plaintiff employees because the Federal Service Labor–Management Relations Statute ("FSL-MRS"), the Civil Service Reform Act ("CSRA"), and the Foreign Service Act ("FSA") govern review of employment disputes between the federal government and its employees, thereby channeling claims to either the Merit Systems Protection Board ("MSPB") for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel ("OSC") for certain "prohibited personnel practices." PI Opp'n at 8–14; Mot to

**Add. 66**

Vacate at 7–8.  And as stated *supra*, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *California*, 145 S. Ct. at 968 (quoting 5 U.S.C. § 702).  At the outset, the Court observes that this purported jurisdictional bar would only apply to the individual plaintiffs employed by USAGM (Patsy Widakuswara, Jessica Jarreat, Kathryn Neeper, and Does 1 and 2), and the public-sector unions purporting to represent terminated employees via associational standing (AFSCME, AFGE, and AFSA), but RSF and RSF-USA, TNG-CWA, and John Does 3 and 4 (PSCs of VOA)[19] are not implicated as non-governmental entities and contractors.[20]  In any event, the Court finds that the individual government employee plaintiffs are not barred from challenging the dismantling of USAGM because this case is not simply a collection of employment disputes.

Defendants rely primarily on *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025), to argue that Plaintiffs claims should be channeled to the federal administrative employment dispute process.  In *AFSA*, two unions representing USAID employees sought to enjoin the dismantling of USAID, effectuated in part by the placement of employees on administrative leave.  The court denied the plaintiffs' motion for a PI, concluding that the plaintiffs' claims were "archetypal complaints about changed employment conditions and their

---

[19] The defendants argue that because John Does 3 and 4 are PSCs, their claims are governed by the Contract Disputes Act (CDA) and must be heard in the Court of Federal Claims.  PI Opp'n at 7, 14–19.  The relevant inquiry under the CDA is identical to that under the Tucker Act: "whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added); *see Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985) (applying the Tucker Act inquiry to determine whether a claim falls under the CDA).  Here, as with the other individual plaintiffs, the "source of the rights" Does 3 and 4 rely upon do not derive from any contracts, but rather, upon various constitutional and statutory rights that USAGM has allegedly violated.

[20] It is also the case that the public-sector unions' assertion of organizational standing is not implicated by this jurisdictional bar, because in that capacity, the unions are suing on their own behalf, not that of their members.  However, the unions "have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of 'great' harms that could warrant a preliminary injunction."  *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *7 n.3 (D.D.C. Feb. 21, 2025).  Thus, though the public-sector unions have asserted organizational standing, their allegations of organizational harm (i.e. loss of dues and diminished bargaining power, *see* PI Mot. at 30–31) are not strong enough to warrant preliminary relief.

**Add. 67**

follow-on effects—which at this point appear to be largely financial." *Id.* at *7. In so holding, the court noted that "it may be the case that, at a high level of generality and in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," but found that "at present, the agency is still standing," so the employees' allegations boiled down to a quotidian employment dispute that fell within the statutory schemes of the FSL-MRS, CSRA, and FSA. *Id.* at *7, 11. Here, such a conclusion would ignore the facts on the record and on the ground. It strains credulity to conclude the USAGM is "still standing" when its 80-year-old flagship news service, VOA, has gone completely dark with no signs of returning, when USAGM has stopped the disbursement of funds to statutorily created, congressionally funded networks, and when USAGM leadership has called the agency "not salvageable" and "a giant rot from top to bottom."[21] It appears to this Court that USAGM has already reached the breaking point about which the *ASFA* court opined. The Court therefore concludes that this is not simply an employment dispute, and it has jurisdiction to hear the plaintiffs' claims.[22]

---

[21] Moreover, to the degree that the defendants argue that the agency still functions—albeit as a skeletal version of its former self—that is due in no small part to the successive bouts of injunctive relief (the March 28 TRO and this Court's TRO in *RFE/RL*), each of which has been necessary to keep USAGM afloat.

[22] The Court has also considered the framework in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–13 (1994), to arrive at this conclusion. Under *Thunder Basin*, a district court lacks jurisdiction over a dispute when the intent for exclusive review is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted). Claims that otherwise would be covered by the federal employment statutory scheme may instead proceed in federal district court if "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13). Such considerations favor the Court's review here. There is no meaningful review available from the MSPB and OSC for the wholesale placement of employees on administrative leave and the silencing VOA. For example, even if Plaintiff Widakuswara took her leave placement to the MSPB and was ultimately reinstated, she would return to an empty agency with no infrastructure to carry out VOA's programming. And the MSPB and OSC have no jurisdiction to review the cancelation of congressional appropriations. This case "raise[s] 'standard questions of administrative' and constitutional law, detached from" any issues related to federal employment. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). Therefore, the Court has jurisdiction to hear this dispute.

