**Nos. 25-5144, 25-5145, 25-5150, 25-5151**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PATSY WIDAKUSWARA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE
ACTING CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MICHAEL ABRAMOWITZ, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
VOICE OF AMERICA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE
ACTING CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

On Appeals from the United States District Court for the District of Columbia
Nos. 25-cv-1015, 25-cv-887, 25-cv-966, 25-cv-907 (Hon. Royce C. Lamberth)

## APPELLEES' BRIEF REGARDING THE RESTORATION OF GRANTS

Counsel for Plaintiffs-Appellees in *Widakuswara*, *Middle East Broadcasting
Networks*, and *Radio Free Asia* are listed on signature pages

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

## B.     Rulings Under Review

References to the rulings at issue appear in the Brief for Defendants-Appellants.

## C.     Related Cases

These cases have not previously been before this Court.  There are two related cases currently pending in the United States District Court for the District of Columbia or on appeal.  *See RFE/RL, Inc. v. Lake*, No. 25-cv-799 (D.D.C.), *appeal docketed*, No. 25-5158 (D.C. Cir.); *Open Tech. Fund v. Lake*, No. 25-cv-840 (D.D.C.).

Dated: July 15, 2025                          /s/ *Donald B. Verrilli, Jr.*
                                                              Donald B. Verrilli, Jr.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Plaintiffs-Appellees in *Widakuswara*, *Middle East Broadcasting Networks*, and *Radio Free Asia* make the following disclosures:

Plaintiff-Appellee Reporters Without Borders, Inc. is a 501(c)(3) non-profit organization headquartered in Washington, D.C. and is the United States affiliate of Plaintiff-Appellee Reporters Sans Frontières, which is headquartered in Paris, France.

Plaintiff-Appellee American Federation of State, County and Municipal Employees ("AFSCME") is a national labor organization and unincorporated membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States.

Plaintiff-Appellee American Federation of Government Employees ("AFGE") is a labor organization and unincorporated association headquartered in Washington, D.C. AFGE is the largest federal employee union.

Plaintiff-Appellee American Foreign Service Association ("AFSA") is a professional association and labor organization headquartered in Washington, D.C. AFSA is the sole labor organization for the United States Foreign Service.

Plaintiff-Appellee The NewsGuild-CWA ("TNG-CWA") is a labor union representing more than 27,000 employees. It is the largest labor union representing journalists and media workers in North America.

Plaintiffs-Appellees Radio Free Asia and Middle East Broadcasting Networks, Inc., are private nonprofit news organizations that provide independent journalism to designated regions of the world.

No Plaintiff-Appellee has a parent corporation, and no publicly held company owns 10% or more of any Plaintiff-Appellee's stock.

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENT............................................................ ii

GLOSSARY OF ABBREVIATIONS .......................................................x

INTRODUCTION ......................................................................................1

STATUTES AND REGULATIONS........................................................4

STATEMENT OF THE CASE...................................................................4

    A.    Factual and Legal Background...............................................4

    B.    Procedural Background ..........................................................7

SUMMARY OF ARGUMENT ..................................................................9

ARGUMENT ...........................................................................................10

I.    Appellees Are Likely to Succeed on the Merits...........................10

    A.    The Government's Efforts to Evade Judicial Review of its
              Unlawful Conduct Fail. ......................................................10

        1.    The Tucker Act Did Not Divest the District Court of
                  Jurisdiction in *RFA* and *MBN*. ..................................10

            a.    The Networks' Statutory Right to Their Funding Is
                      Clear.............................................................................11

            b.    The Networks' Claims Are Based on Their
                      Statutory Rights and the Constitution, Not Any
                      Contract.......................................................................16

        2.    The Tucker Act Cannot Bar the *Widakuswara* Injunction. ......23

        3.    The Impoundment Control Act Does Not Preclude
                Judicial Review. .......................................................24

    B.    The Government Does Not Contest the Merits of Appellees'
              Claims..................................................................................29

II.    The Remaining Injunction Factors Support Relief........................30

    A.    The Injunctions Are Preventing Irreparable Harm. ............30

    B.    The Balance of Equities and Public Interest Support the
              Injunctions. .........................................................................33

CONCLUSION ...........................................................................................34

CERTIFICATE OF COMPLIANCE......................................................................38

CERTIFICATE OF SERVICE .............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013)...................................................................16, 29

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024).........................................................................33

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022)............................................................................................27

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962)............................................................................31

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011)............................................................................................19

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991)..............................................................................................28

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984)............................................................................................27

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024)................................................................................................25

*C.G.B. v. Wolf*,
464 F.Supp.3d 174 (D.D.C. 2020)......................................................................32

*Cienega Gardens v. United States*,
194 F.3d 1231 (Fed. Cir. 1998) ..........................................................................23

*City of New Haven, Conn. v. United States*,
809 F.2d 900 (D.C. Cir. 1987)............................................................................28

*Crowley Gov't Servs., Inc. v. GSA*,
38 F.4th 1099 (D.C. Cir. 2022)...........................................................16, 17, 21

\* Authorities upon which Plaintiffs principally rely are marked with asterisks.

vi

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988)............................................................25

*Department of Education v. California*,
145 S. Ct. 966 (2025)...........................................................21, 22, 33

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985)............................................................22

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..........................................................31, 33

*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995) ............................................................18

*Md. Dep't of Hum. Res. v. HHS*,
763 F.2d 1441 (D.C. Cir. 1985)................................................17, 20, 21

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)......................................................19, 20

*National Center for Manufacturing Sciences v. United States*,
114 F.3d 196 (Fed. Cir. 1997) ......................................................18, 20

*In re NTE Connecticut, LLC*,
26 F.4th 980 (D.C. Cir. 2022)............................................................31

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017)............................................................16

*Pollack v. Hogan*,
703 F.3d 117 (D.C. Cir. 2012)............................................................23

*Quarles v. United States*,
587 U.S. 645 (2019)............................................................15

*Risteen v. Youth For Understanding, Inc.*,
245 F. Supp. 2d 1 (D.D.C. 2002)............................................................31

*Rochester Pure Waters Dist. v. EPA*,
960 F.2d 180 (D.C. Cir. 1992)............................................................34

*Sackett v. EPA*,
566 U.S. 120 (2012)..........................................................................24

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022).............................................................33

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006).....................................................18, 23

*Train v. City of New York*,
420 U.S. 35 (1975)......................................................................16, 29

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992)....................................................16, 21

*Webster v. Doe*,
486 U.S. 592 (1988).....................................................................23, 27

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)....................................................30, 31