### D. PI Factor 1: Likelihood of Success on the Merits

####    i.        APA

The APA permits judicial review of "circumscribed, discrete agency actions."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The defendants argue that the plaintiffs do not seek review of a "discrete" agency action, because they seek review of the dismantling of USAGM across the board, by challenging a host of individual actions.  Therefore, granting the plaintiffs' requested relief, the defendants argue, "would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function." PI Opp'n at 31.

The Court is not persuaded by this argument.  The "discrete" requirement does not mean that if an agency takes a slew of actions quickly, the Court loses its ability to review each of them under the APA.  The Court must, of course, review whether agency actions contravene the agency's statutorily mandated duties, even if there are a lot of actions at issue.  The plaintiffs here have identified the series of actions taken by USAGM since March 15, detailed in Section I.A, *supra*, which are under review here.

The APA also only permits judicial review of "final agency action."  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way."  *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality").

As Judge Oetken concluded in granting the TRO, the defendants' actions constitute final agency actions. *See* March 28 TRO at 7 ("The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions.") (citing *Biden v. Texas*, 597 U.S. 785, 807 (2022)). And although a "closer call," Judge Oetken concluded that this applied to the mass placement of USAGM employees on administrative leave, particularly given USAGM's stated intent to fire over 600 VOA employees in the AFSCME and AFGE bargaining units and public statements from USAGM acting leadership that the agency is "irretrievably broken" and "a giant rot from top to bottom." *Id.* at 8. The defendants hardly challenge this conclusion now, only mentioning finality in a footnote, where they argue that the actions are not final because of "the operations that are ongoing and the fact that [USAGM] has only paused other activities while it determines next steps to bring the agency into compliance with the Executive Order . . . ." PI Opp'n at 31 n.5. But this argument is unconvincing because *final* does not mean *permanent*—just because USAGM maintains the ability to reverse these actions at some unidentified point in the future, that does not change the fact that the agency has made decisions, communicated them to their employees, contractors, and grantees, and thereby altered their rights and obligations. *See Ciba-Geigy Corp.*, 801 F.2d at 436 (an "indicia of finality" is if the agency action causes a "direct and immediate . . . effect on the day-to-day business of the parties challenging the action") (internal quotations omitted). The agency actions at issue—blanket placement of employees on administrative leave, termination of entire bargaining units of employees, termination of PSCs, and cancellation of grants dispensing

congressionally appropriated funds—are, with one exception,[23] discrete, final agency actions subject to judicial review.

### a. Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it fails to "supply a reasoned analysis" for a change in policy. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). To constitute "reasoned analysis," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *State Farm*, 463 U.S. at 43). Thus, "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

Not only is there an absence of "reasoned analysis" from the defendants; there is an absence of any analysis whatsoever. The EO states that only "non-statutory components and functions" of USAGM be eliminated "to the maximum extent consistent with applicable law," 90 Fed. Reg. 13043 (Mar. 14, 2025), but the defendants have provided no indication that an analysis was undertaken to determine which aspects of USAGM are statutorily required and which are not. In

---

[23] The termination of RFE/RL's grant, one of the agency actions at issue here, sits in a different posture rendering it not a "final" agency action. The initial termination of RFE/RL's grant was rescinded by USAGM, and then that grant lapsed, with no grant in place to cover the period of FY 2025 from March 15 to September 30—because the previously negotiated grant agreement for FY 2025, signed by RFE/RL in February 2025, was never signed by USAGM. *See* Section I.B.i.a, *supra*. RFE/RL and USAGM are presently engaged in grant negotiations for the remainder of FY 2025, though RFE/RL has a pending TRO motion arguing that certain grant provisions proposed by USAGM are "poison pills" or otherwise illegal. *RFE/RL v. Lake*, 25-cv-799, Mot. for TRO, ECF No. 28. Nonetheless, at this juncture, in the midst of negotiations, court intervention would be premature. However, the Court observes that delayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review.

**Add. 71**

opposing the initial TRO in the Southern District of New York, the defendants only gave *one line* of reasoning for their actions since March 15, 2025: that they were acting "[i]n furtherance of the OPM Memorandum[24] and the [EO]." *See* ECF. No. 41 at 9. This lack of analysis formed the basis of the March 28 TRO, in which the court held that the defendants' actions were arbitrary and capricious. March 28 TRO at 9 ("This single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis.").