**FEDERAL STATUTES**

2 U.S.C. § 683 ...............................................................................25, 26

2 U.S.C. § 683(b) ...........................................................................25, 26

2 U.S.C. § 687 ...............................................................................25, 26

5 U.S.C. § 706(1) ................................................................................29

5 U.S.C. § 706(2) ................................................................................17

5 U.S.C. § 706(2)(A)............................................................................29

8 U.S.C. § 1101(a)(27)(M) ....................................................................5

22 U.S.C. § 6201(1) ...........................................................................1, 4

22 U.S.C. § 6201(3) .........................................................................4, 34

22 U.S.C. § 6202(a) ..............................................................................8

22 U.S.C. § 6202(b) ..........................................................................8, 11

22 U.S.C. § 6202(b)(1)................................................................1, 5

22 U.S.C. § 6202(b)(2)...................................................................5

22 U.S.C. § 6204(a)(5)................................................................6, 12

22 U.S.C. § 6204(a)(6)................................................................6, 12

22 U.S.C. § 6208(a) .....................................................................12

22 U.S.C. § 6208(b) .....................................................................12

22 U.S.C. § 6208(b)(2)...................................................................5

22 U.S.C. § 6208(c)(5)..............................................................13, 14

22 U.S.C. § 6209(d) .....................................................................11

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 stat. 9 (2025) ....................................................7

*Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (2024) ...........................................6

* International Broadcasting Act,
    Pub. L. No. 103-236, 108 Stat. 382 (1994) ... 4, 6, 8, 9, 11, 12, 15, 17, 24, 28, 29

Pub. L. No. 108-11, 117 Stat. 559 (2003).................................................5

OTHER AUTHORITIES

Allocate, Black's Law Dictionary (12th ed. 2024).................................13

Allocate, Merriam-Webster, https://www.merriam-webster.com/
    dictionary/allocate.............................................................................13

Allocate, Oxford English Dictionary ......................................................13

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFC | Court of Federal Claims |
| IBA | International Broadcasting Act |
| MBN | Middle East Broadcasting Networks, Inc. |
| RFA | Radio Free Asia |
| RSF | Reporters Sans Frontieres |
| TNG-CWA | The NewsGuild-CWA |
| USAGM | United States Agency for Global Media |

# INTRODUCTION

Congress has designated a set of nonprofit news organizations to advance an important "policy of the United States"—promoting "freedom of opinion and expression" by broadcasting "reliable and authoritative" news to audiences that lack access to a free press. 22 U.S.C. §§ 6201(1), 6202(b)(1). Radio Free Asia ("RFA") and the Middle East Broadcasting Networks ("MBN," and collectively "the Networks") are two such organizations. Congress called for the establishment of each and directed them to provide particular types of programming in regions lacking a free and independent press. Congress thereby sought to ensure that uncensored journalism would reach the citizens of nations where authoritarian regimes and state-controlled media would otherwise dominate the airwaves and the Internet.

To ensure that RFA and MBN could carry out their statutorily mandated functions, Congress appropriated millions of dollars for those organizations and directed that specific sums "shall be allocated" to RFA and MBN, by name. Congress charged the U.S. Agency for Global Media ("USAGM") with disbursing the Networks' appropriated funds by mandating that USAGM execute grant agreements with them. For years, across Administrations, USAGM has followed Congress's instructions.

1

In March 2025, however, USAGM abruptly terminated the Networks' grant agreements and withheld all undisbursed 2025 funds. USAGM announced that it took that step because Congress's decision to fund the Networks to accomplish critical statutory functions—promoting "freedom of opinion and expression" in authoritarian countries by broadcasting "reliable and authoritative" news—no longer aligned with (unstated) "agency priorities." JA339, JA363. The Networks, along with organizations whose journalist members depend on them (the "*Widakuswara* plaintiffs"), obtained preliminary relief to halt USAGM's blatant violation of Congress's directives, and this Court after en banc consideration declined to stay the injunctions granted in favor of the Networks.

On appeal, the government cannot bring itself to defend USAGM's brazen disregard for its statutory obligations and the separation of powers. It says *not one word* in defense of USAGM's extraordinary assertion that it could terminate the Networks' grants based solely on the agency's policy disagreement with Congress's spending decision. No doubt for good reason: the unlawfulness of that conduct is undeniable. Congress has directed the Networks to provide certain types of programming to specific regions, and it has directed that they receive appropriated funds to fulfill that command. USAGM has no power to decide that its own "agency priorities" supersede the mandatory directives Congress enacted into law. The agency's decision to starve the Networks of their appropriated funds far exceeds any

statutory authority that Congress gave USAGM, and violates the Take Care Clause and the separation of powers to boot.

Rather than defend USAGM's unconstitutional power grab, the government instead urges that Article III courts must stand down because the Tucker Act requires that the Networks' claims be adjudicated in the Court of Federal Claims ("CFC"). But this is not a contract claim for damages that belongs in an Article I court. The question here is whether the Executive may violate Congress's instruction that specific appropriated sums "shall" be disbursed to designated recipients to enable them to fulfill statutory commands. The Networks do not make a single argument that depends on the contractual terms of their grant agreements; they seek to enforce Congress's statutory directions and the constitutional principles that compel the Executive Branch to obey them—issues that lie at the very core of the Article III judicial power. The Tucker Act simply has no application to disputes of that kind, regardless of whether the funds at issue are disbursed through the mechanism of a government contract. Indeed, it is implausible that Congress would have created exclusive jurisdiction over these issues in the CFC—particularly given that the CFC cannot grant injunctive relief of any kind. In all events, the government's Tucker Act objection would provide no basis to disturb the injunction issued in favor of the *Widakuswara* plaintiffs. They are not parties to the Networks' grant agreements, so the Tucker Act cannot bar their suit.

The remaining equitable factors further support the district court's orders. USAGM's funding terminations, if left in place, would force the Networks to shutter core operations, imperiling their congressionally assigned mission, irreparably damaging their credibility with audiences and sources, and jeopardizing their ability to protect journalists—including those represented by the *Widakuswara* plaintiffs— in the most dangerous media environments in the world. Those irreparable harms unquestionably justify the district court's injunctions, especially given that the government suffers no cognizable harm from following Congress's direction pending a final adjudication.

This Court should affirm.

## STATUTES AND REGULATIONS

Pertinent statutes are set forth in the addendum to Appellants' brief and the supplemental addendum (Supp.Add.) to this brief.

## STATEMENT OF THE CASE

### A.  Factual and Legal Background

1. In the International Broadcasting Act of 1994 ("IBA"), Congress declared it "the policy of the United States to promote the right of freedom of opinion and expression" through "broadcasting to other nations." Pub. L. No. 103-236, 108 Stat. 382, 432-33 (1994) (codified at 22 U.S.C. §§ 6201(1), (3)). Congress therefore vested a set of broadcasting organizations with responsibility to provide American-supported broadcasting to countries that restrict a free and independent press.

Congress directed that such international broadcasting "shall" fulfill statutorily-prescribed functions, including to provide "news which is consistently reliable and authoritative." *Id.* (codified at 22 U.S.C. §§ 6202(b)(1), (2)); *see* 8 U.S.C. § 1101(a)(27)(M) (special immigrant visa for grantees' broadcasters). RFA and MBN are two of the organizations that Congress has designated for those purposes.

RFA brings uncensored journalism to "Asian nations whose people do not fully enjoy freedom of expression." 22 U.S.C. § 6208(b)(2). RFA has helped to hold accountable the Chinese Communist Party and other regimes by dispelling misinformation and covering sensitive issues that would otherwise be censored or ignored by state-controlled media. JA330. RFA programming is also a vital source of reliable news for journalists reporting abroad. Members of two *Widakuswara* plaintiffs—The NewsGuild-CWA ("TNG-CWA"), a union representing 27,000 journalists and media workers, including around 100 RFA employees, and Reporters Sans Frontiers ("RSF"), a press-freedom non-profit—rely on RFA to inform their reporting and personal safety. JA139-141, 126-127.