The defendants have offered no further analysis since. In their briefing before this Court, they do not even use the words "arbitrary" or "capricious" anywhere, even though the central holding of the TRO was that the defendants' actions were arbitrary and capricious. The defendants have also offered no further explanation for the termination of the Network grants, other than the one sentence contained in each termination letter: that the grant "no longer effectuates agency priorities." Compl. ¶ 78. And at this Court's PI hearing, the defendants opted not to argue the merits of the arbitrary and capricious challenge despite being given several opportunities to do so. Tr. of Apr. 17 Hearing, 67:3–9 ("We don't even get to the arbitrary and capricious because there is no final agency decision yet."); *see also* Tr. of Apr. 17 Hearing, 82: 17–18. The defendants solely relied on their threshold, jurisdictional arguments, which this Court has resolved in the plaintiffs' favor *supra*.

Rather than argue that their actions are not arbitrary and capricious, the defendants simply state that USAGM is currently in the process of figuring out how to comply with the EO. Tr. of Apr. 17 Hearing, 45:14–15 ("Right now, the agency is determining how it will best go about

---

[24] The Office of Personnel Management memorandum, or "OPM Memorandum," refers to the memorandum issued on Jan 20, 2025, and amended on March 4, 2025, titled "Guidance on Probationary Periods, Administrative Leave and Details," available at https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf. The memorandum provides that federal agencies "have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." *See* ECF. No. 41 at 9.

**Add. 72**

complying with [the EO].”; *see also* PI Opp’n at 43 (USAGM “has placed its employees on administrative leave temporarily to determine how to bring the agency into compliance with the Executive Order”).  But that necessarily means that the defendants took the actions at issue here without any “reasoned analysis” as to what was “statutorily required” under the EO and what was not.  *State Farm*, 463 U.S. at 43.  And the actions taken reflect a hasty, indiscriminate approach: for example, the Networks received the termination letters *on the exact same day* that President Trump signed the Third Continuing Resolution appropriating line-item funds to the Networks through the end of the fiscal year.  Certainly, disbursing congressional appropriations are statutorily required, and the agency axed them the very same day they were enacted.

Furthermore, the defendants failed to account for any reliance interests, contributing to this Court’s conclusion that their actions were arbitrary and capricious.  “When an agency changes course, as [USAGM] did here, it must ‘be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.’”  *Dep’t of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 212).  VOA has been operating under statutory mandate and with steady congressional appropriations for over eighty years, and in so doing, has cultivated an audience of 425 million listeners who rely on VOA’s output—particularly in areas of the world where a free press is otherwise unavailable.  The Networks have contributed to U.S. international broadcasting by almost exclusively relying on their yearly congressional appropriations, which have been uninterrupted for decades before March 15, 2025.  There is no sign that the defendants considered these longstanding reliance interests before taking the sweeping actions at issue here.[25]

---

[25] Though the Court declines to reach the First Amendment claims at issue, the defendants’ attempts to argue that they are not engaging in viewpoint discrimination ironically serve to highlight their arbitrary and capricious approach to whittling down the agency.  They argue that these Plaintiffs’ First Amendment rights are not implicated here because

**Add. 73**

In short, the defendants had no method or approach towards shutting down USAGM that this Court can discern. They took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions as required by the plain language of the EO, and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world. It is hard to fathom a more straightforward display of arbitrary and capricious actions than the Defendants' actions here.

### b. "Not in Accordance with the Law," 5 U.S.C. § 706(2)(A)

The defendants have also likely violated the APA because their actions are "not in accordance with law." 5 U.S.C. 706(2)(A). This rule applies to actions that "failed to meet statutory, procedural, or constitutional requirements." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). The Court adopts the conclusions from the March 28 TRO and reproduces a sampling of the likely statutory and constitutional violations by the defendants below.

### 1. International Broadcasting Act and the Congressional Appropriations Acts

The defendants are likely in direct violation of numerous federal laws. For one, VOA's congressionally established charter in the International Broadcasting Act states that VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive," 22 U.S.C. § 6202(c), but the defendants have silenced VOA for the first time ever. The International Broadcasting Act further states that U.S. international broadcasting "shall . . . be designed so as to effectively reach a significant audience," and "include news which is

---

they have halted all journalism at VOA and grantee broadcasters, and not "singled out any one viewpoint." PI Opp'n at 24. Because the defendants have eliminated the agency's functions across the board, the argument seems to go, there is no viewpoint discrimination. For one, the Court finds this argument troubling—it cannot be the case that by shutting down all content at an agency, which current leadership has deemed "radical" and "so far to the left," Compl. ¶ 90, the defendants have avoided any First Amendment transgressions. But moreover, even if the defendants were not motivated by viewpoint (which this Court finds dubious, *see* Tr. of Apr. 17 Hearing, 22:19–21), their stance acknowledges that their actions have effectively shut down the agency wholesale, and they have not offered any "reasoned analysis" for doing so.