MBN brings objective journalism to Middle Eastern and North African countries that suppress speech. JA350. MBN was established to promote impartial coverage of the United States following the September 11 attacks. *See* Pub. L. No. 108-11, 117 Stat. 559, 562 (2003) (appropriating funds "for activities related to the Middle East Television Network broadcasting to the Middle East and radio

broadcasting to Iraq"). Today, MBN's work includes countering anti-American propaganda of extremists, including Iran-supported terrorists. JA350.

2. Each year since the Networks' inception, Congress has appropriated funds for the Networks to enable them to fulfill their statutorily-assigned missions. The International Broadcasting Act tasks USAGM with "allocat[ing] funds appropriated for international broadcasting activities" and "mak[ing] and supervis[ing] grants … for broadcasting and related activities." 22 U.S.C. § 6204(a)(5), (6). To fulfill Congress's command that USAGM allocate the appropriated funds to the Networks, USAGM made grants to RFA and MBN on a yearly basis.

Annual appropriations legislation sets the amount that USAGM must allocate to RFA and MBN. In fiscal year 2024, Congress appropriated about $857 million to USAGM. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 735 (2024) (Supp.Add.1). The law mandated that USAGM's appropriation "shall be allocated in accordance with the table" in an accompanying explanatory statement. *Id*. The referenced table "allocated" approximately $60 million to RFA and $100 million to MBN. JA379. The appropriations act provides only one exception to that funding directive: "funds may be reprogrammed within and between amounts designated in [the] table," subject to congressional notification procedures, "except that no such reprogramming may reduce a designated amount by more than 5 percent." Supp.Add.1. Continuing resolutions extended the same

funding directives for RFA and MBN in fiscal year 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101, 139 stat. 9, 10-12 (2025).

3.  USAGM obligated the Networks their appropriated funds for fiscal year 2025 through grant agreements executed in early 2025.  JA381; JA418.  However, on March 15, 2025, USAGM sent each Network a one-page letter, signed by Defendant Kari Lake, terminating the grants.  Each letter provided the same terse rationale for the termination:  "The award no longer effectuates agency priorities."  JA339, JA363.  Each letter invoked an Executive Order "mandating that the USAGM eliminate all non-statutorily required activities and functions."  *Id.*

### B.    Procedural Background

The Networks challenged the grant terminations in the District Court for the District of Columbia.  The *Widakuswara* plaintiffs (seven individuals employed by USAGM, four labor unions, and RSF) challenged the government's effort to dismantle USAGM in the Southern District of New York.  *See Widakuswara v. Lake*, No. 25-cv-2390 (S.D.N.Y.).  Their challenge encompassed the termination of the Networks' grants, which directly harmed their members.  *See* p. 31, *infra*; JA135, 137-142, 145, 147-149, 152, 154-155, 283-284, 297.  Following issuance of a temporary restraining order, their case was transferred to the District of Columbia.

The D.C. district court entered preliminary injunctions in favor of the *Widakuswara* plaintiffs and the Networks, holding that the plaintiffs in each case were likely to show that USAGM's termination of the Networks' grants violated the IBA and appropriations statutes, as well as the Take Care Clause and separation-of-powers principles. JA23-31, 328-329. The court enjoined USAGM to "restore" the Networks' grants "such that international USAGM outlets can 'provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive.'" JA329 (quoting 22 U.S.C. § 6202(a), (b)).

The government appealed and sought a stay, which a divided motions panel granted. JA459. The panel held that the government would likely prevail in showing that the district court lacked jurisdiction under the Tucker Act because the Networks' claims sound in contract. The panel reasoned that the statutes require USAGM only to enter grants obligating the Networks' funding, and not to actually disburse the funds to the Networks. JA463-465. Judge Pillard dissented. In her view, the Networks' claims are statutory, not contractual. JA482-485.

Following petitions for rehearing, the en banc court granted the Networks' petition, vacated the stay, and denied the government's stay motion, "substantially for the reasons explained by Judge Pillard" in her dissent. JA518. The en banc court also emphasized the Networks' uncontested irreparable harm, as USAGM's withholding of funds threatened the Networks' viability. JA518-519.

## SUMMARY OF ARGUMENT

USAGM's decision to terminate the Networks' grants on the ground that those grants "no longer effectuate[] agency priorities," JA339, JA363, is a blatant violation of the IBA and the appropriations act directing that the Networks' funding "shall be allocated" to them, Supp.Add.1.  As the district court correctly held, USAGM's action violates the governing statutes, is arbitrary and capricious, and offends the Constitution.

The government does not even try to defend USAGM's conduct on the merits. It instead urges this Court to hold that the district court had no power to enjoin that conduct.  That argument is misconceived.  The Tucker Act does not divest the district court of jurisdiction, because the Networks' claims are statutory and constitutional— not contractual.  In all events, the Tucker Act has no bearing on the *Widakuswara* injunction, as those plaintiffs are not parties to the Networks' grant agreements.  The government also argues for the first time on appeal that the Impoundment Control Act ("ICA") precludes judicial review, but the government has fallen far short of mustering the clear and convincing evidence necessary to demonstrate that Congress intended to insulate the Executive's unlawful withholding of appropriated funding from all review.

The remaining injunction factors leave no doubt that the injunctions are proper.  Without them, the Networks would be forced to close, unable to continue

their critical mission of providing independent journalism in countries without a free press. Their staff, including TNG-CWA members, would be decimated. Journalists, including those represented by the *Widakuswara* plaintiffs, who depend on the Networks for work authorization and as a vital source of information, would face serious risk. By contrast, the government incurs no cognizable harm from following Congress's express directives.

## ARGUMENT

## I.     Appellees Are Likely to Succeed on the Merits.

### A.     The Government's Efforts to Evade Judicial Review of its Unlawful Conduct Fail.

The government never expressly argues that USAGM acted lawfully in defunding the Networks simply because its "priorities" differ from those of Congress. Instead, the government contends that the district court lacked jurisdiction to review that unlawful conduct because either the Tucker Act or the ICA bars review. Not so. USAGM's unprecedented actions violate Congress's express statutory commands and the Constitution. This case is where it belongs: in an Article III court.

### 1.     The Tucker Act Did Not Divest the District Court of Jurisdiction in *RFA* and *MBN*.

The government's contention that the Tucker Act impliedly forbids APA review depends on its assertion that the Networks' claim must be "contractual—not statutory" because USAGM did not violate any statute when it terminated the

Networks' appropriated funding based on the agency's policy "priorities." Br.57. But that premise is wrong. The IBA and the appropriations acts unequivocally entitle the Networks to receive their appropriated funding in order to perform their statutorily required functions. Those statutes are equally unequivocal in denying USAGM any authority to frustrate Congress's commands based on USAGM's decision that it no longer wishes to pursue the statutory objectives that Congress legislated. The Networks' APA claims are based on their statutory right to receive appropriated funding and seek enforcement of that right against the Executive's usurpation of congressional authority. The district court had jurisdiction to address those claims.