**Add. 74**

consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6202(a), (b). But as of now, it appears that the only operational unit of USAGM is the Office of Cuba Broadcasting, and there is no indication that this office of thirty-three individuals can fulfill USAGM's broad statutory mandate by itself.

Finally, the defendants' decision to cut all grant funding to the Networks directly violates congressional appropriations laws. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). As explained *supra*, USAGM may to some extent reprogram funds among different programs, but any such reprogramming efforts may only reduce funding for a program by five percent or less of what Congress designated—certainly, no law gives the agency the power to cut funding to the drastic degree that is alleged. Additionally, USAGM may only reprogram if it gives the House and Senate Appropriations Committees fifteen days' advance notice, which has not happened here.

The Court therefore concludes that the defendants are likely contravening the APA by acting "not in accordance" with several International Broadcasting Act provisions and congressional appropriations acts.

### 2. *Take Care Clause and Separation of Powers Principles*

"Under the Constitution, the President must 'take care that the laws be faithfully executed,' U.S. Const. art. II, § 3, across the entire Executive Branch—including 'independent' agencies." *Eng. v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018). And because federal agencies are

**Add. 75**

"creatures of statute," and "the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, 'possess[ing] only the authority that Congress has provided them.'" *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024) (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022)).  By violating the International Broadcasting Act and the relevant congressional appropriations acts, the defendants likely contravene the Take Care Clause.  *See* March 28 TRO at 12 ("Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause].").

"Related to Plaintiffs' Take Care Clause claim is their argument that Defendants' actions violate the separation of powers implicit in our constitutional design."  March 28 TRO at 12.  The power to make law resides exclusively with the legislative branch, U.S. CONST. art. I, § 1, and the executive branch may not 'enact, [] amend, or [] repeal statutes.'" *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Specifically, the Court highlights again here that the defendants' unwillingness to expend funds in accordance with the congressional appropriations laws is a direct affront to the power of the legislative branch.  Congress possesses the "power of the purse," which is "the ultimate check on the . . . power of the Executive."  *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015).  Here, the defendants' termination of grants to the Networks and shutting down VOA "potentially run roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds."  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)).

**Add. 76**

### c.  "Unlawfully Withheld or Unreasonably Delayed," 5 U.S.C. § 706(1)

The APA also provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).  This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphases in original).  Here, it is likely that the defendants have also violated section 706(1) of the APA by unlawfully withholding the international broadcasting programming and grants that USAGM is statutorily required to provide.  At the PI hearing, in response to the Court's inquiry regarding the withholding of appropriated funds and the need for recission, the defendants argued that such concerns are not ripe for adjudication.  Tr. of Apr. 17 Hearing, 79:18–19, 80:12–14.  Of course, this argument ignores the fact that, but for the March 28 TRO, the grants to RFA and MBN are currently terminated by the letters from USAGM.  And the defendants have not provided any indication that the $260 million in VOA appropriations is being spent to fulfill its statutory mandate to provide a "consistently reliable" source of news.  22 U.S.C. § 6202(c).  Indeed, at the PI hearing, defense counsel declined to make any representation regarding the planned use of VOA's earmarked funds, while VOA remains silent indefinitely.  Tr. of Apr. 17 Hearing, 81:18–82:5.  These facts suggest that Defendants are "unlawfully withholding" or "unreasonably delaying" required agency action to fund the Networks and carry out international broadcasting mandated by Congress, in violation of Section 706(1) of the APA.[26]

### E.  PI Factor 2: Irreparable Harm

To qualify as irreparable harm, the injuries alleged "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable

---

[26] Because the Court finds that the plaintiffs have demonstrated a likelihood of success on the merits of their APA claims, the Court will not reach the plaintiffs' First Amendment claims.  *See* Compl. ¶¶ 102–116.

relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

(quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Here, the

showing of irreparable harm that formed the basis of the March 28 TRO remains compelling.  *See*

March 28 TRO at 16 ("The dismantling of USAGM would clearly cause employees, contractors,

and grantees irreparable harm.  And Plaintiffs have offered sufficient evidence that Defendants are

doing just that.").  The defendants have already placed a total of "[a]pproximately 1,300 VOA

journalists and other employees" on administrative leave, furloughed others, and stated that over

600 more employees will be terminated within weeks.  Compl. ¶¶ 75, 80; March 26 Letter to the

Court, ECF No. 33 at 2.  "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff]

to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm."