### a. The Networks' Statutory Right to Their Funding Is Clear.

i. The IBA and the relevant appropriations acts unambiguously establish the Networks' statutory right to receive their appropriated funding, subject to narrow exceptions that are not present here and that do not permit USAGM to substitute its policy priorities for Congress's.

Congress charged the Networks—which the IBA identifies by name, 22 U.S.C. § 6209(d)—with performing mandatory statutory functions. Congress stated that "United States international broadcasting *shall* include," among other things, providing "programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations." *See* 22 U.S.C. § 6202(b)

(emphasis added).  Congress also provided that "Radio Free Asia *shall* … provide accurate and timely information, news, and commentary about events in Asia and elsewhere." *Id.* § 6208(b) (emphasis added).  To enable the Networks to fulfill those functions, Congress has appropriated defined sums to the Networks each year since their creation, directing that those amounts "shall be allocated" to the Networks. Supp.Add.1.  Congress also commanded USAGM to distribute the Networks' appropriated funds through grants.  *See* 22 U.S.C. § 6204(a)(6); *id.* § 6204(a)(5) (Agency to "make and supervise grants" to the Networks).[1]

The statutory scheme establishes that USAGM has no discretion to withhold the Networks' appropriated funds in order to further its own "priorities."  First, and most fundamentally, USAGM grants are the exclusive means by which the Networks can obtain the appropriated funding they need to fulfill their statutory obligations. Congress thus necessarily contemplated that USAGM would distribute that funding through grants.  Put another way, because the IBA expressly directs the Networks to "provide programming" in particular regions, USAGM is not free to withhold funding based on its own view that providing such programming is not an Executive Branch "priority."

---

[1] As to RFA, Congress has specified that such grants "shall be available to make annual grants." 22 U.S.C. § 6208(a).

Second, Congress gave USAGM authority to withhold or terminate funding only if a Network fails to use its appropriated funds to further *Congress*'s expressed priorities—not USAGM's. The appropriations act provides that "funds appropriated under this heading *shall be made available* in accordance with the principles and standards set forth in" Sections 6202 and 6204, underscoring that USAGM must make the appropriated funding available to the Networks. Supp.Add.1 (emphasis added). By law, USAGM may terminate the grants only for failure to follow *Congress's* direction. *See, e.g.*, 22 U.S.C. § 6208(c)(5) (failure to use funds "for activities consistent with this section" "shall permit the grant to be terminated"). The statutory framework thus makes crystal clear that Congress left USAGM no discretion to withhold the Networks' appropriated funds based on the Executive's policy disagreement with Congress.

Third, Congress instructed in the appropriations acts that the Networks' designated funding amounts "shall be allocated" to them. Supp.Add.1. To "allocate" means to "*distribute*, allot, or apportion." *See* Allocate, Black's Law Dictionary (12th ed. 2024) (emphasis added); Allocate, Oxford English Dictionary ("to make a distribution or apportionment of (something) among several recipients"), Allocate, Merriam-Webster, https://www.merriam-webster.com/dictionary/allocate. USAGM thus has a duty to distribute those funds to the Networks in accordance with the statutory standards.

Any doubt is eliminated by the fact that Congress took the unusual step of prohibiting USAGM from reprogramming more than 5% of a Network's designated appropriated amount. "[A]gencies generally are free to reprogram" appropriated funds, GAO, Redbook 2-44, including to further their own policy priorities—but here Congress went out of its way to deny USAGM the lion's share of that authority. Congress expressly determined for itself *how much* funding was necessary for each Network to perform its statutory broadcasting functions—and that USAGM has no discretion to alter those amounts by more than 5% for its own policy reasons.

ii. The government does not even attempt to identify any statutory authority that would allow USAGM to withhold the Networks' funds based on USAGM's unstated "priorities." The government instead makes two primary arguments, both meritless. First, the government attacks a strawman, arguing that "the governing statutes do not give the networks an unqualified right to the appropriated funds." Br. 54, 56-57. But, as explained above, whatever limited authority USAGM possesses to ensure that the Networks use their appropriated funds to advance *Congress's* priorities, *see, e.g.*, 22 U.S.C. § 6208(c)(5), USAGM did not invoke that authority (nor could it have). The government identifies no provisions that permit USAGM to terminate the Networks' grants, or to withhold more than 5% of their appropriated funding, for USAGM's own policy reasons. That is because there are none.

The government next asserts, invoking Judge Katsas' stay-stage dissent, that the appropriations acts at most require USAGM to "enter grants *obligating* the appropriated amounts to the networks." Br. 55 (quoting JA466). In other words, as long as USAGM makes the funding theoretically available to the Networks by entering into grant agreements, the statute does not require USAGM actually to disburse the obligated funds. But even if the appropriations acts, considered in isolation, permitted USAGM to withhold funding based on its own policy priorities—they do not, *see* pp. 13-14, *supra*—the *IBA* requires disbursement. After all, the very reason that Congress directed that the appropriated amounts "shall be allocated" to the Networks is to enable them to perform the mandatory broadcasting functions set forth in the IBA. The government's suggestion that USAGM may grant the Networks the appropriated funds on paper, only to refuse actual payment, would permit USAGM to negate Congress's express statutory commands and *Congress's* policy determination that the Networks should further U.S. interests through international broadcasting. Congress did not "enact[] a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019). The Supreme Court has made exactly that point in the appropriations context, stating that where "legislation was intended to provide a firm commitment of substantial sums … to achieve an early solution of what was deemed an urgent problem," "[w]e cannot believe that Congress at the last minute scuttled the entire effort by providing the Executive with

the seemingly limitless power to withhold funds from allotment and obligation."
*Train v. City of New York*, 420 U.S. 35, 45-46 (1975); *accord In re Aiken Cnty.*, 725
F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (Executive "does not have
unilateral authority to refuse to spend [appropriated] funds" for "policy reasons").
The government seeks that same "seemingly limitless power" here. This Court
should enforce the separation of powers and deny it that power.

### b. The Networks' Claims Are Based on Their Statutory Rights and the Constitution, Not Any Contract.

The Networks' claims that USAGM exceeded its statutory authority and
violated the Constitution fall within the heartland of the Article III courts' authority.
This Court "determine[s] whether an action is in 'its essence' contractual"—and thus
diverted to the CFC—based on two considerations: (1) "the source of the rights
upon which the plaintiff bases its claims" and (2) "the type of relief sought (or
appropriate)." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017)
(citation omitted). The first inquiry turns on whether the claims are "founded only
on a contract," or instead "stem from a statute or the Constitution." *Transohio Sav.
Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992),
*overruled on other grounds by Perry Cap.*, 864 F.3d at 620. The second inquiry
"boils down to whether the plaintiff effectively seeks to attain monetary damages."
*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). Here, both
inquiries establish Article III jurisdiction.