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

The defendants argue that the plaintiffs "fundamentally complain of adverse employment

actions . . . that can be remedied by money damages at the end of the litigation."  PI Opp'n at 42.

While the defendants are correct that "ordinary economic injuries are usually insufficient to require

injunctive relief," *Wis. Gas,* 758 F.2d at 674, it is also true that "financial harm can 'constitute

irreparable harm . . . where the loss threatens the very existence of the movant's business,'"

*Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C.

Mar. 18, 2025) (quoting *Wis. Gas,* 758 F.2d at 674).  The defendants have silenced VOA, canceled

funds to affiliate Networks, and shut down all transmitters at foreign service stations abroad.

Compl. ¶¶ 78–83.  "[T]hese furloughs and lay-offs entail the dismantling of human infrastructure

required to run USAGM, VOA, and USAGM's grantees."  March 28 TRO at 17.  "[S]hutting down

necessary systems, laying off personnel, and terminating contracts, even ones that might be able

to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the

**Add. 78**

agency in the long-term. . . . In short, these harms cannot be remedied with mere money damages." *Id.*

The Court also concludes that the harm to Does 3 and 4, foreign nationals working as PSCs with VOA, from the looming loss of their J-1 visas constitutes irreparable harm. In opposing the March 28 TRO, the defendants argued that the revocation of these J-1 visas is not irreparable harm because it merely forces them to leave the country "earlier than scheduled." March 28 TRO at 19 (quoting Defs.' TRO Opp'n at 13). The court dispensed with that argument then, and the Court adopts the same reasoning here: the *immediate* termination of John Does 3 and 4's contracts and visas is "not merely speeding up the inevitable" because the hastiness of the defendants' actions eliminates the notice that Does 3 and 4 would otherwise have "to find a new job to sponsor a subsequent visa, or to apply for another kind of visa to stay in the country." March 28 TRO at 19–20. The defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately.

The defendants do not appear to challenge the plaintiffs' showing of irreparable harm to RSF plaintiffs who rely on VOA while living and reporting abroad, or the harm to TNG-CWA (labor organization of RFA employees). The Court finds these allegations of irreparable harm compelling as well. *See* Brunnit Decl. ¶ 6 (offering testimony of irreparable harm to RSF Plaintiffs because the shutdown of VOA "depriv[es] correspondents of a trustworthy source of news" in countries "where VOA is one of the few, if not the only, sources of independent and reliable news," and impedes RSF's ability to "dissemina[te] vital public interest information for journalists and public safety . . . ."); Second Schleuss Decl. ¶¶ 4–6 (testifying that TNG-CWA members will lose their health insurance as soon as May 1 and describing the medical consequences of such a result, and testifying that TNG-CWA members with H1-B visas face "deport[ation] to their home

**Add. 79**

countries where they could face threats, harassment, or imprisonment for their work as journalists"
as a result of their furlough status).

In sum, the irreparable harm that the plaintiffs allege impacts the very existence of
USAGM, the health and safety of its journalists and employees, and the interests of the millions
of reporters and listeners who depend on USAGM's programming.  For all of these reasons, the
Court concludes that the plaintiffs' have demonstrated irreparable harm warranting the issuance of
a preliminary injunction.

### F.  PI Factors 3 and 4: Balance of Equities and Public Interest

These final PI factors "merge when the government is the opposing party."  *Am. Ass'n of
Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting
*Nken*, 556 U.S. at 435, 129 S.Ct. 1749).  "[C]ourts must balance the competing claims of injury
and must consider the effect on each party of the granting or withholding of the requested relief[,]
. . . pay[ing] particular regard for the public consequences" that would result in granting the
emergency relief sought.  *Winter*, 555 U.S. at 24 (quotation marks omitted).  Here, as noted in the
March 28 TRO, while the plaintiffs "have put forward a laundry list of injuries" that would occur
absent injunctive relief, the defendants only seem to assert that injunctive relief would disrupt their
ability to comply with the EO.  March 28 TRO at 20.  However, the defendants are apparently still
in the process of determining *how* to comply with the EO.  In doing so, they have likely violated
it by reducing USAGM's activities to levels far below the constitutional and statutory minimums.
Therefore, there is no competing harm to the government with the issuance of preliminary relief
that orders compliance with governing statutes and the Constitution, while "[t]here is a substantial
public interest 'in having governmental agencies abide by the federal laws that govern their
existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted).  Moreover, Congress has

**Add. 80**

"enshrined into law that '[i]t is in the interest of the United States to support broadcasting to other nations.'" *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *4 (quoting 22 U.S.C. § 6201(3)). It is, therefore, *Congress's* "longstanding determination" that international broadcasting activities, which the defendants have eliminated, are in the public interest. *Id.* The Court therefore concludes that these final PI factors weigh in favor of a preliminary injunction.