16

i. First, the Networks' claims are grounded in statute and the Constitution—not their grant agreements. The Networks' point is that USAGM has violated the IBA and appropriations acts by terminating the Networks' funding based solely on USAGM's own policy priorities, in disregard of Congress's paramount constitutional authority. JA484 (Pillard, J.); *see* pp. 11-16, *supra*. USAGM's action is therefore contrary to law under the APA, 5 U.S.C. § 706(2), and offends the Take Care Clause and the separation of powers. Because those challenges "stem from a statute or the Constitution," they fall within the district courts' jurisdiction. *Crowley*, 38 F.4th at 1107.

By the same token, the Networks' challenge exists "prior to and apart from rights created under" their grant agreements. *Id*. (citation omitted). The Networks have never argued that USAGM breached those agreements. *See* pp 11-16, *supra*. This Court could thus decide the merits without even looking at the grant agreements, rendering the Tucker Act inapplicable. *See, e.g.*, *Crowley*, 38 F.4th at 1108-1109 (rejecting Tucker Act jurisdiction where the challenge "requires primarily an examination of the statutes the [government] has purportedly violated, not of [the plaintiff's] contract"); *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (same).

In fact, the CFC would not even have jurisdiction over the Networks' claims—so there must be jurisdiction in the district court, as this Court has

"reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). The Federal Circuit, whose precedent binds the CFC, has held that the CFC lacks jurisdiction over statutory claims that are materially indistinguishable from the Networks'—that is, where the plaintiff alleges a statutory right to appropriated funds congressionally designated for it, but the government contends that the plaintiff in effect seeks to enforce a contract governing "the terms under which [the plaintiff] was to proceed with respect to the appropriated funds." *National Center for Manufacturing Sciences v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997). The Federal Circuit held that the plaintiffs' APA claims were "plainly based on the Appropriations Act and therefore do not state a contract-based claim." *Id.* The Federal Circuit has also held that the CFC lacks jurisdiction over claims based on non-money mandating constitutional provisions, including the "doctrine of separation of powers." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). Because the CFC would lack jurisdiction here, the district courts must possess it. *Tootle*, 446 F.3d at 176.

The government's contrary arguments lack merit. The government's primary contention is that the Networks lack any statutory right to their funding, and thus their claims must sound in contract. Br.54-57. But the Networks *do* have statutory rights. *See* pp. 11-14, *supra*. The government advances the fallback that "Plaintiffs

seek to enforce a contractual agreement," Br.49, but that ipse dixit mischaracterization cannot alter the gravamen of the Networks' claims. The question is whether the Networks—who are masters of their complaint—allege statutory violations rather than contractual ones. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982). They do. Ultimately, the government's argument thus reduces to the untenable proposition that because Congress has created "a contractual scheme" for routing the Networks' appropriated funding to them, the very existence of those contracts extinguishes the Networks' statutory right to that funding and relegates them to contract claims. Br.49-50. But this Court has expressly held that the Tucker Act does not divest a district court of jurisdiction to enjoin a "clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971; *cf. Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011) (where Congress uses contracts to implement a statute, such contracts do not transform claims under the statutory scheme into contract claims).

Were the rule otherwise, the government could "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities." *Megapulse*, 672 F.2d at 971; *Bowen*, 487 U.S. at 905 (CFC "does not have the general equitable powers of a district court to grant prospective relief"). The contractual damages remedies available in the CFC typically cannot substitute

for the injunctive relief that is available only in district court, especially in cases like this one, where the steady availability of funding is essential to maintain an "ongoing relationship" between the parties. *Bowen*, 487 U.S. at 905. In allocating jurisdiction between the CFC and the district courts, Congress could not possibly have intended the severe *substantive* consequence of depriving the government's contractual counterparties of any statutory right that has a corresponding provision in the contract. This Court has rightly refused to "accept such an interpretation of the law." *Megapulse*, 672 F.2d at 971.

ii. The second consideration—the type of relief sought—confirms that the Tucker Act does not apply because the Networks seek injunctive relief, not "money damages." *Bowen*, 487 U.S. at 893. The Networks sought (and obtained) an injunction that requires restoration of their grant agreements. JA329. That remedy is not "money damages" because it is not "*compensation* for the damage sustained by the failure of the Federal Government to pay as mandated." *Bowen*, 487 U.S. at 900; *see id.* at 893; *Md. Dept of Hum. Res.*, 763 F.2d at 1446; *Nat'l Ctr. for Mfg. Sciences*, 114 F.3d at 200 (demand for appropriated funds "is not a demand for 'money damages'"). It is, instead, a classic request for prospective relief to govern the parties' "cooperative, ongoing relationship" with the government regarding "the allocation and use" of funds, *Nat'l Ctr. For Mfg. Scis*, 114 F.3d at 201—relief the CFC is powerless to grant, *see Bowen*, 487 U.S. at 905.

The government implicitly concedes that the Networks did not seek, and the court did not order, money damages. Nevertheless, the government insists that the remedy at issue is "inherently contractual" because it "in substance orders specific performance." Br.51. But this Court has rejected that argument: district courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract." *Transohio*, 967 F.2d at 611; *see also Md. Dept of Hum. Res.*, 763 F.2d at 1449. Rather, the operative question is "whether the plaintiff effectively seeks to attain monetary damages." *Crowley*, 38 F.4th at 1107. And the government's argument proves too much: it would foreclose jurisdiction over a statutory claim any time the government's unlawful conduct also violates a contract—something this Court has already rejected. *See* p. 19, *supra*.

iii. Lacking a sound argument under this Court's two-part test, the government falls back on inapposite cases.

The government first invokes the Supreme Court's stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025). Br.51-52. But that case is nothing like this one. The plaintiffs in *California* were discretionary grantees who did not allege that the termination of their grants violated *any statute*. Mem. ISO Mot. for TRO at 16-23, *California v. Dep't of Educ.*, 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7. Instead, the plaintiffs' alleged entitlement to funds arose solely from

21

grants awarded in the agency's discretion following a competitive process—and they contended only that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government invoked. *Id*. The Supreme Court unsurprisingly concluded that the plaintiffs sought to "enforce a contractual obligation," notwithstanding their invocation of the APA. *California*, 145 S. Ct. at 968 (citation omitted).

The government's other case, *Ingersoll-Rand Co. v. United States*, is to the same effect. Br.53-54. There, the Air Force awarded a procurement contract to the plaintiff. Without any statutory right to the contract, the plaintiff contended that "the *contract* forbids termination under th[e] conditions" presented—a quintessential Tucker Act claim. 780 F.2d 74, 78 (D.C. Cir. 1985) (emphasis added).

Those decisions in no way dictate the answer here, in a statutory and constitutional case wholly divorced from any contract terms. Indeed, the Networks would have the very same claims even if "the grant agreements never existed at all." JA485-86 (Pillard, J.). The plaintiffs in *California* and *Ingersoll-Rand* could not possibly say the same.

iv. Finally, the government's jurisdictional argument—that the Tucker Act renders the APA's sovereign-immunity waiver inapplicable—implicates only the Networks' statutory claims, not their constitutional ones. Br.46. The latter claims do not rely on the APA's waiver of sovereign immunity. "Constitutional claims for

injunctive or declaratory relief face no sovereign immunity bar." JA485 (Pillard, J.) (citing *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012)). The Tucker Act provides no other basis, express or implied, to divest Article III courts of jurisdiction over separation-of-powers claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.").