### G. The Court will Not Impose Bond.

Under Federal Rule of Civil Procedure 65(c), a Court may require a party to post bond for "costs and damages sustained" by the defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). A district court's failure to require the posting of a bond has been held reversible error in some Circuits, while others have found reversible error only when the district court failed to expressly consider the question of requiring a bond. Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed. April 2025).

The Court has considered the question of whether to impose bond and declines to do so, following the practice of other courts in this Circuit faced with a similar posture. "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)). Such a situation arises where a bond would "hold Plaintiffs hostage" for the harm from the government's unlawful withholding of "previously committed funds." *Id.* (noting that defendants "will personally face no monetary injury from the injunction"). That is squarely the case here, where the defendants are already constitutionally required to distribute funds in accordance with the yearly appropriations bill, so a bond would merely impose a financial barrier to litigation for plaintiffs seeking to vindicate their statutory and constitutional rights. In cases such as this one

**Add. 81**

where funds are committed by Congress for specific programs, "public policy mandate[s] that parties . . . adversely affected by improper administration of programs . . . be strongly encouraged to correct such errors."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (quoting *Bass v. Richardson*, 338 F. Supp. 478, 491 (S.D.N.Y. 1971)).  To that end, the Court will not impose bond.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for a Preliminary Injunction will be **GRANTED** as follows: The Court will preliminarily enjoin the defendants, pending further order of this Court, to 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).  The Court will **DENY** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.

**Add. 82**

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____4-22-25_____
_____2:45 p.m._____

_Royce C. Lamberth_

Royce C. Lamberth
United States District Judge

**Add. 83**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATSY WIDAKUSWARA**, *et al.*,

     *Plaintiffs,*

**v.**

**KARI LAKE,** *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al.*,

     *Defendants.*

Case No. 1:25-cv-1015-RCL

## <u>ORDER</u>

For the reasons contained in the accompanying Memorandum Opinion, the plaintiffs' Motion for a Preliminary Injunction [ECF No. 17][1] is **GRANTED** as follows:

The Court will preliminarily enjoin the defendants, pending further order of this Court, to: 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025; 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the

---

[1] The plaintiffs sought emergency relief by filing a motion (styled as a proposed order to show cause) for a preliminary injunction. *See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of Proposed Order to Show Cause, ECF No. 17.

**Add. 84**

disbursement to RFA and MBN of the funds Congress appropriated; and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C § 6202(c).  The Court **DENIES** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.

**IT IS SO ORDERED.**

Date:    4-22-25
            2:45 a.m.

Royce C. Lamberth
United States District Judge

**Add. 85**

INTERNATIONAL FISHERIES COMMISSIONS

The agreement includes $65,719,000 for International Fisheries Commissions. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL FISHERIES COMMISSIONS
[Budget authority in thousands of dollars]

| Commission/Activity | Budget Authority |
|---|---|
| Great Lakes Fishery Commission | 50,000 |
| *Lake Champlain and Lake Memphremagog Basins* | *10,000* |
| *Grass Carp* | *1,000* |
| *Lake Memphremagog Fishery* | *500* |
| Inter-American Tropical Tuna Commission | 1,750 |
| Pacific Salmon Commission | 5,868 |
| International Pacific Halibut Commission | 4,582 |
| Other Marine Conservation Organizations | 3,519 |
| **Total** | **65,719** |

## RELATED AGENCY

UNITED STATES AGENCY FOR GLOBAL MEDIA

INTERNATIONAL BROADCASTING OPERATIONS

The agreement includes $857,214,000 for International Broadcasting Operations, of which $42,861,000 may remain available until September 30, 2025. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL BROADCASTING OPERATIONS
[Budget authority in thousands of dollars]

| Entities/Grantees | Budget Authority |
|---|---|
| Federal Entities | |
| Mission Support | 225,640 |
| *Office of Technology, Services, and Innovation* | *174,440* |
| Office of Cuba Broadcasting | 25,000 |
| Voice of America | 260,032 |
| Subtotal | 510,672 |