### 2. The Tucker Act Cannot Bar the *Widakuswara* Injunction.

In all events, the Tucker Act cannot affect the *Widakuswara* plaintiffs' challenges to the grant terminations because those plaintiffs have no contract with the government and could not conceivably vindicate their rights in the CFC. As explained, *see* pp. 17-18, *supra*, this Court has "categorically reject[ed]" the idea that "a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle*, 446 F.3d at 176. No jurisdiction would lie in the CFC for the *Widakuswara* plaintiffs' claims because jurisdiction for contract claims under the Tucker Act (with only limited, inapplicable exceptions the government has never invoked) requires a contract "between the plaintiff and the government"—and the *Widakuswara* plaintiffs have no contract with the government. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998).

That leaves only the district court for *Widakuswara* plaintiffs TNG-CWA and RSF to challenge the grant terminations that harm them. Contrary to Defendants' glancing assertion (at Br.50 n.2), the injunctions *are* redressing harms to TNG-CWA and RSF. Terminating the Networks' grants would require severe cuts to TNG-CWA members' employment—including health coverage and work-visa status—and would shut down reporting on which both organizations' members rely.

### 3. The Impoundment Control Act Does Not Preclude Judicial Review.

For the first time on appeal, the government asserts the sweeping and unprecedented claim that the ICA precludes review of the Executive's unlawful refusal to disburse funds in accordance with the commands of the IBA and appropriations acts. Br.57-62. That contention is meritless.

As an initial matter, the government's argument that the "[ICA] does not have a private cause of action" is irrelevant. Br.58. The Networks have not alleged any violation of the ICA.

To the extent the government contends that the ICA precludes private parties from obtaining judicial review under the APA in *any* case alleging withholding of appropriated funds (whether or not the ICA is implicated), Br.60, that is equally meritless. The APA creates a "presumption favoring judicial review of administrative action," *Sackett v. EPA*, 566 U.S. 120, 128 (2012), that may be overcome only by "'clear and convincing evidence' of congressional intent to

preclude judicial review," *Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (citation omitted). "[T]he presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority." *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988).

There is nothing close to clear and convincing evidence of congressional intent to preclude judicial review here. The ICA regulates the relationship between *Congress* and the *Executive*—not the government and private parties—by requiring the Executive to notify Congress when it wishes to hold back appropriated funds from obligation and establishing a procedure for Congress to approve or override those decisions. 2 U.S.C. § 683. If Congress does not approve a proposed rescission within 45 days, the ICA states that the funds in question "shall be made available for obligation." 2 U.S.C. § 683(b). The Comptroller General—an officer within the legislative branch—may file suit when "*under this chapter*, budget authority is required to be made available for obligation and such budget authority is not made available for obligation." 2 U.S.C. § 687 (emphasis added). Thus, the Comptroller General may sue only in the narrow situation in which "under this chapter" (i.e.,

under the ICA, which constitutes Chapter 17B of Title 2) the Executive "is required" to "obligat[e]" funds but does not do so.[2]  *Id*.; *id*. § 683(b).

Nothing about those congressional-executive procedures remotely suggests that Congress intended to broadly preclude all APA actions concerning executive withholding of appropriated funds.  The ICA provides a review mechanism for the Comptroller General, asserting Congress's prerogatives, when the Executive has refused to make funds "available for obligation" despite Congress's expressed disagreement with that decision.  2 U.S.C. § 687; *id*. § 683.  But the statute does not address disputes between private parties and the Executive over funding that Congress has specifically directed to private parties, or the many means—beyond refusing to *obligate* funds—that the Executive might employ to deny a private party appropriated funding (such as refusing to transfer already-obligated funds to a party's account).  Nor does the ICA purport to empower the Comptroller General to sue on private parties' behalf (and it is doubtful that the Comptroller General would have standing to do so).  The ICA is thus narrowly focused on the interchange between Congress and the Executive, and the Comptroller General's right of action is similarly limited.  Nothing in Congress's regulation of its own relationship with

---

[2] The Comptroller General has sued under the ICA only once, in 1975.  *See* Sean Stiff, Cong. Rsch. Serv., RL46417, *Congress's Power Over Appropriations: Constitutional and Statutory Provisions* 56 (2020).

the Executive suggests, much less provides clear and convincing evidence, that Congress intended to preclude suits by private parties. To be sure, Congress's provision of particularly "detailed mechanism[s] for judicial consideration of particular issues at the behest of particular persons," can in some circumstances indicate congressional intent to preclude review of the *same* agency decisions "at the behest of other persons," *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984). But the government cites no authority suggesting that a carefully circumscribed statute permitting a legislative branch officer to sue to enforce Congress's prerogatives in the context of congressional-executive disputes could broadly preclude review of private parties' challenges to the distinct executive decisions that deny appropriated funding to private parties. *See Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 734, (2022) (no "textual basis" for precluding review of particular agency decision where statute merely precluded review of *other* decisions); *Webster*, 486 U.S. at 603.

That conclusion is reinforced by the fact that if the government were correct, the Executive's unlawful withholding of funds from parties like the Networks would likely be entirely insulated from judicial review. The Comptroller General would have no right of action in many such cases (i.e., where the funds have already been obligated but the Executive refuses to disburse them), and the Comptroller General has *never* in the decades since the ICA's enactment brought suit seeking obligation

27

of funds to a private party. At the same time, no private party would be able to seek review under the APA, even though courts have consistently declined to find preclusion of APA review in those circumstances. *See, e.g., Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (court declines to infer intent to preclude review where construction would "wholly deprive" parties of means of enforcing "statutory rights").

Just as fundamentally, Congress enacted the ICA "at a time when Congress was united in its furor over presidential impoundments," particularly those based on the Executive's policy disagreements with Congress. *City of New Haven, Conn. v. United States*, 809 F.2d 900, 906, 909 (D.C. Cir. 1987). It is therefore implausible to think that Congress could have intended, in enabling the Comptroller General to sue to require obligation in the specific context of the ICA's congressional-executive exchange, to preclude *all* private entities from challenging the Executive's unlawful withholding of funds in *all* situations. Doing so would not only permit the Executive to nullify Congress's appropriations decisions; it would also render unenforceable *other* statutes like the IBA, which direct disbursement of appropriated funds to identified entities to perform statutory missions. Such a reading of the ICA would upend the separation of powers by making courts largely powerless to enforce Congress's exercise of its Article I powers when the Executive seeks to arrogate

those powers to itself by violating statutory commands to disburse funds. Congress would never have taken such a step.

Indeed, this Court and the Supreme Court have long rejected Executive claims of "unreviewable" and "seemingly limitless power to withhold funds" appropriated by Congress. *Train*, 420 U.S. at 46; *Aiken Cnty.*, 725 F.3d at 261 n.1. This Court should not grant any Executive that very authority by adopting the government's textually indefensible reading of the ICA.