14

**Add. 86**

| Independent Grantee Organizations | |
|---|---:|
| Radio Free Europe/Radio Liberty | 142,212 |
| Radio Free Asia | 60,830 |
| Middle East Broadcasting Networks | 100,000 |
| Open Technology Fund | 43,500 |
| Subtotal | 346,542 |
| **Total** | **857,214** |

*Consultation.*—Not less than 30 days prior to the submission of the operating plan required by section 7062(a) of the Act for funds appropriated or otherwise made available under this heading, the United States Agency for Global Media (USAGM) Chief Executive Officer (CEO) shall consult with the Committees on Appropriations on the allocation of funding by entity and the use of the 2023 Language Service Review (LSR) and other information to inform agency operations. The operating plan shall also clearly identify resources allocated in fiscal year 2024 for the new headquarters building.

*Language Service Review.*—Not later than 60 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing the process and outcome of the 2023 LSR and the status of implementation of strategies for language services following the 2022 LSR.

*Mission Support.*—The agreement updates the name of "International Broadcasting Bureau" in the above table to "Mission Support", consistent with the December 2023 congressional notification to the Committees on Appropriations.

*Networks.*—The USAGM CEO is directed to use the expertise of Office of Cuba Broadcasting to inform programming about Cuba by other USAGM networks.

*New Headquarters Building.*—Not later than 90 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing updated plans for the new headquarters relocation, including timelines and estimated costs.

*Open Technology Fund.*—Funds made available for the Open Technology Fund should be made available for grants for innovative methods to reach audiences inside of Cuba. Not later than 45 days after the date of enactment of the Act, the USAGM CEO shall consult with the Committees on Appropriations on such grants.

15

**Add. 87**

## Second Supplemental Declaration of Kevin W. Fleming

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      This declaration supplements my March 28 and April 16, 2025, declarations with an updated snapshot of RFA's current finances.

3.      In my April 16 declaration, I explained that RFA had furloughed 250 employees (78% of its U.S.-based staff); that RFA had stopped accepting work from stringers around the world; and that RFA had terminated or suspended 95% of independent contractor agreements for domestic and international freelance journalists.

4.      Since then, RFA's situation has grown more dire.

5.      In addition to the actions listed above, we have now suspended 100% of temporary staff and 20% of international staff.  Those measures were necessary in order to conserve funds so that RFA could continue to pay out money associated with employment terminations, like accrued leave.  RFA continues to try to protect its staff during this difficult time.

6.      As a result of the measures described above, RFA has been unable to generate content and programming on air and online as it previously did.  Due to RFA's drastically reduced staffing levels, there has been no new content produced from multiple editorial divisions.  Currently, radio programming has been reduced by approximately 89%.  RFA now broadcasts just seven hours *per week*.  Online, RFA's written content is down by 48% and its video content is down by 60%.  The impact on programming will become only more pronounced in the coming weeks, with four additional language services expected to go dark in May, as RFA continues to preserve as much cash as possible.

7.      In my April 16 declaration, I explained that RFA had $12 million cash on hand.  That figure is now $10 million.

8.      Based on our funds, I initially projected that RFA would have enough money to stay afloat through May 16, 2025.  Since then, RFA made the decision to retain certain key staff members who are visa holders for as long as possible.  RFA also calculated that in order to pay for health insurance for all furloughed staff, and cover some critical operational costs, it would need to move ahead with layoffs one week earlier than planned.  RFA now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures.

9.      On May 9, 2025, RFA will be forced to lay off the approximately 340 people it employs in the United States and abroad.  That is 90% of the entire organization.

**Add. 88**

10. After May 9, RFA will exist in name only. There will be even fewer staff left, even more minimal broadcasting, and RFA likely will be looking at bankruptcy in late summer 2025. Even before then, however, it will default on its bills and certain employee-related obligations.

11. On April 18, 2025, RFA wrote to USAGM's Chief Financial Officer to follow up on RFA's April drawdown request. RFA specifically noted that its "April funding drawdown request remains pending." RFA reminded USAGM that USAGM's March 15, 2025 "termination" of RFA's grant had been enjoined, and that its current grant agreement (which USAGM signed on January 16, 2025) therefore was operative.

12. On April 24, 2025, RFA wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from January "is operative" and that "RFA is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

13. RFA specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

14. To date, RFA has not received its April funds, which ordinarily it would have received within the first week of April. It is now nearly May, and RFA is running on fumes.

15. For the reasons I previously explained, if May 9, passes without RFA's funding restored, it will be extremely difficult—if not impossible—for RFA to ever again resume its work, given the reputational and network impacts previously explained.