## B. The Government Does Not Contest the Merits of Appellees' Claims.

The district court correctly concluded that USAGM's unlawful withholding of the Networks' funds based on unexplained "agency priorities" violates the Administrative Procedure Act as "arbitrary and capricious" agency action, agency action "not in accordance with law," and agency action unlawfully withheld. JA25-JA29, JA31; 5 U.S.C. § 706(1)-(2)(A). Beyond the government's meritless argument (in service of its jurisdictional contentions) that the Networks lack a statutory right not to have their funding terminated based on non-statutory agency policy determinations, the government does not challenge the district court's APA holdings on appeal. Nor does the government contest the district court's conclusion that USAGM's withholding of funds, in defiance of the IBA and appropriations acts, likely violates the Take Care Clause and the constitutional separation of powers. *See*

JA29-JA30.  This Court should therefore hold that Appellees have demonstrated a likelihood of success on their claims.

## II.   The Remaining Injunction Factors Support Relief.

The preliminary injunctions are protecting against irreparable injuries:  the Networks depend on regular disbursement of their appropriated funds for their survival, and the *Widakuswara* plaintiffs depend on the Networks for employment, work authorization necessary for their safety, and vital reporting.  Moreover, both equity and the public interest favor requiring the government to follow the law during the pendency of litigation.

### A.   The Injunctions Are Preventing Irreparable Harm.

1.  As the en banc court concluded, terminating the Networks' grants would "promptly and severely threaten their continued viability, rendering them unable to exist except as a formal matter and making it unlikely that they could recover even if they ultimately prevail on their claims."  JA518; *see* JA372 (RFA declaration); JA375 (MBN declaration).  This "existential threat," JA492 (Pillard, J.), unquestionably qualifies as irreparable harm.  *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

The government does not contest any of the Networks' sworn statements documenting the injuries they would suffer absent an injunction.  The government nevertheless insists that those injuries are insufficient because they are monetary—

in the government's view (Br.65), "the classic example of reparable harm." But this Court has squarely rejected that argument; even "[r]ecoverable monetary loss may constitute irreparable harm" where "the loss threatens the very existence of the movant's business." *Id.* at 674. As the en banc court determined, that is precisely the showing that the Networks have made, and that the government has failed to contest.

Moreover, the Networks do not rely solely on monetary harms. Each has attested without refutation that, absent regular funding, it would be forced to shut down core operations, JA334-335 (RFA), JA355 (MBN)—imperiling its ability to fulfill its congressionally assigned mission. That is classic irreparable harm. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The Networks also attested, again without dispute, that the terminations would tarnish their reputations as reliable news organizations. JA341-344 (RFA), JA355-358 (MBN). That too is irreparable harm. *See, e.g., Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962).

2. The grant terminations also cause irreparable harm to *Widakuswara* plaintiffs TNG-CWA and RSF. Over 100 TNG-CWA members work at RFA and face multiple irreparable harms, including unrecoverable income losses, JA137; *In re NTE Connecticut, LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022), and loss of health insurance necessary for lifesaving treatment, JA283-284; *Risteen v. Youth For*

31

*Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002). Some face losing their work visas, and being forced to return to autocratic countries where their prior journalism will put them at risk. JA139, 147-148, 154-155, 284; *see also* JA343 (RFA declaration supporting same). TNG-CWA will also itself suffer harm from unrecoverable lost dues. JA138. The Networks' defunding also harms journalist members of TNG-CWA and RSF who rely on RFA reporting to inform not only their own reporting, but also their personal safety as they work in countries that otherwise lack free press. JA126-127, 139-141, 297.

3.   Against the weight of these overwhelming irreparable injuries, the government protests that it too is being injured—by "being ordered to shell out millions of dollars on grant agreements it attempted to terminate" and that it "is unlikely to recover." Br.64 (citation omitted). The en banc court rejected that argument because "the government has not contended that it will ultimately prevail in establishing an entitlement to those funds; it instead has argued solely that, as a jurisdictional matter, the entitlement must be determined in another forum." JA518. The government suffers no cognizable injury from losing funds that it does not argue it has a legal entitlement to keep. *See C.G.B. v. Wolf*, 464 F.Supp.3d 174, 218 (D.D.C. 2020).

Finally, any harm suffered by the government pales in comparison to the existential threat facing the Networks. For that reason, the government's invocation

of *California* (again) does not assist (again).  In that case, the grantees represented "that they have the financial wherewithal to keep their programs running."  145 S. Ct. at 969.  Here, the opposite is true.

## B.  The Balance of Equities and Public Interest Support the Injunctions.

"The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'"  *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (citations omitted).  Those factors conclusively support injunctive relief.  The injunctions require USAGM to stop its unlawful conduct—which the government does not defend on appeal.  "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," and "generally no public interest in the perpetuation of unlawful agency action."  *Newby*, 838 F.3d at 12 (citation omitted).  Equity likewise favors the injunctions, which allow the Networks to survive while seeking a final judgment.  *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1330 (D.C. Cir. 2024) (equity favors allowing a party to "fully litigate[]" its claims "without being throttled by a shutdown of its business").

The government responds that "the public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Agency and its broadcasting networks."  Br.67.  But it is Congress's role to make spending decisions, and the President's role faithfully to implement them.  *See*

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992). And here, Congress has been direct and explicit: it is "in the interest of the United States to support broadcasting to other nations," 22 U.S.C. § 6201(3), and federal dollars "shall be allocated" to further that mission, Supp.Add.1. It does not serve the public interest for "networks charged with exemplifying the ideals of free speech, free opinion, and a free press to the world at large" to be "silenced by our own government's action in disregard of the expressed will of Congress." JA495 (Pillard, J.).

## CONCLUSION

The Court should affirm the preliminary injunctions requiring restoration of the Networks' grants.

Dated: July 15, 2025

Respectfully submitted,

DEMOCRACY FORWARD
FOUNDATION

MUNGER, TOLLES & OLSON LLP

_____/s/_____

Kristin Bateman*
Jennifer Fountain Connolly
Robin F. Thurston
Skye L. Perryman
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
jconnolly@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Donald B. Verrilli, Jr.*_____
Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
601 Massachusetts Ave. NW, Ste. 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

*Counsel for Plaintiffs-Appellees
American Federation of State, County
and Municipal Employees (AFSCME);
American Federation of Government
Employees (AFGE); American Foreign
Service Association (AFSA); Middle
East Broadcasting Networks, Inc.; the
NewsGuild-CWA; and Radio Free Asia*

Hailyn J. Chen
Adeel Mohammadi
350 S. Grand Ave., Fiftieth Floor
Los Angeles, CA 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn
560 Mission St., Twenty-Seventh Floor
San Francisco, CA 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

*Counsel for Plaintiffs-Appellees Middle
East Broadcasting Networks, Inc. and
Radio Free Asia*

*Admitted in California only;
practicing under the supervision of
District of Columbia Bar members

GOVERNMENT
ACCOUNTABILITY PROJECT

_____/s/_____
David Z. Seide
1612 K Street, NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

*Counsel for Plaintiffs-Appellees Patsy*
*Widakuswara, Jessica Jerreat, Kathryn*
*Neeper, John Doe 1, John Doe 2, John*
*Doe 3, and John Doe 4*

AMERICAN FEDERATION OF
STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, AFL-
CIO (AFSCME)