16. As I previously explained, certainty of funding is critical to RFA's operation and financial management. At the outset of the fiscal year, RFA creates an annual budget and financial plan by month based on the total annual appropriation amount.

17. RFA can function only if it receives its funding at regular, predictable intervals. RFA's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

18. RFA's conservative fiscal management and the steps outlined above have allowed it to survive at reduced operating levels despite not receiving its April funding, but it will not be able to survive for much longer. Already the organization has suffered irreparable harm. After May 9, 2025, the organization will effectively cease to exist as it once did.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __27__ day of April, 2025.

Kevin W. Fleming (Apr 27, 2025 18:11 EDT)

_____

Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

3

**Add. 90**

## Second Supplemental Declaration of Deirdre Kline

1.    I am the Chief Operating Officer (COO) of Middle East Broadcasting Networks, Inc. (MBN). I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.    This declaration supplements my April 9 and April 16, 2025 declarations with an updated snapshot of MBN's current finances.

3.    In my April 16 declaration, I explained that MBN furloughed more than 95% of its domestic staff for a period of two weeks beginning on March 23, 2025. I also explained that on April 12, 2025—when MBN still had not received its April funds (or any indication of when they might be disbursed)—MBN was forced to terminate the employment of 514 people, more than 90% of its entire organization.

4.    Because MBN did not have sufficient funds to pay out earned annual leave, severance, and other end-of-service benefits, people who worked at MBN for decades, and relied on those benefits, were left with nothing.

5.    In my April 16 declaration, I stated that fewer than 45 people remain employed at MBN. By May 2, that number will be 36 because MBN will be forced to make additional cuts. At the start of this litigation, MBN employed more than 500 people, including more than 380 in the United States.

6.    In my previous declaration, I indicated that MBN had approximately $4.3 million cash on hand. By May 2, that figure will be approximately $2.5 million.

7.    Since I submitted my previous declarations, MBN has informed the State Department that nearly all of MBN's employees on a visa program have been terminated. Former employees who worked at MBN pursuant to visas must leave the United States within 30 days. At MBN, these former employees include one person who has stage four cancer and another who is eight months pregnant. Others have had to pull their children out of school and leave their lives behind to go back to their home countries.

8.    On April 18, 2025, MBN wrote to USAGM's Chief Financial Officer to follow up on MBN's April drawdown request. MBN specifically noted that its "April funding drawdown request remains pending." MBN reminded USAGM that USAGM's March 15, 2025 "termination" of MBN's grant had been enjoined, and that its current grant agreement (which USAGM signed on February 27, 2025) therefore was operative.

9.    On April 24, 2025, MBN wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from February "is operative" and that "MBN is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

1

**Add. 91**

10.     MBN specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

11.     To date, MBN has not received its April funds, which it historically has received within the first week of the month.

12.     MBN currently exists as a shell of its former self.  It can further extend its extinction only by taking steps like declaring bankruptcy, ending all content production (already drastically reduced), and laying off its remaining staff.

13.     The skeleton staff is still working, many with reduced pay, and like their former colleagues, they will end their time at MBN without severance or annual leave payouts.  These employees will also be ineligible to continue their health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act, or COBRA, because without funding, MBN will be forced to cancel its healthcare insurance plan.

14.     MBN is delinquent on its leases in Springfield, Virginia, in Washington, D.C., and in Dubai and has been forced to cut back broadcasting, as described in my April 16 declaration.  Without access to its annual appropriation, MBN's payments to vendors are also late.  Soon, MBN's creditors will no doubt seek to recoup their funds, and MBN will almost certainly be forced into bankruptcy.

15.     If MBN's congressionally appropriated funding does not reach MBN before May 31, 2025, the organization will cease to exist except on paper.

16.     It will be impossible for MBN ever again to resume its work; its reputation as a faithful employer, trusted news source, and robust independent organization is in tatters.

17.     Certainty of funding is critical to MBN's operation and financial management.  At the outset of the fiscal year, MBN creates an annual budget and month-by-month financial plan—both premised on the total of its annual appropriation.

18.     MBN can function only if it receives its funding at regular, predictable intervals.  MBN's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

19.     As of April 28, 2025, it will have been two months since MBN received any of its congressional annual appropriation from USAGM.

20.     The drastic steps that MBN has taken, outlined above and in my previous declarations, have allowed it to survive despite not receiving its April funding, but it cannot survive past May 31, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

2

**Add. 92**

Dated this **27** day of April, 2025.

Deirdre Kline
Chief Operating Officer,
Middle East Broadcasting Networks, Inc.

**Add. 93**