_____/s/_____
Teague Paterson
Matthew Blumin
Georgina Yeomans
1625 L Street, N.W.
Washington, D.C. 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff-Appellee*
*American Federation of State, County,*
*and Municipal Employees, AFL-CIO*
*(AFSCME)*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Plaintiffs-Appellees Patsy*
*Widakuswara, Jessica Jerreat, Kathryn*
*Neeper, John Doe 1, John Doe 2, John*
*Doe 3, John Doe 4, American Federation*
*of State, County and Municipal*
*Employees (AFSCME); American*
*Federation of Government Employees*
*(AFGE); American Foreign Service*
*Association (AFSA); and the NewsGuild-*
*CWA*

STATE DEMOCRACY DEFENDERS
FUND

_____/s/_____
Norman L. Eisen
Joshua Kolb
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans Frontières,*
*Reporters Without Borders, Inc.,*
*American Federation of State, County*
*and Municipal Employees (AFSCME);*
*and American Federation of*
*Government Employees (AFGE)*

MEDIA FREEDOM &
INFORMATION ACCESS CLINIC -
YALE LAW SCHOOL\*\*

_____/s/_____
David A. Schulz
127 Wall Street
New Haven, CT 06520
tobin.raju@YLSClinics.org
David.schulz@YLSClinics.org

*Counsel for Plaintiffs-Appellees Patsy*
*Widakuswara, Jessica Jerreat, Kathryn*
*Neeper, and John Does 1-4*

\*\* The views expressed herein do not
purport to represent the institutional
views of Yale Law School, if any.

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp
Raeka Safai
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff-Appellee American*
*Foreign Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-
CIO

_____/s/_____
Rushab Sanghvi
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for Plaintiff-Appellee American*
*Federation of Government Employees,*
*AFL-CIO (AFGE)*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in this Court's Order of June 9, 2025, because it contains 7,488 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 15 2025

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I certify that on July 15, 2025, a true and correct copy of this filing was filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.

Dated: July 15, 2025

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

# SUPPLEMENTAL ADDENDUM

# INDEX TO SUPPLEMENTAL ADDENDUM

Further Consolidated Appropriations Act of 2024,
 Pub. L. No. 118-47, 138 Stat. 460, 735-736 (2024) [excerpt] .................... Supp.Add.1

### INTERNATIONAL FISHERIES COMMISSIONS

For necessary expenses for international fisheries commissions, not otherwise provided for, as authorized by law, $65,719,000: *Provided,* That the United States share of such expenses may be advanced to the respective commissions pursuant to section 3324 of title 31, United States Code.

## RELATED AGENCY

### UNITED STATES AGENCY FOR GLOBAL MEDIA

#### INTERNATIONAL BROADCASTING OPERATIONS

For necessary expenses to enable the United States Agency for Global Media (USAGM), as authorized, to carry out international communication activities, and to make and supervise grants for radio, Internet, and television broadcasting to the Middle East, $857,214,000, of which $42,861,000 may remain available until September 30, 2025: *Provided,* That in addition to amounts otherwise available for such purposes, up to $75,722,000 of the amount appropriated under this heading may remain available until expended for satellite transmissions, global network distribution, and Internet freedom programs, of which not less than $43,500,000 shall be for Internet freedom programs: *Provided further,* That of the total amount appropriated under this heading, not to exceed $35,000 may be used for representation expenses, of which $10,000 may be used for such expenses within the United States as authorized, and not to exceed $30,000 may be used for representation expenses of Radio Free Europe/Radio Liberty: *Provided further,* That funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act): *Provided further,* That notwithstanding the previous proviso, funds may be reprogrammed within and between amounts designated in such table, subject to the regular notification procedures of the Committees on Appropriations, except that no such reprogramming may reduce a designated amount by more than 5 percent: *Provided further,* That funds appropriated under this heading shall be made available in accordance with the principles and standards set forth in section 303(a) and (b) of the United States International Broadcasting Act of 1994 (22 U.S.C. 6202) and section 305(b) of such Act (22 U.S.C. 6204): *Provided further,* That the USAGM Chief Executive Officer shall notify the Committees on Appropriations within 15 days of any determination by the USAGM that any of its broadcast entities, including its grantee organizations, provides an open platform for international terrorists or those who support international terrorism, or is in violation of the principles and standards set forth in section 303(a) and (b) of such Act or the entity's journalistic code of ethics: *Provided further,* That in addition to funds made available under this heading, and notwithstanding any other provision of law, up to $5,000,000 in receipts from advertising and revenue from business ventures, up to $500,000 in receipts from cooperating international organizations, and up to $1,000,000 in receipts from privatization efforts of the Voice of America and the International Broadcasting Bureau, shall remain available until expended for carrying out authorized purposes: *Provided further,*

*Allocations.*

*Notifications.*

*Notifications.*
*Deadline.*
*Determination.*
*Terrorism.*

Notifications.

That significant modifications to USAGM broadcast hours previously justified to Congress, including changes to transmission platforms (shortwave, medium wave, satellite, Internet, and television), for all USAGM language services shall be subject to the regular notification procedures of the Committees on Appropriations: *Provided further,* That up to $7,000,000 from the USAGM Buying Power Maintenance account may be transferred to, and merged with, funds appropriated by this Act under the heading "International Broadcasting Operations", which shall remain available until expended: *Provided further,* That such transfer authority is in addition to any transfer authority otherwise available under any other provision of law and shall be subject to prior consultation with, and the regular notification procedures of, the Committees on Appropriations.

Transfer authority.

Consultation. Notifications.

### BROADCASTING CAPITAL IMPROVEMENTS

For the purchase, rent, construction, repair, preservation, and improvement of facilities for radio, television, and digital transmission and reception; the purchase, rent, and installation of necessary equipment for radio, television, and digital transmission and reception, including to Cuba, as authorized; and physical security worldwide, in addition to amounts otherwise available for such purposes, $9,700,000, to remain available until expended, as authorized.

## RELATED PROGRAMS

### THE ASIA FOUNDATION

For a grant to The Asia Foundation, as authorized by The Asia Foundation Act (22 U.S.C. 4402), $22,000,000, to remain available until expended.

### UNITED STATES INSTITUTE OF PEACE

For necessary expenses of the United States Institute of Peace, as authorized by the United States Institute of Peace Act (22 U.S.C. 4601 et seq.), $55,000,000, to remain available until September 30, 2025, which shall not be used for construction activities.

### CENTER FOR MIDDLE EASTERN-WESTERN DIALOGUE TRUST FUND

For necessary expenses of the Center for Middle Eastern-Western Dialogue Trust Fund, as authorized by section 633 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2004 (22 U.S.C. 2078), the total amount of the interest and earnings accruing to such Fund on or before September 30, 2024, to remain available until expended.

### EISENHOWER EXCHANGE FELLOWSHIP PROGRAM

For necessary expenses of Eisenhower Exchange Fellowships, Incorporated, as authorized by sections 4 and 5 of the Eisenhower Exchange Fellowship Act of 1990 (20 U.S.C. 5204–5205), all interest and earnings accruing to the Eisenhower Exchange Fellowship Program Trust Fund on or before September 30, 2024, to remain